**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| TERESA GOUCH, DENISE SPANOS, GEORGE AMERSON, KYLE MUMMEY, and MARCIA BEASLEY, individually and on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>        v.<br><br>BLUE CROSS BLUE SHIELD ASSOCIATION,<br><br>        Defendant. | Case No. 1:23-cv-15709<br>Honorable John J. Tharp, Jr. |

**DEFENDANT BLUE CROSS BLUE SHIELD ASSOCIATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 2

   I.    BCBSA and the Federal Employee Program. ....................................................... 2

   II.   BCBSA's Cookie Banner and Privacy Policy ...................................................... 5

   III.  Website Access and Analytic Technologies ......................................................... 6

   IV.  Plaintiffs' Claims. ................................................................................................. 8

LEGAL STANDARD .................................................................................................. 10

ARGUMENT ............................................................................................................... 10

   I.    Plaintiffs' Wiretapping and Eavesdropping Claims Fail to Allege Facts Establishing the Elements of these Claims and Are Barred by Exceptions. ............................................... 10

        A.   The CIPA and IES Claims Fail Because Plaintiffs Do Not Plausibly Allege Lack of Consent to the Data Collection Practices at Issue. ...................................... 11

        B.   The Party Exception Precludes the ECPA and CIPA Claims. ............................. 14

        C.   The ECPA, CIPA, and IES Claims Also Fail Because the Tech Companies Were Party to the Communications and Therefore no Interception Occurred. ................. 18

   II.   ICTA – a Law Prohibiting Use of Computer Viruses – Does Not Apply to the Pixel Tracking Alleged. ....................................................................................................... 19

   III.  Plaintiffs' Common Law Claims Are Barred by the Filed Rate Doctrine and Other Deficiencies. .............................................................................................................. 20

        A.   Plaintiffs' Claims for "Benefit of the Bargain" Damages Must Be Dismissed Under the Filed Rate Doctrine Because Awarding Such Damages Would Undermine OPM's Exclusive Authority to Negotiate FEHBA Rates. ....................................... 20

        B.   The Invasion of Privacy Claim Also Fails Because Plaintiffs Do Not Allege Public Disclosure. ....................................................................................................... 24

        C.   Plaintiffs Cannot Claim Breach of Implied Contract When There Is an Express Contract Established by the Cookie Banner and Privacy Policy. ............................ 25

        D.   The Unjust Enrichment Claim Is Untenable Where There Is an Express or Implied Contract and is Not a Recognized Claim Under Governing Illinois Law. .............. 26

        E.   Plaintiffs' Negligence Claim Also Fails Because Plaintiffs Do Not Plausibly Allege Any Facts Supporting the Elements of the Claim. ................................................ 27

CONCLUSION ............................................................................................................ 27

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                           **Page(s)**

*Allen v. Brown Advisory, LLC*,
    41 F.4th 843 (7th Cir. 2022) ................................................................................................10

*In re Anthem, Inc. Data Breach Litig.*,
    2016 WL 3029783 (N.D. Cal. May 27, 2016) ...............................................................22, 23

*Arkansas Louisiana Gas Co. v. Hall*,
    453 U.S. 571 (1981)...........................................................................................................21

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................................10, 27

*B.K. v. Eisenhower Med. Center*,
    2024 WL 878100 (C.D. Cal. Feb. 29, 2024).....................................................14, 15, 26, 27

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...........................................................................................................10

*Bradley v. Google, Inc.*,
    2006 WL 3798134 (N.D. Cal. Dec. 22, 2006) ....................................................................11

*Caro v. Weintraub*,
    618 3d 94, 98-100 (2d Cir. 2010) ......................................................................................14

*Denius v. Dunlap*,
    330 F.3d 919 (7th Cir. 2003) ...............................................................................................8

*Enger v. Chi. Carriage Cab Corp.*,
    812 F.3d 565 (7th Cir. 2016) .............................................................................................26

*In re Facebook, Inc. Internet Tracking Litig.*,
    956 F.3d 589 (9th Cir. 2020) .............................................................................................14

*Fero v. Excellus Health Plan, Inc.*,
    236 F. Supp. 3d. 735 (W.D.N.Y. 2017) .............................................................................22

*Garcia v. Enter. Holdings, Inc.*,
    78 F. Supp. 3d 1125 (N.D. Cal. 2015) ...............................................................................13

*Gociman v. Loyola Univ. of Chicago*,
    41 F.4th 873 (7th Cir. 2022) ..........................................................................................5, 26

*Goldwasser v. Ameritech*,
    222 F.3d 390 (7th Cir. 2000) ........................................................................................20, 21

*In re Google Assistant Privacy Litig.*,
   457 F. Supp. 3d 797 (N.D. Cal. 2020) ................................................................12

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
   934 F.3d 316 (3d Cir. 2019)..............................................................14, 18, 19

*Graham v. Noom, Inc.*,
   533 F. Supp. 3d 823 (N.D. Cal. 2021) ................................................................15

*Halperin v. Int'l Web Servs., LLC*,
   123 F. Supp. 3d 999 (N.D. Ill. 2015) ................................................................20

*Health Care Serv. Corp. v. Methodist Hosps. of Dallas*,
   2015 WL 11120541 (N.D. Tex. Jan. 28, 2015), *aff'd* 814 F.3d 242 (5th Cir.
   2016) ................................................................................................................4

*Health Care Serv. Corp. v. Methodist Hosps. of Dallas*,
   814 F.3d 242 (5th Cir. 2016) ................................................................................3

*Helfrich v. Blue Cross & Blue Shield Ass'n*,
   804 F.3d 1090 (10th Cir. 2015) ................................................................4

*Hoffman v. N. States Power Co.*,
   764 N.W.2d 34 (Minn. 2009).................................................................24

*Kurowski v. Rush Sys. For Health*,
   2023 WL 4707184 (N.D. Ill. July 24, 2023)..............................................17, 24, 25

*Kurowski v. Rush Sys. for Health*,
   2023 WL 8544084 (N.D. Ill. Dec. 11, 2023) .............................................17

*Kurowski v. Rush Sys. for Health*,
   659 F. Supp. 3d 931 (N.D. Ill. 2023) ....................................................14, 16, 17

*Landale Signs & Neon, Ltd. v. Runnion Equip. Co.*,
   2016 WL 7409916 (N.D. Ill. Dec. 22, 2016)........................................25

*Lax v. Mayorkas*,
   *20 F.4th 1178 (7th Cir. 2021)* ................................................................3

*Licea v. Vitacost.com, Inc.*,
   2023 WL 5086893 (S.D. Cal. July 24, 2023) .........................................15

*Marcatante v. City of Chicago, Ill.*,
   657 F.3d 433 (7th Cir. 2011) .................................................................25

*Marcus v. AT&T Corp.*,
   138 F.3d 46 (2d Cir. 1998)....................................................................24

*Mashallah, Inc. v. W. Bend Mut. Ins. Co.*,
    20 F.4th 311 (7th Cir. 2021) ...........................................................................26

*McCauley v. City of Chicago*,
    671 F.3d 611 (7th Cir. 2011) ...................................................................10, 20

*Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*,
    341 U.S. 246 (1951).........................................................................................20

*Murphy v. Thomas Jefferson Univ. Hosps., Inc.*,
    2023 WL 7017734 (E.D. Pa. Oct. 10, 2023)...................................................27

*New v. Verizon Commc'ns, Inc.*,
    635 F. Supp. 2d 773 (N.D. Ill. 2008) ..............................................................25

*Northeastern Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*,
    707 F.3d 883 (7th Cir. 2013) ...........................................................................20

*Perkins v. LinkedIn Corp.*,
    53 F. Supp. 3d 1190 (N.D. Cal. 2014) .......................................................11, 13

*Rios v. State Farm Fire & Cas. Co.*,
    469 F. Supp. 2d 727 (S.D. Iowa 2007) ............................................................22

*Roehrborn v. Lambert*,
    277 Ill. App. 3d 181 (1995) .............................................................................25

*Silver v. Stripe Inc.*,
    2021 WL 3191752 (N.D. Cal. July 28, 2021).................................................13

*Simon v. KeySpan Corp.*,
    694 F.3d 196 (2d Cir. 2012).............................................................................22

*Smith v. Facebook, Inc.*,
    262 F. Supp. 3d 943 (N.D. Cal. 2017), *aff'd* 745 F. Appx. 8 (9th Cir. 2018).............12, 13, 14

*South Branch LLC v. Commonwealth Edison Co.*,
    46 F.4th 646 (7th Cir. 2022) ...............................................................20, 21, 22

*Stanford Health Care v. Blue Cross Blue Shield of N. Carolina, Inc.*,
    2022 WL 195847 (N.D. Cal. 2022) ..................................................................25

*Tierney v. Vahle*,
    *304 F.3d 734 (7th Cir. 2002)* ............................................................................3

*Ward v. K Mart Corp.*,
    554 N.E.2d 223 (Ill. 1990)...............................................................................27

**Statutes, Rules & Regulations**

5 C.F.R. § 890.503(c)(2) ................................................................................. 4

48 C.F.R. § 1632.170(b) .................................................................................. 4

48 C.F.R. § 1632.170(b)(1) ............................................................................. 4

48 C.F.R. § 1652.216-71(b) ............................................................................ 4

48 C.F.R. § 1652.232-71(d) ............................................................................ 4

720 ILCS 5/14-1(g) ...................................................................................... 11

720 ILCS 5/17-51(a)(4) ................................................................................ 19

720 ILCS 5/17-51(c) .................................................................................... 19

5 U.S.C. § 8901(7) ......................................................................................... 2

5 U.S.C. § 8902(i) ..................................................................................... 3, 23

5 U.S.C. § 8902-03 ........................................................................................ 2

5 U.S.C. § 8903(1) ......................................................................................... 2

5 U.S.C. § 8906(b)(1) .................................................................................... 4

5 U.S.C. § 8906(b)(2) .................................................................................... 4

5 U.S.C. § 8906(f) ......................................................................................... 4

5 U.S.C. § 8909(a) ......................................................................................... 4

5 U.S.C. § 8909(b) ......................................................................................... 4

5 U.S.C. § 8913 .............................................................................................. 2

18 U.S.C. § 2511(2)(d) ............................................................................ 14, 19

42 U.S.C. § 1320d(6) .................................................................................... 16

42 U.S.C. § 1320d-6(a)(3) ....................................................................... 15, 16

720 Ill. Stat. § 5/14-2(a)(3) .......................................................................... 11

Cal. Pen. Code § 631(a) ........................................................................... 11, 15

California Invasion of Privacy Act, Cal. Penal Code §§ 630-637.2 ..................... *passim*

Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), et seq. ............................... *passim*

Fed. R. Civ. P. 12(b)(6) ........................................................................................................... 3

Fed. R. Civ. P. 12(c) ............................................................................................................... 3

Federal Employees Health Benefits Act, 5 U.S.C. §§ 8901-8914 ......................................... 2

HIPAA ............................................................................................................................. 15, 18

Illinois Computer Tampering Act, 720 ILCS 5/17-51, et seq .................................................. 9

**Other Authorities**

H.R. Rep. No. 105-374 (1997) ........................................................................................... 3, 24

## **INTRODUCTION**

This case is part of a wave of privacy litigation against healthcare-related companies regarding their use of tracking or analytics tools on their websites. Unlike most of these other cases, however, plaintiffs do not – and cannot – allege that Blue Cross Blue Shield Association ("BCBSA") uses tracking code on its secured portal for insureds, where personal patient information might be implicated. Rather, Plaintiffs challenge BCBSA's use of these website tools on its publicly available website www.fepblue.org (the "Public Website"), which prominently warns users that cookies are used and through which Plaintiffs agreed to a Privacy Policy disclosing the use of tracking technologies.[1] In other words, on the face of the pleadings, no privacy violation occurred and the case must be dismissed.

*First*, Plaintiffs' federal, Illinois, and California wiretapping claims (Counts I, II, and IV) fail for multiple reasons:

- Given that (1) BCBSA discloses its use of tracking and analytics technologies through a cookie banner and its privacy policy and (2) TikTok, Facebook, LinkedIn, and Google separately disclose their use of cookies to accountholders, Plaintiffs have not and cannot plausibly alleged lack of consent for their Illinois and California claims.

- Because BCBSA was a party to and did not intercept the communications for the purposes of committing a crime or tort, BCBSA cannot be liable under the federal or California statute.

- No interception or eavesdropping occurred because the third-party technology companies were each a party to the communications.

---

[1] Plaintiffs filed the initial Complaint on November 7, 2023. Dkt. 1. On January 26, 2024, they filed the Amended Complaint; the revisions that fail to salvage their insufficiently pled claims. Dkt. 22.

***Second***, Plaintiffs' computer tampering claim fails because Plaintiffs do not allege facts to suggest that BCBSA damaged, destroyed, altered, deleted, or removed data or that BCBSA's conduct was unauthorized.

***Third***, Plaintiffs insufficiently plead their common law claims (Counts V–VIII). They are not entitled to "benefit of the bargain" damages under any of those claims due to the filed rate doctrine, which prohibits courts from questioning a rate that has been filed with a federal regulator. Furthermore, their claims fail as boilerplate recitation of the elements without factual support. In particular, their invasion of privacy claim fails because they have not alleged any public disclosure. For these reasons and others detailed below, Plaintiffs' common law claims fail.

## FACTUAL BACKGROUND

I. **BCBSA and the Federal Employee Program.**

***The Federal Employees Health Benefits Act ("FEHBA") and the Service Benefit Plan.***

Congress enacted FEHBA, 5 U.S.C. §§ 8901-8914, to provide health benefits for federal employees, annuitants, and their dependents. *See* FAC ¶ 62. Instead of selecting one insurer for this purpose, Congress vested a government agency—the U.S. Office of Personnel Management ("OPM")—with broad discretion to establish insurance plans with different insurers (or sets of insurers), which are known under FEHBA as "carriers." *See* 5 U.S.C. §§ 8901(7), 8902-03, 8913. One such FEHBA plan is the "Government-wide" Service Benefit Plan (the "Plan"). *See* 5 U.S.C. § 8903(1). The Plan is formed, pursuant to FEHBA, by federal government contract No. CS 1039 between OPM and BCBSA. *See generally* 2013 Contract No. CS 1039 ("2013 OPM-BCBSA Contract"); 2022 Contract No. CS 1039 ("2022 OPM-BCBSA Contract").[2] In contracting to

---

[2] The 2013 OPM-BCBSA Contract and 2022 OPM-BCBSA Contract are attached as **Exhibit A** and **Exhibit B**, respectively, to the accompanying Declaration of Brendan G. Stuhan ("Stuhan Declaration" or "Stuhan Decl."). The contracts are referenced collectively herein as "OPM-

establish the Plan, BCBSA acts on behalf of local participating Blue Cross and Blue Shield companies ("BCBS Companies") that insure the Plan and administer it in their respective localities. *Id*. § 4.3; *Health Care Serv. Corp. v. Methodist Hosp. of Dallas*, 814 F.3d 242, 247 (5th Cir. 2016).

    ***Service Benefit Plan Funding.*** As with all terms of FEHBA contracts, OPM has authority to negotiate the rates (*i.e.*, premiums) paid under FEHBA plans. OPM is statutorily assigned responsibility to negotiate rates that "reasonably and equitably reflect the cost of the benefits provided." 5 U.S.C. § 8902(i). For the Plan, the rates "shall be determined on a basis which, in the judgment of [OPM], is consistent with the lowest schedule of basic rates generally charged for new group health benefit plans issued to large employers." *Id*. Congress specifically intended that every enrollee in a nationwide FEHBA plan, such as the Plan, would pay the same rate. *See, e.g.*, H.R. Rep. No. 105-374, at 9 (1997) (discussing amendment to FEHBA that "strengthen[ed] the ability of national plans to offer uniform benefits and rates to enrollees regardless of where they may live"). The rates are specified in the contract each year. *See* 2022 OPM-BCBSA Contract, App'x. B; 2021 Amend., App'x B; 2023 Amend., App'x B; 2024 Amend, App'x B.

    Under FEHBA, the federal government pays for the majority of the premium cost for each

---

BCBSA Contract." Periodically, the OPM-BCBSA Contract is restated in full. Stuhan Decl. ¶ 5. The most recent version was published in 2022, and the prior version was published in 2013. *Id*. Those versions were in effect from November 2021 to the present—the same timeframe plaintiffs allege as the class period. FAC ¶ 139. In other years, OPM and BCBSA entered into amendments to the most recent version of the full contract. Stuhan Decl. ¶ 6. The 2021 annual amendment to the 2013 OPM-BCBSA Contract, and the 2023 and 2024 annual amendments to the 2022 OPM-BCBSA Contract, are attached to the Stuhan Declaration as **Exhibit C**, **Exhibit D**, and **Exhibit E**, respectively. Each is cited herein as "202x Amend." The Amended Complaint specifically references the OPM-BCBSA Contract, *e.g.*, FAC ¶¶ 2, 62-63, and the provisions therein relating to premium rates are essential to evaluating Counts V-VIII. Thus, the Court may consider those documents on a Rule 12(b)(6) or Rule 12(c) motion. *See Lax v. Mayorkas*, 20 F.4th 1178, 1181 n.1 (7th Cir. 2021); *Tierney v. Vahle*, 304 F.3d 734, 738-39 (7th Cir. 2002).

enrollee, with the enrollee paying the remainder. *See* 5 U.S.C. § 8906(b)(1), (b)(2), (f); *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090, 1092 (10th Cir. 2015). All premiums are deposited initially into the Employees Health Benefits Fund within the U.S. Treasury. 5 U.S.C. § 8909(a); *Helfrich*, 804 F.3d at 1092. Carriers of experience-rated FEHBA plans—such as the Plan (*see, e.g.*, OPM-BCBSA Contract § 3.3(a))—*do not* receive the premiums as they are paid into the Employees Health Benefits Fund in the federal Treasury. Instead, the premiums are placed into a special letter of credit account within the U.S. Treasury fund. 48 C.F.R. § 1632.170(b)(1); *see also id*. § 1652.232-71(d). BCBSA and the BCBS Companies then draw directly from the letter of credit account in the Treasury fund to pay for benefit claims and allowable administrative expenses. *Id.* §§ 1632.170(b), 1652.216-71(b); *Helfrich*, 804 F.3d at 1092; *see also* OPM-BCBSA Contract § 4.10 ("OPM will administer Letter of Credit drawdowns directly with the local [BCBS] Plans").

Any Plan premiums that are not used to pay benefits and administrative expenses remain the property of the government and are not paid to BCBSA or the BCBS Companies. *See, e.g*., OPM-BCBSA Contract § 3.3; *Helfrich*, 804 F.3d at 1092; *see also Health Care Serv. Corp. v. Methodist Hosps. of Dallas*, 2015 WL 11120541, at *12 (N.D. Tex. Jan. 28, 2015), *aff'd* 814 F.3d 242 (5th Cir. 2016). Such funds are used, in OPM's discretion, to reduce premium rates or to "increase the benefits provided by[] the plan." 5 U.S.C. § 8909(b); *see also* 5 C.F.R. § 890.503(c)(2).

*The FEP Blue Website.* To facilitate Plan enrollments and operations, BCBSA operates the website www.fepblue.org, which is accessible to the public at large (the "Public Website"). Visitors to the Public Website can explore available health plans and read general health information, download a copy of the prescription formulary, and search for providers. Plan

members can also sign up for and log into a separate, secured member portal called MyBlue, located at https://www.fepblue.org/pilot/login.

## II.     BCBSA's Cookie Banner and Privacy Policy

All visitors to BCBSA's website are subject to BCBSA's Privacy Policy. In this regard, a pop-up banner on the Public Website states, "We use cookies on this website to give you the best experience and measure website usage. By continuing to use this website, you consent to these cookies. For more information, view our privacy policy" (the "Cookie Banner").[3] The Cookie Banner continues to appear on every page of the site unless and until a user clicks the "x" at the upper right of the banner. *Id.* The phrase "privacy policy" appears with a blue underline. *Id.*

If a user clicks on "privacy policy," the browser navigates to a page displaying BCBSA's Privacy Policy. The Policy explains the types of cookies collected on the website, details the use of pixel tags, and discloses the use of third-party analytics providers. *Id.* For example, the Policy discloses the use of:

- "Social Media Cookies" and that "[a] social networking website such as Facebook, Twitter or LinkedIn can record that you have visited this page and could use this information to serve you relevant ads";

- "Analytics and Performance Cookies," including "Google Analytics," providing links to information about how to prevent Google from collecting information";

- "Pixel tags" to "track the actions of users on the Website"; and

- "Targeted and Advertising Cookies" that "track your browsing habits to enable us to show

---

[3] The Court may consider the cookie banner and the linked privacy policy because the website and its operation are integral to the pleadings. *Gociman v. Loyola Univ. of Chicago*, 41 F.4th 873, 881 (7th Cir. 2022). The cookie banner and privacy policy have remained unchanged during the relevant time period.

advertising that is more likely to be of interest to you."

BCBSA further discloses that Targeted and Advertising Cookies "use information about your browsing history to group you with other users who have similar interests. Based on that information, third party advertisers can place cookies to enable them to show advertisements that we think will be relevant to your interests while you are on third party websites." *Id.*

## III.    Website Access and Analytic Technologies

A brief explanation of what happens when a user visits a website is necessary to understand the context of Plaintiffs' claims. Using the example from the FAC, when an individual navigates to a host website such as BCBSA's Public Website, the visitor's internet browser (*e.g.*, Google Chrome, Safari, or Microsoft Edge) sends an "HTTP request" (typically, a "GET request") and "essentially asks the Defendant's Website to retrieve certain information (such as a specific webpage)" on the visitor's browser. FAC ¶¶ 47-48.

According to Plaintiffs, and as disclosed in the Cookie Banner and Privacy Policy, BCBSA uses the following technologies on the Public Website: (1) the TikTok Pixel; (2) the Meta Pixel; (3) Google Analytics; and (4) the LinkedIn Insight Tag. *See id.* ¶¶ 28–101.

***TikTok Pixel***. The TikTok Pixel is a "piece of code that companies can embed in their websites to transmit information to TikTok about user activities on the website." *Id.* ¶ 51. According to Plaintiffs, when the TikTok Pixel is embedded into a website's Source Code, it causes the user's web browser to simultaneously transmit communications directed to the website to TikTok's servers. *Id.* ¶ 50. Plaintiffs claim the TikTok Pixel causes the following data to be shared: (1) when actions take place on the website; (2) the user's IP address; (3) the device make, model, operating system, and browser information; (4) third-party cookies to match the user's website communications to an identified person on TikTok; (5) pages viewed on the website; (6)

buttons clicked on the website; and (7) content typed into "search" bars. *Id*. ¶ 52.

**Meta Pixel.** Meta Pixel, Meta's analytics tool, is a piece of code incorporated into websites to track user activity. *See id*. ¶ 86. More specifically, Plaintiffs claim the Meta Pixel "records a user's IP address, pages viewed (such as specific URL information), buttons clicked, search queries, and other user activities on a website." *Id*. ¶ 86. Meta collects this information by placing cookies in users' web browsers thereby allowing them to be identified–regardless of whether they have or are logged into a Facebook account. *Id*. ¶¶ 87, 88.

**Google Analytics.** Google Analytics, Google's tool, is a piece of code installed in websites to track user activity. FAC ¶ 92. Plaintiffs claim the data intercepted and transmitted to Google can include: "the URL of the specific webpage the user is trying to access; the user's IP address; the User-agent, which identifies the user's device platform and browser; the user's geolocation, if available; . . . the URL of the page on which the user clicked a link to access a new page; event data, which describes how users interact with a website, for example, whether they saw an ad or played a video; and the actual search queries on the site." *Id*. ¶ 93.

**LinkedIn Insight Tag.** The LinkedIn Insight Tag is a piece of code that companies can add to their websites to "enable in-depth campaign reporting and unlock valuable insights" about their website's visitors. FAC ¶ 98. The tool enables the collection of a user's visits to the website including the URL, referrer, IP address, devise and browser characteristics, and timestamp. *Id*. ¶ 98. Like the other tools alleged, Plaintiffs claim the LinkedIn Insight Tag transmits cookies and unique identifiers to LinkedIn allowing it to identify a user. *Id*. ¶ 99.

## IV.     Plaintiffs' Claims.

Plaintiffs are five current and former federal employees who are or were insured through the Plan. Plaintiffs have accounts with TikTok, Facebook, Instagram, LinkedIn,[4] and Google (the "Tech Companies"). Although the federal government "ban[ned] the use of TikTok on official government devices" due to its "aggressive data-harvesting practices," Plaintiffs continued to maintain TikTok accounts on their personal devices. FAC ¶¶ 20-24, 33.

Because Plaintiffs allege they are accountholders of the Tech Companies, they consented to certain data being collected by or disclosed to the Tech Companies. Indeed, the Tech Companies have extensive sets of contract terms and policies that implicate the collection and sharing of user data.[5] TikTok's Privacy Policy discloses that TikTok may collect information "about you and the actions you have taken outside of the Platform, such as your activities on other websites" and such data collection may occur through the TikTok Pixel. TikTok Privacy Policy, https://www.tiktok.com/legal/page/us/privacy-policy/en. Meta similarly discloses that it may collect users "information and activities on and off our Products" including "[w]ebsites you visit and cookie data, like through . . . the Meta Pixel." Facebook Privacy Policy, https://www.facebook.com/privacy/policy/. Google also discloses its collection of data on third party websites through Google Analytics and allows users to "[m]anage information that websites and apps using Google services, like Google Analytics, may share with Google when you visit or interact with their services."  Google Privacy Policy, https://policies.google.com/privacy?hl=en-US&hl=en_US. LinkedIn's policy also notes, "You can opt out from our use of data from cookies and similar technologies that track your behavior on the sites of others for ad targeting and other

---

[4] Plaintiff Gouch does not allege she has a LinkedIn account.
[5] The court may take judicial notice of these public webpages. *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003).

ad-related purposes." LinkedIn Privacy Policy, https://www.linkedin.com/legal/privacy-policy.

Plaintiffs do not and cannot allege that BCBSA disclosed any medical claims information or other treatment information located on the secure MyBlue portal. Rather, Plaintiffs allege only that third parties had access to the terms they entered in the search bar on the Public Website by obtaining the URLs that they visited. Plaintiffs' allegations vary in detail and in whether and what types of advertisements they allege they saw after browsing the Public Website:

| Plaintiff (State) | Website Interaction | Viewed After Website Interaction |
|---|---|---|
| Teresa Gouch (CA) | Searched for 3 specific doctors and 2 symptoms | Facebook & TikTok ads about "medicines, supplements, medical research programs, doctors in her area, health insurance, and [BCBS]" |
| Denise Spanos (SC) | Searched for 2 conditions and 2 doctor specialties | Facebook ads about 1 condition |
| George Amerson (TX) | Searched for doctors through the search bar | None |
| Kyle Mummey (PA) | Researched 4 symptoms and conditions, (no allegation as to the search bar) | TikTok, Facebook, and Instagram ads "related to his health information" |
| Marcia Beasley (FL) | Searched for unspecified doctors, researched unspecified conditions, "inquire[d] about prescriptions" | None |

FAC ¶¶ 20-24. Notably, two of the Plaintiffs do not allege that they viewed any related advertisements, none of the Plaintiffs allege that Google or LinkedIn served them ads of any kind, and Plaintiff Gouch does not allege that she was served with ads related to the doctors or symptoms she allegedly researched.

Based on these allegations, Plaintiffs seek to represent a national class of Plan members and website users (and/or a California class for one claim) in asserting claims for violations of: (1) the Electronic Communications Privacy Act; (2) the Illinois Eavesdropping Statute; (3) the Illinois

Computer Tampering Act; (4) the California Invasion of Privacy Act; and common law causes of action for (5) negligence; (6) invasion of privacy; (7) breach of implied contract; and (8) unjust enrichment. These claims are meritless.

## LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *id.*). Although a court is required to accept as true all well-pleaded facts, it need not accept conclusory allegations or legal conclusions. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (legal conclusions and conclusory allegations reciting the elements of the claim are not entitled to the presumption of truth). *Id*. Factual allegations need not be detailed, but must provide "some specific facts to support the legal claims asserted." *Id*. Absent such factual support, a claim fails to "raise a right to relief above [a] speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). Where a plaintiff's claims constitute bare recitations of the elements necessary to state a claim, dismissal is warranted. *See id*.

## ARGUMENT

I.    **Plaintiffs' Wiretapping and Eavesdropping Claims Fail to Allege Facts Establishing the Elements of these Claims and Are Barred by Exceptions.**

The Electronic Communications Privacy Act ("ECPA" or the "Wiretap Act"), 18 U.S.C. § 2511(1), et seq., establishes a private right of action against any person who intentionally intercepts, discloses, or uses any wire or electronic communication. Similarly, the Illinois Eavesdropping Statute ("IES") creates a cause of action against an "eavesdropper" and their

principal for the surreptitious "interception, recording, or transcription" of any private communication by a non-party without all parties' consent. 720 Ill. Stat. §§ 5/14-2(a)(3); 5/14-6. The California Invasion of Privacy Act ("CIPA") "forbid[s] unauthorized wiretapping, eavesdropping or recording electronic communications, intercepting wireless telephone and cordless telephone transmissions, manufacturing devices designed for electronic eavesdropping, and disclosing intercepted electronic communications." *Bradley v. Google, Inc*., 2006 WL 3798134, at *6 (N.D. Cal. Dec. 22, 2006) (citing Cal. Penal Code §§ 630-637.2).

These wiretapping claims fail because: (1) they fail to plausibly allege lack of consent to the collection of their data; (2) BCBSA is a party to the communication and Plaintiffs did not plausibly allege any intention to commit an independent crime or tort; and (3) the Tech Companies were party to the communications such that no interception occurred.

### A. The CIPA and IES Claims Fail Because Plaintiffs Do Not Plausibly Allege Lack of Consent to the Data Collection Practices at Issue.

Lack of consent is an element of the CIPA and IES claims. CIPA applies only to one "who willfully *and without the consent of all parties* to the communication . . . attempts . . . to learn the contents or meaning of any . . . communication." Cal Pen. Code § 631(a) (emphasis added). Similarly, IES prohibits knowing and intentional eavesdropping without the consent of all parties. 20 Ill. Stat. §§ 5/14-2(a)(3); 5/14-6. Relatedly, IES only prohibits eavesdropping or interception that is "surreptitious," i.e., "obtained or made by stealth or deception, or executed through secrecy or concealment." 720 ILCS 5/14-1(g). Neither statute requires express consent. Rather, the question of consent is essentially: "Would a reasonable user who viewed [the defendant's] disclosures have understood that [it] was collecting [the information at issue]?" *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1212 (N.D. Cal. 2014).

To be sure, Plaintiffs say their internet communications with BCBSA's website were

intercepted by third parties "without authorization or consent" from Plaintiffs and Class members. FAC ¶¶ 140, 160-62. But this conclusory allegation is just a formulaic recitation of the lack of consent element. *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 828 (N.D. Cal. 2020) (dismissing CIPA claim and noting that "Plaintiffs' allegation that the recordings 'were made without Plaintiffs' consent' is conclusory").

Plaintiffs' conclusory allegations about lack of consent are implausible when viewed alongside BCBSA's disclosures to Public Website visitors and MyBlue accountholders about data collection and the use of third-party cookies. For example, BCBSA's Cookie Banner discloses to all website visitors that the website uses cookies. The Cookie Banner also links to the Privacy Policy, which further explains, the use of "Social Media Cookies" and that "[a] social networking website such as Facebook, Twitter or LinkedIn can record that you have visited this page and could use this information to serve you relevant ads." Additionally, the Privacy Policy further discloses the use of "Google Analytics" for information about use of the website and "Targeted and Advertising Cookies" that "track your browsing habits to enable us to show advertising that is more likely to be of interest to you."

In *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 955 (N.D. Cal. 2017), *aff'd* 745 F. Appx. 8 (9th Cir. 2018), the court granted a motion to dismiss the ECPA and CIPA claims arising from Facebook's collection of the plaintiffs' web browsing activity on several healthcare websites using Facebook's Business Tools (such as pixels and cookies). The court found that the claims were barred because the plaintiffs consented to Facebook's activity when they signed up for Facebook accounts and agreed to Facebook's Cookies Policy and Privacy Policy, which "discloses the precise conduct at issue"—just like BCBSA's Cookie Banner and Privacy Policy do here. *Id.* at 953-955. Other courts interpreting these statutes "consistently hold that terms of service and

privacy policies . . . can establish consent to the alleged conduct challenged under various states wiretapping statutes and related claims," including CIPA. *Silver v. Stripe Inc.*, 2021 WL 3191752, at *4 (N.D. Cal. July 28, 2021) (dismissing ECPA and CIPA claim because plaintiffs agreed to a privacy policy that "explicitly state[d] that consumers' information may be provided to [the defendant's] 'partners'"); *see also Garcia v. Enter. Holdings, Inc.*, 78 F. Supp. 3d 1125, 1136 (N.D. Cal. 2015) (stating "lack of consent is an express element of a [CIPA] claim" and finding plaintiff consented to data sharing through defendant's privacy policy); *Perkins*, 53 F. Supp. 3d at 1213 (dismissing ECPA claim because plaintiffs consented to data collection due to "the clarity of the disclosure, the proximity of the disclosure to the wrongful conduct, and the ability to opt out").

Like in *Smith*, Plaintiffs' claims here are based on *Facebook's and other third-party tech companies'* alleged collection of information. FAC ¶¶ 52, 53, 61, 87, 97, 98; *Smith*, 262 F. Supp. 3d at 949. And just like the plaintiffs in *Smith*, Plaintiffs here expressly consented to Facebook and these other companies collecting their browsing activity and other data regarding their website use through tools such as the Pixel. *See Smith*, 262 F. Supp. 3d at 953. In *Smith* the plaintiffs attempted to evade this consent by arguing on appeal that "the collection of health-related data" fell outside of the scope of Facebook's policies because it was somehow "qualitatively different" or "sensitive." 745 F. Appx. at 9. The Ninth Circuit rejected that argument, finding that the data could not "reveal details of an individual's health status or medical history" and, in any event, "many other kinds of information are equally sensitive." *Id.* The Ninth Circuit further rejected the argument that such data was subject to the "stringent disclosure requirements" under state and federal statutes pertaining to medical information, reasoning instead that "the connection between a person's browsing history and his or her own state of health is too tenuous" to fall within the sweep of health information laws. *Id.* Accordingly, Facebook's conduct fell "within the scope of

13

Plaintiffs' consent to Facebook's Terms and Policies." *Id.* The same is true here. Simply put, Plaintiffs did not—and cannot—plausibly allege the requisite lack of consent.

### B. The Party Exception Precludes the ECPA and CIPA Claims.

A party to a communication is not liable under ECPA, 18 U.S.C. § 2511(1), et seq., unless that party has intercepted the communication for the purpose of a criminal or tortious act. 18 U.S.C. § 2511(2)(d) ("It shall not be unlawful" for "a party to the communication" to "intercept" that same communication); *Kurowski v. Rush Sys. for Health*, 659 F. Supp. 3d 931, 937 (N.D. Ill. 2023) ("*Kurowski I*"). The party exemption analysis is identical for the CIPA claim. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020); *In re Google Inc. Cookie Placement Consumer Privacy Litig.* ("*Google Cookie*"), 934 F.3d 316, 325 (3d Cir. 2019) (CIPA claims dismissed because Wiretap Act's party exception applied).

Plaintiffs concede that BCBSA was a party to the communications. FAC at ¶¶ 66 (federal employees use the system to "communicate other sensitive health-related information to their health insurer"); 67 (as a visitor navigates the website it communicates with BCBSA's server). While the party exception does not apply if the communication alleged is "intercepted for the purpose of committing any criminal or tortious act…," *Kurowski I,* 659 F. Supp. 3d at 937, *i.e.*, the "crime-tort exception," Plaintiffs have not plausibly alleged any such criminal or tortious act.

To establish the "crime-tort exception," "a plaintiff must plead sufficient facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is *independent* of the intentional act of recording or interception itself." *B.K. v. Eisenhower Med. Center*, 2024 WL 878100 (C.D. Cal. Feb. 29, 2024). *See also Google Cookie*, 806 F.3d 125, 145 (3d Cir. 2015)("[T]he criminal or tortious acts contemplated by § 2511(2)(d) are acts secondary to the acquisition of the communication involving tortious or criminal use of the interception's fruits."); *Caro v. Weintraub*, 618 3d 94, 98-100 (2d Cir. 2010) ("[T]he offender

must intend to commit a crime or tort independent of the act of recording itself.... Intent may not be inferred simply by demonstrating that the intentional act of recording itself constituted a tort. A simultaneous tort arising from the act of recording itself is insufficient.").

While Plaintiffs repeatedly allege that BCBSA used the code at issue for marketing, advertising, and analytics purposes, FAC ¶¶ 10, 163, 191, 192, Plaintiffs do not allege that this purpose constitutes independent illegal or actionable conduct such that the party exception is inapplicable. *B.K.*, 2024 WL 878100, at *5 (dismissing ECPA claim premised on healthcare company's use of a pixel on its website, because the sole purpose alleged was the "commercial advantage" of the defendant). Similarly, the allegation that BCBSA used the code for its own purposes precludes aiding and abetting liability under CIPA. *Licea v. Vitacost.com, Inc.*, 2023 WL 5086893, at *4 (S.D. Cal. July 24, 2023) ("[A] website owner that engages a vendor to record website-based communications for the website owner's own purposes is not thereby aiding and abetting eavesdropping by a third party in violation of Section 631(a)."); *Graham v. Noom, Inc.*, 533 F. Supp. 3d 823, 832 (N.D. Cal. 2021) (a defendant that uses a tool "to record and analyze its own data in aid of [defendant's] business . . . is not a third-party eavesdropper").

Even to the extent a HIPAA violation could be considered an independent act (and it should not), Plaintiff have not plausibly alleged such a violation. According to Plaintiffs, the alleged "crime" is disclosure of "individually identifiable health information to another person," in violation of HIPAA. *See* 42 U.S.C. § 1320d-6(a)(3). "Individually identifiable health information" (or "IIHI") is defined as "any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider, health plan, employer, or health care clearinghouse; and (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or

future payment for the provision of health care to an individual, ***and—(i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.***" FAC at ¶ 168 (quoting 42 U.S.C. § 1320d(6) (emphasis added)).

According to Plaintiffs, the Tech Companies identify the Plaintiffs independently and without any assistance from BCBSA. *See, e.g.*, FAC at ¶ 57 ("On information and belief, TikTok can then match the communications to a particular individual through a process called 'fingerprinting.'"); ¶ 87 ("Meta can then use this information to match the web communications with the user's Facebook ID.") 94 ("the user's communications to the website are transmitted to Google together with cookies and other unique identifiers that Google can use to match the communications to individuals who use Google's services"), 99 ("The LinkedIn Insight Tag also transmits various cookies and unique identifiers to LinkedIn that allow LinkedIn to match the user's activity on the website to the user's LinkedIn account."). Indeed, because only the Public Website—and not MyBlue—is at issue, Plaintiffs would not have logged in, so it is unlikely (and Plaintiffs have not alleged) that BCBSA itself even knew who Plaintiffs were when they were interacting with the site.[6] Thus, BCBSA could not have disclosed identifiable information.

Relatedly, because they were browsing the Public Website, and not MyBlue, Plaintiffs' interactions with the website do not necessarily relate to their own medical conditions or physicians or that of another in their household. While the court in *Kurowski* eventually ruled that

---

[6] Despite Plaintiffs' allegations about their Plan membership and use of the Public Website, they do not allege whether they signed up for MyBlue. This is an omission with important implications to the case because, as BCBSA will show should the case proceed to discovery, MyBlue users expressly agree to BCBSA's Privacy Policy as part of their agreement to BCBSA's Terms and Conditions, which "govern [users'] use of the fepblue.org website and the MyBlue Portal." BCBSA Terms & Conditions, https://www.fepblue.org/legal/terms-privacy (last accessed: Mar. 12, 2024). Should Gouch amend to specify that she was a MyBlue user and thereby agreed to the Terms & Conditions, her claim would fail for an additional reason: she agreed that Illinois—not California—law governs her use of the Public Website. *Id.*

the plaintiff cured her ECPA claim and sufficiently alleged the crime-tort exception when she alleged that Rush "transmitted the name and location of her personal physician, as well as her physician's specialty," this case is different. *Kurowski v. Rush Sys. for Health*, 2023 WL 8544084, at *3 (N.D. Ill. Dec. 11, 2023) ("*Kurowski III*") (noting that plaintiff alleged "this information was, in turn, used by at least Facebook to target her with particular advertising associated with her particular health conditions."). However, unlike in this case, *Kurowski* involves claims that tracking devices were on a medical system's secured patient portal, where names of treating physicians would be found. Researching doctors or reading information about a health condition on a public website does not mean that a website visitor is a patient of such doctors or suffering from such conditions. *See Kurowski v. Rush Sys. For Health*, 2023 WL 4707184, at *4 (N.D. Ill. July 24, 2023) ("*Kurowski II*") (dismissing wiretapping claims and explaining that "[t]he interpretation of IIHI offered by HHS in its guidance goes well beyond the meaning of what the statute can bear.").

Plaintiffs' allegations are simply not enough to conclude that any third party learned Plaintiffs' health information. For example, Plaintiff Amerson "search[ed] for doctors, including by typing words into the Website's 'search' bar." FAC ¶ 22. He does not allege whether he ever saw these doctors. Nor does he suggest that the identity of these doctors disclosed a condition that he actually has or that he was ever served ads related to his browsing. And even if he *had* alleged that his browsing related to his own medical conditions, that information would not be apparent by virtue of his browsing activity. Indeed, even those Plaintiffs with more specific allegations related to their browsing (*e.g.*, Plaintiff Mummey, who researched specific symptoms and conditions) may have been reading about symptoms and conditions due to the health of a household member, a parent, or for an entirely unrelated reason. Plaintiff Gouch was served with

ads unrelated to the terms she searched. Finally, none of the Plaintiffs allege that either LinkedIn or Google served ads related to their browsing. These allegations fail to plausibly suggest that BCBSA aided any interception for the purpose of a HIPAA violation. Because Plaintiffs failed to allege facts to support the crime-tort exception, their ECPA and CIPA claims fail.

### C. The ECPA, CIPA, and IES Claims Also Fail Because the Tech Companies Were Party to the Communications and Therefore no Interception Occurred.

Plaintiffs' theory is that by installing analytics technologies on its website, BCBSA violated ECPA, CIPA, and IES by assisting the Tech Companies in eavesdropping on Plaintiffs' website communications with BCBSA. The Third Circuit addressed an internet tracking cookies dispute involving this exact technological scenario and held that no "eavesdropping" occurred in violation of CIPA and the Wiretap Act because the party in Facebook's position was the "intended recipient" of, and thus a party to, the communication at issue. *Google Cookie*, 806 F.3d at 152. Under *Google Cookie*, Plaintiffs' claims fail as a matter of law.

Plaintiffs allege that the Tech Companies are eavesdroppers that were able to "intercept" Plaintiffs' website communications with BCBSA because BCBSA installed code on its website. But Plaintiffs' allegations make clear that the communications at issue are actually between Plaintiffs and the Tech Companies, not Plaintiffs and BCBSA. According to Plaintiffs, the TikTok Pixel causes *Plaintiffs'* internet browsers to "***simultaneously transmit communications . . . to TikTok's servers.***" FAC ¶ 50 (emphasis added). *See also* FAC ¶¶ 85 ("These three tracking technologies work in substantially the same manner as the TikTok Pixel"); 92 ("Google's code directs the user's browser to send a separate and concurrent communication to Google without the user's knowledge"); 100 ("LinkedIn Insight Tag causes the browser to transmit the same information to LinkedIn").

This is the precise technological situation addressed in *Google Cookie*, where the Third

Circuit stated that the relevant "server hosting the publisher's webpage … instruct[ed] the user's web browser to send a GET request to [Defendant] Google."  806 F.3d at 152. The Third Circuit's legal interpretation of the technology involved was that Google was "itself a party to all of the electronic transmissions that are the bases of the plaintiffs' wiretapping claims." *Id*. In the Third Circuit's view, the fact that Google was a party to the duplicated transmissions was dispositive of the federal wiretapping and CIPA claims. *See id.* ("Because § 631 [CIPA] is aimed only at 'eavesdropping, or the secret monitoring of conversations by third parties, we will affirm the dismissal of the [CIPA] claim for the same reasons we affirm the dismissal of the federal Wiretap Act claim"); *id*. at 142-43 ("Because the defendants were the intended recipients of the transmissions at issue—*i.e.* GET requests that the plaintiffs' browsers sent directly to the defendants' servers—we agree that § 2511(2)(d) means the defendants have done nothing unlawful under the Wiretap Act.").  The result should be the same here: Plaintiffs' ECPA, IES, and CIPA claims should be dismissed.[7]

## II.     ICTA – a Law Prohibiting Use of Computer Viruses – Does Not Apply to the Pixel Tracking Alleged.

ICTA is a poor fit to the allegations in this case. ICTA provides a private right of action where the defendant obtains unauthorized access to a computer or network and "inserts or attempts to insert a program" that will "damage or destroy that computer," "alter, delete, or remove a computer program or data," or "cause loss to the users of that computer." 720 ILCS 5/17-51(a)(4); *see also* 720 ILCS 5/17-51(c) (limiting the right of civil actions to one who suffers loss by reason of a violation of subdivision (a)(4)). Plaintiffs claim BCBSA violated this statute by inserting or attempting to insert tracking code from TikTok, Meta, Google, and LinkedIn into their browsers.

---

[7] While *Google Cookie* did not examine an IES claim specifically, the language of the statute mandates the same result.

FAC ¶ 199. However, they fail to allege that this code caused damage to their computers, altered or removed data, or caused any "loss" to them other than a nebulous "risk" that their data might be used. Their conclusory recitation of the elements of the claim, without more are insufficient to state a claim. *See id*. ¶¶ 199–202; *McCauley*, 671 F.3d at 616 (legal conclusions and conclusory allegations merely reciting the elements of a claim are not entitled to the presumption of truth).

Moreover, Plaintiffs fail to allege that BCBSA inserted code without authorization or in excess of the authority granted. *See Halperin v. Int'l Web Servs., LLC*, 123 F. Supp. 3d 999, 1010–1012 (N.D. Ill. 2015) (dismissing ICTA claim where complaint failed to describe what plaintiff authorized defendant to do or how software exceeded that authorization). Just as Plaintiffs fail to plausibly allege lack of consent, they fail to explain how BCBSA lacked authorization in light of its Cookie Banner and Privacy Policy and in light of the Tech Companies' privacy policies. Plaintiffs, therefore, fail to establish the requisite elements and cannot state an ICTA claim.

### III. Plaintiffs' Common Law Claims Are Barred by the Filed Rate Doctrine and Other Deficiencies.

#### A. Plaintiffs' Claims for "Benefit of the Bargain" Damages Must Be Dismissed Under the Filed Rate Doctrine Because Awarding Such Damages Would Undermine OPM's Exclusive Authority to Negotiate FEHBA Rates.

The filed rate doctrine "prohibits courts—both state and federal—from questioning a rate that has been filed with a federal regulator." *Northeastern Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 707 F.3d 883, 887 (7th Cir. 2013) (citing *Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251-52 (1951)); *see also South Branch LLC v. Commonwealth Edison Co.*, 46 F.4th 646, 649-53 (7th Cir. 2022). The doctrine both "prevents courts from second-guessing the reasonableness of terms in a federally-filed rate," *Northeastern Rural Elec. Membership Corp.*, 707 F.3d at 896, and prevents discrimination in charges amongst rate payers. *Goldwasser v. Ameritech*, 222 F.3d 390, 402 (7th Cir. 2000). Courts may not usurp

Congress's assignment to federal regulatory agencies of the authority to determine the reasonableness of filed rates. *See Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 579 (1981) ("It would undermine the congressional scheme of uniform rate regulation to allow a state court to award as damages a rate never filed with the Commission and thus never found to be reasonable within the meaning of the Act.").

Under the doctrine, courts have barred claims for damages alleging overcharges and inadequate provision of services where services were provided pursuant to a filed rate, because awarding the damages would involve determining the rate the agency would have set in light of the allegedly inadequate services. For example, in *Goldwasser*, the court rejected consumers' claims that they had been overcharged by a local exchange carrier as result of its failure to carry out its responsibilities under the Telecommunications Act of 1996. *Goldwasser*, 222 F.3d at 398. The court affirmed the district court's holding that the filed rate doctrine barred judicial reexamination of the reasonableness of the rates and precluded the plaintiffs' action for damages because it "necessarily implicates the rates [the carrier was] charging." *Id*. at 402.

The doctrine similarly barred consumers' claims for overcharges caused by new legislation Commonwealth Edison allegedly secured by bribing state officials. *South Branch LLC,* 46 F.4th at 648-49. "In effect," plaintiffs were seeking a "federal judgment retroactively adjusting the electricity rates they paid." *Id*. at 650. The court affirmed dismissal of the damages claim, holding that "when the plaintiffs paid their electricity bills based on rates which had been properly filed with the [Illinois Commerce Commission], they paid the state's required legal rate" and "suffered no legally cognizable injury." *Id*. at 654. According to the court, "[d]etermining a damages award here based on the alleged overpayment for electricity would involve asking what the reasonable rate should have been had the three pieces of legislation not been passed. . . . [T]he filed rate

doctrine bars such judicial determinations." *Id*. at 653.

The doctrine has also been applied to bar damages claims implicating insurance ratemaking, including, importantly, OPM's negotiation and approval of Plan premiums. In *Fero v. Excellus Health Plan, Inc.*, 236 F. Supp. 3d. 735 (W.D.N.Y. 2017), Plan enrollees brought a claim against BCBSA under a New York deceptive trade practices statute seeking damages arising from an alleged disclosure of their personal health information in a data breach following a cyberattack against a BCBS Company. The court held that to the extent the claim sought benefit-of-the bargain damages, it was foreclosed under the filed rate doctrine. *Id*. at 780-81. The court agreed with BCBSA that awarding the benefit-of-the bargain losses the plaintiffs requested would have required the court to "second-guess the insurance premium rates set by OPM and determine what rates were reasonable in light of the purportedly inadequate services." *Id*. at 780. The OPM premium rates with BCBSA were "filed rates" and therefore "per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Id.* at 779, 781 (citing *Simon v. KeySpan Corp.*, 694 F.3d 196, 204 (2d Cir. 2012)).

Similarly, in *In re Anthem, Inc. Data Breach Litig.*, 2016 WL 3029783, at *23-24 (N.D. Cal. May 27, 2016), the court held that the filed rate doctrine barred claims for "[b]enefit of the [b]argain [l]osses" because they "represent[] a refund for the portion of Plaintiffs' premiums that should have, but did not, go towards data security." *Id.* at *23. Awarding damages "'would [inevitably] require the Court to determine what rate would have been reasonable and thereby interfere with [the agency]'s rate-making process.'" *Id.* at *24 (citation omitted) (first alteration by *Anthem* court). Because "the filed rate 'doctrine precludes a claim for damages which would *indirectly* cause the application of rates different from the filed rates,'" the court dismissed the insureds' claim for damages. *Id.* (citation omitted); *see also Rios v. State Farm Fire & Cas. Co.*,

469 F. Supp. 2d 727, 739, 740 (S.D. Iowa 2007) (rejecting insureds' claims they were fraudulently induced to buy policies with a favorable payment term not followed by the carrier, because awarding damages would usurp the state agency's rate-making authority in that the court would have to "second guess" the rate the agency would have charged for a policy that did not contain the favorable but unfollowed payment provision).

As discussed above, OPM must agree to all Plan rates, in accordance with its statutory mandate to negotiate rates that "reasonably and equitably reflect the cost of the benefits provided" and that "in the judgment of [OPM], [are] consistent with the lowest schedule of basic rates generally charged for new group health plans issued to large employers." 5 U.S.C. § 8902(i). Because the rates are "filed with" (indeed, agreed to by) OPM, "as required" by FEHBA, *Anthem*, 2016 WL 3029783, at *23, the filed rate doctrine applies to bar Plaintiffs' purported benefit of the bargain damages.

Count V (negligence) and Count VI (invasion of privacy) expressly seek benefit-of-the-bargain damages. FAC ¶¶ 224, 231. Likewise, Count VII (breach of implied contract) is premised on Plaintiffs supposedly having been overcharged by BCBSA and on an alleged denial of Plaintiffs' benefit of the bargain, based on allegations that they would have "paid substantially less" for BCBSA's services in the absence of the alleged misappropriation of data. FAC ¶ 239. Count VIII (unjust enrichment) alleges that Plaintiffs were denied compensation for BCBSA's use of their personal data that Plaintiff supplied "for the purposes of receiving healthcare services or healthcare-related information and knowledge." FAC ¶ 242; *see also id*. ¶¶ 241-46. That is just another way of alleging that Plaintiffs should have paid less for their Plan coverage because part of the arrangement involved uncompensated use of Plaintiffs' personal data by BCBSA. In all of these claims, Plaintiffs improperly ask this Court to second-guess the reasonableness of the rates

filed with (and approved by) OPM under the OPM-BCBSA Contract. That means their claims are barred by the filed rate doctrine.

Separately, if the putative class—which includes only persons "participating in the FEHB program whose Sensitive Information was disclosed," FAC ¶ 140—were successful on Counts V, VI, VII or VIII, those individuals would receive a lower premium rate than other Plan enrollees whose information was not allegedly "disclosed," despite Congress' express desire that "national plans" such as the Plan, "offer uniform . . . rates to enrollees." H.R. Rep. No. 105-374, at 9 (1997). Further, even if *all* Plan enrollees' data were disclosed (and there is no allegation that was the case), success on these Counts would still result in different rates because every enrollee would suffer different damages depending on factors such as what data was disclosed and to whom it was disclosed and how it was used and a plethora of highly-individualized factors relating to each member. Such outcomes implicate nondiscrimination concerns because "the court has no jurisdiction to reallocate [premiums] among other [affected customers]." *Hoffman v. N. States Power Co.*, 764 N.W.2d 34, 47 (Minn. 2009) (internal quotation marks and citation omitted); *see also Marcus v. AT&T Corp.*, 138 F.3d 46, 60 (2d Cir. 1998) ("'Uniform treatment would not result, even if all sued, unless the highly improbable happened, and the several juries and courts gave to each the same measure of relief.'") (citation omitted).

### B. The Invasion of Privacy Claim Also Fails Because Plaintiffs Do Not Allege Public Disclosure.

The common law claims all fail for reasons in addition to the filed rate doctrine. To state a claim for invasion of privacy by publication of private facts, Plaintiffs must allege that: (1) publicity was given to the disclosure of private facts; (2) the facts were private, not public; and (3) a reasonable person would find the matter highly offensive if made public. *Kurowski II,* 2023 WL 4707184, at *9. For liability to attach, the publication must be made to more than a small group—

rather, it must be made to "the public at large or to so many persons that the matter must be regarded as one of general knowledge." *Id.* at *9. While Plaintiffs allege that BCBSA shared their information with TikTok, Meta, Google, and LinkedIn, FAC ¶ 228, they do not allege any disclosure to the public at large. *Kurowski II*, 2023 WL 4707184, at *9; *Roehrborn v. Lambert*, 277 Ill. App. 3d 181, 184 (1995). Plaintiffs' claim fails on this basis alone.

### C. Plaintiffs Cannot Claim Breach of Implied Contract When There Is an Express Contract Established by the Cookie Banner and Privacy Policy.

An implied contract arises from a "promissory expression" that may be inferred from facts and circumstances that demonstrate the parties' intent to be bound." *Landale Signs & Neon, Ltd. v. Runnion Equip. Co.*, 2016 WL 7409916, at *7 (N.D. Ill. Dec. 22, 2016). To establish the existence of an implied contract, the plaintiff must show the same elements as an express contract—offer, acceptance, consideration—and also establish a meeting of the minds and mutual intent to contract. *Id.; New v. Verizon Commc'ns, Inc.*, 635 F. Supp. 2d 773, 782–83 (N.D. Ill. 2008). A breach of implied contract claim does not stand where an express contract exists. *See Marcatante v. City of Chicago, Ill.*, 657 F.3d 433, 440 (7th Cir. 2011) ("An implied contract claim cannot coexist with an express contract on the same subject.").

Here, Plaintiffs agreed to the Cookie Banner, including the Privacy Policy, by continuing to navigate the Public Website. Therefore, the implied contract claim must be dismissed. Even if the Court were to find that an express contract were not created, Plaintiffs fail to allege facts to suggest any implied contract was created. According to Plaintiffs, when they "paid money and provided their Sensitive Information to Defendant in exchange for services" they entered implied contracts whereby BCBSA agreed to safeguard and not disclose their information without their consent. FAC ¶ 234. Such allegations are insufficient to establish mutual intent to be bound. *See, e.g.*, *Stanford Health Care v. Blue Cross Blue Shield of N. Carolina, Inc.*, 2022 WL 195847, at *6

(N.D. Cal. 2022) (finding that the alleged "verification of benefits and authorization of services" failed to "sufficient[ly] plead mutual assent for an implied contract claim."); *B.K*, 2024 WL 878100, at *9 (dismissing implied contract claim).

### D. The Unjust Enrichment Claim Is Untenable Where There Is an Express or Implied Contract and is Not a Recognized Claim Under Governing Illinois Law.

Plaintiffs fail to allege facts that BCBSA was somehow unjustly enriched. While they make vague assertions that consumer data is valuable, FAC ¶ 105, they do not allege how BCBSA was enriched by Plaintiffs' alleged searches for doctors and health conditions. The claim therefore must be dismissed. *B.K*, 2024 WL 878100, at *9 ("While Plaintiffs allege that 'a complete health care record sells for $250 on average,' the Complaint does not include facts specific to unjust enrichment of Defendant resulting from Plaintiffs' information.").

Furthermore, "unjust enrichment has no application" when an express or implied contract governs the parties' relationship. *Gociman*, 41 F.4th at 886 (express contract); *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 571 (7th Cir. 2016) (implied contract). Here, Plaintiffs agreed to the Cookie Banner, including the Privacy Policy, by continuing to navigate the Public Website. Therefore, Plaintiffs' claims alleging an implied contract must fail. Even if the court were to find that no express contract exists, Plaintiffs' allegation of an implied contract bars their unjust enrichment claim. *Enger*, 812 F.3d at 571.

Plaintiffs' unjust enrichment claim is barred for the additional reason that Illinois does not recognize unjust enrichment as a standalone cause of action. *Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 324–35 (7th Cir. 2021) (unjust enrichment is not an independent cause of action—rather, "it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress or undue influence, or, alternatively, it may be based on contracts which are implied in law"). Plaintiffs' unjust enrichment cause of action must be

dismissed with prejudice.

### E. Plaintiffs' Negligence Claim Also Fails Because Plaintiffs Do Not Plausibly Allege Any Facts Supporting the Elements of the Claim.

To state a cause of action for negligence, a plaintiff must allege "the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach." *Ward v. K Mart Corp.*, 554 N.E.2d 223, 226 (Ill. 1990). Plaintiffs attempt to allege the existence of a duty, a breach, and causation, but they assert nothing but conclusions. FAC ¶¶ 218, 223, 224 ("As a direct and proximate result of Defendant's breach and unauthorized disclosure of Plaintiffs' and the Class's Sensitive Information, Plaintiffs and Class Members suffered and continue to suffer harm and injury, including loss of privacy associated with disclosure of their sensitive medical data and the loss of the benefit of the bargain."). Plaintiffs so-called allegations are nothing more than "naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678; *see also Murphy v. Thomas Jefferson Univ. Hosps., Inc*., 2023 WL 7017734, at *5 (E.D. Pa. Oct. 10, 2023) (granting motion to dismiss pixel lawsuit for, *inter alia*, failure to state a negligence cause of action with requisite specificity). Without specific averments to substantiate their allegations, Plaintiffs fail to state a negligence claim. *B.K.*, 2024 WL 878100, at *8 (dismissing negligence claim based on website tracking).

### CONCLUSION

For the reasons discussed above, Plaintiffs' claims should be dismissed. Because amendment cannot cure the deficiencies in Plaintiffs' claims, dismissal with prejudice is proper.

Dated: March 15, 2024

Respectfully submitted,

By: /s/ *Zoë K. Wilhelm*

    Zoë K. Wilhelm *(Pro Hac Vice)*
    Faegre Drinker Biddle & Reath LLP
    1800 Century Park East, Suite 1500
    Los Angeles, California 90067
    Telephone: (310) 203-4000
    Facsimile: (310) 229-1285
    Email: zoe.wilhelm@faegredrinker.com

    Justin O. Kay
    Ambria D. Mahomes
    Faegre Drinker Biddle & Reath LLP
    320 S. Canal Street, Suite 3300
    Chicago, Illinois 60606
    Telephone: (312) 569-1000
    Facsimile: (312) 569-3000
    Email: justin.kay@faegredrinker.com
    Email: ambria.mahomes@faegredrinker.com

    Andrew M. Taylor *(Pro Hac Vice)*
    Faegre Drinker Biddle & Reath LLP
    2200 Wells Fargo Center
    90 S. 7th Street
    Minneapolis, Minnesota 55402
    Telephone: (612) 766-7000
    Facsimile: (612) 766-1600
    Email: andrew.taylor@faegredrinker.com

    *Attorneys for Defendant*
    *Blue Cross Blue Shield Association*