**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Teresa Gouch, Denise Spanos, George Amerson, Kyle Mummey, and Marcia Beasley, individually and on behalf of themselves and all others similarly situated, | Case No. 1:23-cv-15709 |
| | The Honorable John J. Tharp, Jr. |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT BLUE CROSS BLUE SHIELD ASSOCIATION'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT** |
| v. | |
| Blue Cross Blue Shield Association, | |
| Defendant. | |

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................1

FACTUAL BACKGROUND ...................................................................................2

    *i.*      *BCBSA's Deployment of the TikTok Pixel* ...............................4

    *ii.*      *BCBSA's Use of Other Tracking Technologies* .....................6

    *iii.*      *Interception of Plaintiffs' Private Health Information* ...........7

LEGAL STANDARD ..............................................................................................8

ARGUMENT ...........................................................................................................8

I.      PLAINTIFFS ADEQUATELY ALLEGE VIOLATIONS OF THE FEDERAL AND STATE WIRETAP STATUTES .......................................................8

    A.      BCBSA Cannot Meet Its Burden to Demonstrate that Plaintiffs Consented to the Interception and Disclosure of their Private Health Information ...........................................................................9

    B.      The Party Exception Does Not Apply Because BCBSA Intercepted Plaintiffs' Communications for a Criminal or Tortious Purpose..........13

    C.      TikTok and the Other Third-Party Technology Companies were Not Parties to Plaintiffs' Communications .................................18

II.      PLAINTIFFS STATE A CLAIM UNDER THE ILLINOIS COMPUTER TAMPERING ACT ...........................................................................20

III.      PLAINTIFFS ADEQUATELY ALLEGE COMMON LAW CLAIMS ...........21

    A.      The Filed Rate Doctrine Does Not Bar "Benefit of the Bargain" Damages..........21

    B.      Plaintiffs Adequately Allege a Claim for Invasion of Privacy by Publication of Private Facts ...............................................24

    C.      Plaintiffs State a Claim for Breach of Implied Contract........................26

    D.      Plaintiffs Adequately Allege a Claim for Negligence ...........................27

CONCLUSION.......................................................................................................28

# TABLE OF AUTHORITIES

## Cases

*Allen v. Brown Advisory, LLC*,
  41 F.4th 843 (7th Cir. 2022) ................................................................................ 8

*Allen v. Novant Health, Inc.*,
  2023 WL 5486240 (M.D.N.C. Aug. 24, 2023) ...................................................... 26

*Anand v. Heath*,
  2019 WL 2716213 (N.D. Ill. June 28, 2019)......................................................... 11

*Arkansas Louisiana Gas Co. v. Hall*,
  453 U.S. 571 (1981) ............................................................................................. 21

*Arsberry v. Illinois*,
  244 F.3d 558 (7th Cir. 2001) ............................................................................... 21

*Ashcroft v. Iqbal*,
  566 U.S. 662 (2009) ............................................................................................... 8

*B.K. v. Desert Care Network et al*,
  2024 WL 1343305 (C.D. Cal. Feb. 1, 2024) ........................................................ 16

*B.K v. Eisenhower Med. Ctr.*,
  2024 WL 878100 (C.D. Cal. Feb. 29, 2024) ................................................... 17, 27

*Brown v. Google LLC*,
  2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) ......................................................... 9

*Brown v. Google LLC*,
  525 F. Supp. 3d 1049 (N.D. Cal. Mar. 12, 2021) ................................................ 17

*Calhoun v. Google LLC*,
  526 F. Supp. 3d 605 (N.D. Cal. 2021).................................................................... 9

*Campbell v. Facebook, Inc.*,
  77 F. Supp. 3d 836 (N.D. Cal. 2014)...................................................................... 9

*Castillo v. Seagate Tech., LLC*,
  2016 WL 9280242 (N.D. Cal. Sept. 14, 2016) ..................................................... 27

*Chapman v. Yellow Cab Cooperative*,
  875 F.3d 846 (7th Cir. 2017) ................................................................................. 8

*Cosgrove v. Commonwealth Edison Co.*,
  315 Ill. App. 3d 651 (2000) ................................................................. 27

*Cousin v. Sharp Healthcare*,
  2023 WL 8007350 (S.D. Cal. Nov. 17, 2023) ...................................... 13

*Doe v. Regents of Univ. of California*,
  672 F. Supp. 3d 813 (N.D. Cal. 2023) ................................................. 26

*Ellsworth v. U.S. Bank, N.A.*,
  908 F. Supp. 2d 1063 (N.D. Cal. 2012) ............................................... 23

*Flores v. United Airlines*,
  2021 WL 843415 (N.D. Ill. Mar. 5, 2021) ........................................... 12

*Friedman v. AARP, Inc.*
  283 F. Supp. 3d 873 (C.D. Cal. 2018) ................................................. 23

*Gunn v. Cont'l Cas. Co.*,
  622 F. Supp. 3d 694 (N.D. Ill. 2022) ................................................... 22

*Halperin v. Int'l Web Servs., LLC*,
  123 F. Supp. 3d 999 (N.D. Ill. 2015) ................................................... 20

*Harvey v. Centene Mgmt. Co.*,
  357 F. Supp. 3d 1073 (E.D. Wash. 2018) ....................................... 22, 23

*In re Facebook, Inc, Internet Tracking Litigation*
  956 F. 3d 589 (9th Cir. 2020) ................................... 13, 18, 19, 20

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
  402 F. Supp. 3d 767 (N.D. Cal. 2019) ................................... 9, 10, 25

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
  934 F.3d 316 (3rd Cir. 2019) ............................................................... 19

*In re Google, Inc.*,
  2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ...................................... 9

*In re Group Health Plan Litigation*,
  2023 WL 8850243 (D. Minn. Dec. 21, 2023) ...................... 15, 16, 18, 26

*In re Meta Pixel Healthcare Litig.*,
  647 F. Supp. 3d 778 (N.D. Cal. 2022) .............................. 12, 13, 16, 17

iii

*In re Michaels Stores Pin Pad Litig.*,
   830 F. Supp. 2d 518 (N.D. Ill. 2011).................................................................. 26

*In re Yahoo Mail Litig.*,
   7 F. Supp. 3d 1016 (N.D. Cal. 2014)................................................................... 9

*Kaminski v. Elite Staffing, Inc.*,
   23 F.4th 774 (7th Cir. 2022)................................................................................ 8

*Kane v. Univ. of Rochester*,
   2024 WL 1178340 (W.D.N.Y. Mar. 19, 2024)................................................ 16

*Karraker v. Rent-A-Ctr., Inc.*,
   411 F.3d 831 (7th Cir. 2005).............................................................................. 24

*Kirsten v. California Pizza Kitchen, Inc.*,
   2022 WL 16894503 (C.D. Cal. July 29, 2022)................................................. 27

*Kurowski v. Rush Sys. for Health*,
   2023 WL 4707184 (N.D. Ill. July 24, 2023)..................................................... 25

*Kurowski v. Rush Sys. for Health*,
   2023 WL 8544084 (N.D. Ill. Dec. 11, 2023).................................................... 15

*Liston v. King.com, Ltd.*,
   254 F. Supp. 3d 989............................................................................................ 12

*Matera v. Google, Inc.*,
   2016 WL 5339806 (N.D. Cal. Sept. 23, 2016).................................................... 9

*Mekhail v. N. Mem'l Health Care*, No.,
   2024 WL 1332260 (D. Minn. Mar. 28, 2024)................................................... 16

*Miller v. Motorola, Inc.*,
   202 Ill. App. 3d 976, 560 N.E.2d 900 (1990)............................................. 24, 25

*Murphy v. Thomas Jefferson Univ. Hosp., Inc.*,
   2023 WL 7017734 (E.D. Pa. Oct. 10, 2023)..................................................... 27

*Ne. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*,
   707 F.3d 883 (7th Cir. 2013).............................................................................. 21

*Rowlands v. United Parcel Serv. - Fort Wayne*,
   901 F.3d 792 (7th Cir. 2018)................................................................................ 8

iv

*Sgouros v. TransUnion Corp.*,
  2015 WL 507584 (N.D. Ill. Feb. 5, 2015) ................................................................. 11

*Smith v. Facebook*,
  262 F. Supp. 3d 943 (N.D. Cal. 2017) ...................................................................... 12

*Sotelo v. DirectRevenue, LLC*,
  384 F.Supp.2d 1219 (N.D. Ill. 2005) ........................................................................ 20

*Sussman v. Am. Broad. Cos., Inc.*,
  186 F.3d 1200 (9th Cir. 1999) .................................................................................. 14

*United States v. Szymuszkiewicz*,
  622 F.3d 701 (7th Cir. 2010) ............................................................................. 18, 19

*W. Bend Mut. Ins. Co. v. Schumacher*,
  844 F.3d 670 (7th Cir. 2016) ...................................................................................... 8

## Statutes

18 U.S.C. § 2511(2)(d) .................................................................................................. 13
720 Ill. Comp. Stat. Ann. 5/17-51(a)(4)(B) ................................................................... 20
Cal. Pen. Code § 631(a) ............................................................................................... 13

## Rules

Fed. R. Civ. P. 8(a)(2) ..................................................................................................... 8

## INTRODUCTION

Federal and state law prohibit the disclosure of a patient's sensitive healthcare information to unauthorized third parties. In recent years, as digital surveillance and online tracking have steadily increased, federal regulators have warned healthcare providers against the use of website tracking technologies that disclose patient health information without consent. Despite these warnings, Blue Cross Blue Shield Association ("BCBSA"), which provides health insurance to over 5 million federal employees, deployed various tracking technologies on its website to intercept and disclose employee health information to third-party social media and advertising companies. To compound the harm, one of the tracking technologies deployed by BCBSA transmitted employee health information to TikTok, a China-owned technology company that has raised widespread concerns over national security and data privacy.

Plaintiffs are current and former federal employees who communicated sensitive and highly personal healthcare information to BCBSA via its website, including information about specific health symptoms, conditions, treatments, and physicians. Unbeknownst to Plaintiffs, BCBSA allowed TikTok and other technology companies to secretly intercept these communications and link them to account profiles maintained by Plaintiffs. In this way, TikTok and other third parties could learn that a specific federal employee had inquired of BCBSA about sensitive health issues such as "mental health services," "pregnancy," and "addiction."

BCBSA's unlawful interception and disclosure of employee health information violated federal and state wiretap laws. BCBSA moves to dismiss these claims, arguing that Plaintiffs consented to the interception. But BCBSA cannot meet its burden to prove consent given the misleading and vague disclosures on its website regarding its sharing of private health information. Nor can BCBSA escape liability based on its status as a "party" to the communications because

BCBSA intercepted the communications for the purpose of making money by violating a separate federal law related to safeguarding health information. And because BCBSA was the only intended recipient of Plaintiffs' communications, and Plaintiffs never consented to allowing third parties to eavesdrop on the communications, TikTok and the other technology companies themselves cannot be considered "parties" to the communications.

BCBSA's deployment of the tracking technologies also violated the Illinois Computer Tampering Act by causing Plaintiffs' electronic devices to re-direct their communications and unique identifiers to TikTok and the other third-party technology companies without Plaintiffs' authorization.

Finally, Plaintiffs' adequately alleged common law claims for invasion of privacy, breach of implied contract, and negligence.[1] Contrary to BCBSA's arguments, the filed rate doctrine does not bar these claims given Plaintiffs' lost benefit of the bargain in the services received from BCBSA. BCBSA's other technical arguments regarding the sufficiency of the individual common law claims likewise fail.

## FACTUAL BACKGROUND

In an age of mass digital surveillance and online tracking, federal regulators have focused efforts on preventing unlawful disclosures of an individual's most sensitive data: private health information. In December 2022, the U.S. Department of Health and Human Services issued guidance instructing healthcare providers not to use online tracking technologies for marketing purposes without obtaining an individual's HIPAA-compliant consent. ¶¶ 8, 133-35.[2] According to federal regulators, using such tracking technologies could "reveal incredibly sensitive

---

[1] Plaintiffs do not contest dismissal of their independent claim for unjust enrichment but reserve the right to assert unjust enrichment as a remedy.

[2] All citations to ¶ refer to Plaintiffs' Amended Complaint. Dkt. 22.

information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment." *See* ¶ 133 n.104. The guidance further advised against such disclosures regardless of whether they occurred from logged-in patient portals or "unauthenticated" (*i.e.* publicly available) portions of a website. ¶ 134.

In July 2023, federal regulators sent a letter to approximately 130 healthcare providers warning against the use of online tracking technologies that cause unauthorized disclosures of health information to third parties. ¶ 9. The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others." *Id.* According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more." *Id.*

BCBSA provides health insurance to approximately 5.5 million federal employees, retirees, and their family members. ¶ 2. As part of its offerings to federal employees, BCBSA promotes a website, fepblue.org, where covered employees can search for information about health symptoms, conditions, treatments, physicians, and insurance plans. ¶ 3.

Despite warnings from federal regulators, BCBSA deployed multiple tracking technologies on its website. ¶ 4. Under BCBSA's direction and control, these tracking technologies intercepted and disclosed the health information of federal employees to some of the largest technology and advertising companies in the world, including TikTok, Meta, Google, and LinkedIn. ¶¶ 84-85. Disclosure of health information to these third-party technology companies underscore the privacy concerns voiced by federal regulators. ¶¶ 9, 86-100. But the disclosures to TikTok, in

particular, implicate unique privacy and national security interests given the sensitivity of employee health information and TikTok's foreign ownership and poor track record of data privacy. ¶¶ 32-33, 79-80.

i.    *BCBSA's Deployment of the TikTok Pixel*

The TikTok Pixel is a piece of code that companies can embed in their websites to transmit information to TikTok about user activities on the website. ¶ 51. Once the TikTok Pixel is installed on a website, the Pixel secretly operates in the background, invisible to visitors to the website, while it intercepts and records the user's communications with the website. *Id.*

By default, the TikTok Pixel collects information about the timing of when actions on the website take place (like when a page is viewed); the user's IP address; the device make, model, operating system, and browser information for the user; third-party cookies to match the user's website communications to an identified person on TikTok; pages viewed on the website; buttons clicked on the website; and content typed into "search" bars. ¶ 52. Beyond these standard collection efforts, a website owner can also customize the TikTok Pixel to collect additional information about a website visitor's activities and transmit that information to TikTok. *Id.*

TikTok uses cookies and other unique identifiers intercepted by the TikTok Pixel to match a website visitor's communications and activities with a particular individual. ¶ 55. When an individual with a TikTok account visits a website that uses the TikTok Pixel, such as BCBSA's website, the Pixel intercepts the individual's communications and transmits them to TikTok along with unique first and third-party cookies that TikTok uses to "match[] [the] visitors on [the] website with people on TikTok." ¶ 56.

Even if an individual does not have a TikTok account, when they visit BCBSA's website, the Pixel intercepts the individual's communications and transmits the information to TikTok.

4

¶ 57. TikTok can then match the communications to a particular individual through a process called "fingerprinting," which involves aggregating multiple data points associated with a user's browser, device, and other identifiers that can be used to uniquely identify the user. ¶¶ 58-59.

The TikTok Pixel provides "another vector for data collection beyond TikTok's popular mobile app, which is increasingly under fire in Washington as a possible way for the Chinese government to collect data on Americans." ¶ 44. Given TikTok's aggressive data-harvesting practices and its direct ties to China, government entities in the U.S. and across the globe have taken steps to ban the use of TikTok on official government devices. ¶ 33.

In December 2022, for example, the U.S. House of Representatives banned TikTok from all House-managed mobile devices citing "a number of security risks." ¶ 35. In February 2023, the White House announced that "all federal agencies must eliminate TikTok from phones and systems and prohibit internet traffic from reaching the company." ¶ 36. The Office of Management and Budget called the directive a "critical step forward in addressing the risks presented by the app to sensitive government data." *Id.* In June 2023, the U.S. government extended the TikTok ban to electronic devices used by all federal contractors. ¶ 38. State and local governments across the U.S. have taken similar action to ban TikTok on official government devices, as have national governments across the globe, all stemming from security and privacy concerns associated with TikTok's data-collection practices. ¶¶ 39, 41.

Despite the growing privacy and national security concerns associated with TikTok's aggressive data-harvesting practices, BCBSA deployed the TikTok Pixel on its website to intercept and disclose the private health information of federal employees, all without employees' knowledge or consent. ¶¶ 25, 65, 82. Federal employees, for example, who inquired about "Mental Health" services on BCBSA's website had their search queries secretly intercepted and transmitted

to TikTok. ¶¶ 68-69. Similarly, employees who inquired about "Pregnancy" on BCBSA's website had their inquiries intercepted and disclosed to TikTok, including the substance of their communications concerning "pregnancy/maternity." ¶¶ 70-71. An employee who used BCBSA's website "search" bar to type the word "addiction" or "depression," likewise had the substance of those communications surreptitiously intercepted and transmitted to TikTok. ¶ 72.

If the employee had a personal TikTok account, the TikTok Pixel triggered the transmission of unique cookies that TikTok could use to link each employee communication on BCBSA's website with the employee's TikTok profile, thus revealing the employee's identity and allowing TikTok and BCBSA to retarget that employee with ads related to BCBSA or the employee's underlying health conditions. ¶¶ 61, 75, 123. Further, if the employee did not maintain a TikTok account, TikTok would still receive the substance of the employee's communications with BCBSA along with various identifiers that TikTok could use to potentially identify the employee through the employee's online "fingerprints" and "identity graph." ¶¶ 58-60, 76. Once TikTok had that information, it could use it for any purpose, and the federal employee would have no way of deleting or retrieving the sensitive data. ¶ 77.

ii. *BCBSA's Use of Other Tracking Technologies*

In addition to its use of the TikTok Pixel, BCBSA deployed tracking technologies from at least three other companies that triggered the unauthorized disclosure of federal employees' private health information. ¶ 84. The tracking technologies included: (1) the Meta Pixel, (2) Google Analytics, and (3) the LinkedIn Insight Tag. *Id.*

These three tracking technologies worked in substantially the same manner as the TikTok Pixel. ¶ 85. They all intercepted and redirected the website user's communications with BCBSA— including specific URL information showing the pages visited, buttons clicked, and search queries

conducted by visitors—to unauthorized third parties. *Id.* Meta, Google, and LinkedIn then matched the communications with account holders for purposes of targeted advertising or otherwise monetizing the user data. *Id.*

For example, a federal employee who visited the BCBSA website's "Coronavirus Resource Center," had the substance of their web communication—"coronavirus-updates"—intercepted and disclosed to Facebook along with unique identifiers that Facebook could use to link the communications to the employee's Facebook account. ¶¶ 89-90. Similarly, an employee who searched for physicians with experience treating "gambling addictions," had the substance of those queries intercepted by Google's tracking technology together with unique cookies Google could use to link the communications to the employee's Google account. ¶ 95. The same thing happened to employees who inquired about "cancer coverage," with the substance of those communications being intercepted by LinkedIn and matched to the employee's LinkedIn profile. ¶100. In each instance, the employee's substantive health-related communication was intercepted and disclosed to third parties together with the employee's unique identifiers triggered by BCBSA's deployment of the tracking technologies. ¶ 85.

### iii.  Interception of Plaintiffs' Private Health Information

Plaintiffs are current and retired federal employees who are insured through BCBSA's federal employee insurance program. Plaintiffs visited BCBSA's website multiple times in the last several years to inquire about specific health symptoms, conditions, treatments, and physicians. ¶¶ 20-24. Plaintiff Gouch, for example, typed search terms into the Website "search" bar to find physicians to treat her particular health conditions. ¶ 20. After visiting BCBSA's website, Plaintiff Gouch received ads on Facebook and TikTok about medicines, doctors in her area, health insurance, and Blue Cross Blue Shield. *Id.* Similarly, Plaintiff Mummey used BCBSA's website

to search for physicians and to research his particular health conditions. ¶ 23. Plaintiff Mummey also received ads related to his health information on TikTok, Facebook, and Instagram, after visiting Defendant's website. *Id.* None of the Plaintiffs were aware BCBSA had deployed tracking technologies to intercept their health-related queries on the Website. ¶ 25. Nor did Plaintiffs consent to the disclosures. ¶¶ 12, 25.

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, the complaint must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 776 (7th Cir. 2022) (quoting Fed. R. Civ. P. 8(a)(2)). Plaintiffs need not plead facts corresponding to every element of a legal theory. *Chapman v. Yellow Cab Cooperative*, 875 F.3d 846, 848 (7th Cir. 2017). Instead, the plaintiff need only plead a plausible claim. *Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 800 (7th Cir. 2018). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009). In deciding a motion to dismiss, the court accepts the well-pleaded factual allegations in the complaint "as true" and "draw[s] all reasonable inferences in [plaintiff's] favor." *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (citing *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016)).

## ARGUMENT

## I. PLAINTIFFS ADEQUATELY ALLEGE VIOLATIONS OF THE FEDERAL AND STATE WIRETAP STATUTES

Plaintiffs allege violations of the Electronic Communications Privacy Act ("ECPA"), the California Invasion of Privacy Act ("CIPA"), and the Illinois Eavesdropping Statute ("IES") based on BCBSA's deployment of the tracking technologies to intercept and disclose Plaintiffs' private

health information. BCBSA raises several technical challenges to these claims, none of which are persuasive.

### A. BCBSA Cannot Meet Its Burden to Demonstrate that Plaintiffs Consented to the Interception and Disclosure of their Private Health Information

BCBSA argues that Plaintiffs consented to the interception and disclosure of their private health information. As the party seeking the benefit of the defense, BCBSA has the burden to prove consent. *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 620 (N.D. Cal. 2021) (citing *Matera v. Google, Inc.*, 2016 WL 5339806, at *7 (N.D. Cal. Sept. 23, 2016)). Consent "can be explicit or implied, but any consent must be actual." *In re Google, Inc.*, 2013 WL 5423918, at *12 (N.D. Cal. Sept. 26, 2013). For consent to be actual, the disclosures must "explicitly notify" users of the practice at issue. *Id.* at *13; *see also Campbell v. Facebook, Inc.*, 77 F. Supp. 3d 836, 847–48 (N.D. Cal. 2014) (explaining that disclosures must give users notice of the "specific practice" at issue). "The disclosures must have only one plausible interpretation for a finding of consent." *Calhoun*, 526 F. Supp. 3d at 620 (citing *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 794 (N.D. Cal. 2019)).

Further, "consent is not an all-or-nothing proposition." *In re Google, Inc.*, 2013 WL 5423918, at * 12. "A party may consent to the interception of only part of a communication or to the interception of only a subset of its communications." *Brown v. Google LLC*, No. 4:20-CV-3664-YGR, 2023 WL 5029899, at *13 (N.D. Cal. Aug. 7, 2023) (cleaned up). Courts apply a "reasonable person" standard in evaluating consent. *Id.* (citing *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1028 (N.D. Cal. 2014)). Thus, "if a reasonable . . . user could have plausibly interpreted the contract language as not disclosing that [the defendant] would engage in particular conduct, then [the defendant] cannot obtain dismissal of a claim about that conduct (at least not based on the issue of consent)." *In re Facebook, Inc.*, 402 F. Supp. 3d at 789.

As a starting point, Plaintiffs plausibly allege they did not consent to BCBSA's interception and disclosure of their private health information to TikTok and the other technology companies. The Amended Complaint states, for example, that BCBSA deployed the tracking technologies surreptitiously and without the knowledge of website users. ¶ 4, 54. Plaintiffs further allege that the tracking technology code was hidden from the naked eye and operated secretly behind the scenes while Plaintiffs navigated BCBSA's website. ¶¶ 51, 53-54, 85. Plaintiffs assert they reasonably expected their online communications with BCBSA regarding sensitive health topics would be private and not shared outside of BCBSA without their express consent. ¶ 25. Further, Plaintiffs allege that BCBSA never obtained Plaintiffs' HIPAA-compliant consent to disclose their substantive health information to TikTok and the other technology companies. ¶¶ 13, 25. In short, Plaintiffs plausibly allege they did not consent to BCBSA's unlawful disclosures, and they plead specific facts that support those allegations.

BCBSA cannot meet its burden to overcome Plaintiffs' well-pleaded allegations. BCBSA first points to the Cookie Banner displayed at the bottom of its website, which "discloses to all website visitors that the website uses cookies." Def's Mem. of Law in Support of Mot. to Dismiss ("Mot.") at 12. But the Cookie Banner says nothing about BCBSA disclosing substantive communications regarding employees' health symptoms, conditions, treatments, and physicians to TikTok and other third-party technology companies. Nor would a "reasonable user" who read that BCBSA "use[s] cookies on [the] website to give you the best experience and measure website usage," *id.*, conclude that BCBSA was disclosing substantive health information to TikTok and other third parties, *In re Facebook, Inc.*, 402 F. Supp. 3d at 794 ("The disclosures must have only one plausible interpretation for a finding of consent."). At most, the Cookie Banner references BCBSA's use of its own cookies to enhance its website's functionality, not the interception and

10

disclosure of substantive health information to a foreign-owned technology company and other social media giants.

BCBSA's reliance on its Privacy Policy fares no better. Because visitors to BCBSA's website do not affirmatively assent to the Privacy Policy—for example, by clicking a button—the policy would be considered a "browsewrap" agreement, which "[c]ourts are reluctant to enforce." *Anand v. Heath*, No. 19-CV-00016, 2019 WL 2716213, at *3 (N.D. Ill. June 28, 2019); *see also Sgouros v. TransUnion Corp.*, No. 14 C 1850, 2015 WL 507584, at *6 (N.D. Ill. Feb. 5, 2015) ("A 'browsewrap' agreement is an agreement where users are bound to its terms by merely navigating or using a website."). BCBSA must show that Plaintiffs had "constructive knowledge" of the Privacy Policy, which "require[s] (i) conspicuous hyperlinks or texts of agreements and (ii) an explicit text referencing terms of agreements or instructing users that they are assenting to agreements." *Sgouros*, 2015 WL 507584, at *6. While the Privacy Policy was hyperlinked in the Cookie Banner, there was no "explicit text referencing terms of agreements or instructing users that they [were] assenting to agreements." *Id.* Indeed, the Cookie Banner stated merely that users "consent[ed] to . . . cookies," and directed users to the Privacy Policy for "more information." Mot. at 12. Nothing in the Cookie Banner instructed users they were assenting to the terms of the Privacy Policy itself, which materially deviated from the generic disclosures in the Cookie Banner. *Cf. Anand*, 2019 WL 2716213 (finding lack of assent where "the website did not include language explaining that clicking the 'Continue' button would constitute assent to the terms and conditions or that continuation was conditioned on such assent").

Regardless, the Privacy Policy is silent with respect to any transmission of data to TikTok. And given the federal government's broad efforts to ban TikTok on official government devices, a reasonable federal employee reading the Privacy Policy would not be on notice of their health

insurer transmitting private health information to a foreign-owned technology company. BCBSA cannot demonstrate consent based on the Cookie Banner or Privacy Policy.

BCBSA also argues Plaintiffs consented to the interception and disclosure of their private health information through their accounts with the technology companies. Mot. at 8, 13. BCBSA provides hyperlinks to the companies' privacy policies, but the Court should deny BCBSA's request to take judicial notice of these policies because it is unclear which version of the terms may apply. *See Flores v. United Airlines*, No. 18 C 6571, 2021 WL 843415, at *6 (N.D. Ill. Mar. 5, 2021) (refusing to "take judicial notice of the contents of a website, given how easily a website can be changed"); *Liston v. King.com, Ltd.*, 254 F. Supp. 3d 989, 1004 n. 4 (N.D. Ill. 2017) ("Because King has failed to demonstrate that the submitted version of the license agreement was in place and applied to Liston at the relevant time period—the only apparent relevance it could have at this juncture—the request for judicial notice is denied."). The current link to the TikTok Privacy Policy, for example, indicates the terms were last updated on "March 28, 2024," but it is not clear what provisions were "updated."

In any event, courts have rejected BCBSA's argument that plaintiffs consent via the privacy policies of the technology companies. *See In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 793 (N.D. Cal. 2022) ("Meta's policies do not, however, specifically indicate that Meta may acquire health data obtained from Facebook users' interactions with their medical providers' websites. Its generalized notice is not sufficient to establish consent."). The Court in *In re Meta Pixel Healthcare Litigation* also distinguished *Smith v. Facebook*, 262 F. Supp. 3d 943, 955 (N.D. Cal. 2017)—which BCSBA relies on—explaining that "the collection of protected health information from a medical provider is a different matter entirely" from the "general internet browsing at issue in *Smith*." *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 794. The court

was "skeptical that a reasonable user who viewed Meta's policies would have understood that Meta was collecting protected health information." *Id.* at 793-94. BCBSA cannot seek refuge in the privacy policies of TikTok and the other technology companies.

### B. The Party Exception Does Not Apply Because BCBSA Intercepted Plaintiffs' Communications for a Criminal or Tortious Purpose

BCBSA argues it did not unlawfully intercept Plaintiffs' communications because it was the intended recipient of the communications. BCBSA points to ECPA's "party exception," which states that, "[i]t shall not be unlawful under this chapter for a person . . . to intercept a wire, oral, or electronic communication where such person is a party to the communication." 18 U.S.C. § 2511(2)(d). The "party exception" does not apply, however, if the "communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State." *Id.* In other words, if BCBSA intercepted Plaintiffs' communications "for the purpose of committing any tortious or criminal act," it cannot escape liability for the interception.[3]

The crime-tort exception focuses on whether "the *purpose* for the interception—its

---

[3] ECPA and Section 631 of CIPA both contain a party exemption. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F. 3d 589, 607 (9th Cir. 2020). But a party to a communication may still be liable for interceptions under either statute, albeit based on different theories. Under ECPA, the crime-tort exception defeats the party exemption. Under CIPA, which does not have a crime-tort exception, a party may be liable for "aid[ing]" another to "learn the contents" of communications. Cal. Pen. Code. § 631(a). BCBSA cites two session replay cases in asserting that CIPA "aiding" liability is precluded. But courts addressing tracking technologies on healthcare websites have recently held healthcare entities must face Pixel-related claims under CIPA's "aiding" liability on facts substantially identical to this case. *Cousin v. Sharp Healthcare*, No. 22-CV-2040-MMA-DDL, 2023 WL 8007350, at *5 (S.D. Cal. Nov. 17, 2023); *Toy v. Life Line Screening of America, LTD*, No. 23-CV-04651-RFL (N.D. Cal. March 19, 2024) (ECF No. 36).

intended use—was criminal or tortious." *Sussman v. Am. Broad. Cos., Inc.*, 186 F.3d 1200, 1202 (9th Cir. 1999) (emphasis in original) (quotation marks and citation omitted). The existence of a lawful purpose does not sanitize an interception that was also made for a tortious or unlawful purpose. *Id.*

Plaintiffs' allegations meet this requirement. Specifically, Plaintiffs allege that "[b]y embedding the tracking technologies on its Website and disclosing the content of federal employee communications relating to symptoms, conditions, treatments, doctors, and other Sensitive Information, Defendant had a purpose that was tortious, criminal, and designed to violate state and federal laws." ¶ 166. The Amended Complaint then lists various tort and criminal laws that BCBSA intended to violate through the interception of Plaintiffs' communications, including HIPAA's criminal prohibitions against disclosing "individually identifiable health information" without authorization. *Id.* That provision imposes liability for disclosing information that "relates to the past, present, or future physical or mental health or condition of an individual" and that "identifies the individual" or "with respect to which there is a reasonable basis to believe that the information can be used to identify the individual." ¶ 168. The Amended Complaint exhaustively details how BCBSA acted with intent to violate HIPAA by intercepting Plaintiffs' communications concerning medical symptoms, health conditions, and doctors, including by capturing Plaintiffs' specific queries typed into the website's "search bar." ¶¶ 10, 20-24. Plaintiffs further allege that BCBSA disclosed this sensitive health information to various technology companies, including TikTok, Meta, Google, and LinkedIn, along with unique identifiers that could be used to link the web communications to an identified individual. ¶¶ 55-59, 68-77, 86-101. As alleged in the Amended Complaint, some Plaintiffs recall receiving targeted health-related ads after visiting BCBSA's website. ¶¶ 20, 21, 23.

14

Multiple federal courts have found substantially identical allegations sufficient to trigger the crime-tort exception. In *Kurowski v. Rush Sys. for Health*, No. 22 C 5380, 2023 WL 8544084, at *3 (N.D. Ill. Dec. 11, 2023) ("*Rush III*"), the plaintiff alleged that Rush "transmitted the name and location of her personal physician, as well as her physician's specialty." *Id.* The plaintiff "further allege[d] that this information was, in turn, used by at least Facebook to target her with particular advertising associated with her particular health conditions." *Id.* Finally, the plaintiff alleged that "Rush knowingly transmit[ted] this data and that it [did] so for the purpose of financial gain." *Id.* Taking as "true [plaintiff's] well-pleaded allegations," Judge Kennelly found that the allegations were "sufficient to invoke the HIPAA exception-to-the-party-exception . . . [and that the complaint] plausibly state[d] a claim for relief under the Wiretap Act."[4] *Id.*

Similarly, in *In re Group Health Plan Litigation*, No. 23-CV-267 (JWB/DJF), 2023 WL 8850243, at *8 (D. Minn. Dec. 21, 2023), the plaintiffs "allege[d] the primary motivation in HealthPartners' interception and disclosure [via the Meta Pixel] was to commit wrongful and tortious acts, namely, the use of patient data for advertising in the absence of express written consent, and the use for marketing and revenue generation was in violation of HIPAA and an invasion of privacy." *Id.* (internal quotation marks omitted). The plaintiffs also "specifically list[ed] the various laws they allege[d] HealthPartners purposefully violated and then continue[d] for multiple paragraphs explaining how these laws were violated." *Id.* The court denied HealthPartners' argument that the allegations were "conclusory" and found that because the "case

---

[4] BCBSA attempts to sidestep *Rush III* by arguing that the decision involved tracking technologies on the hospital's patient portal. Mot. at 17. But nothing in Judge Kennelly's decision anchored the finding regarding the viability of the ECPA claim on the *location* of the tracking technologies. Rather, *Rush III* rightly focused on the *nature* of the information transmitted—the name and location of plaintiff's physician and the physician's specialty, which would reveal plaintiff's underlying health condition and thus constitute "individually identifiable health information" under HIPAA. *Rush III*, 2023 WL 8544084, at *2.

[was] at the pleading stage," and "determination of HealthPartners' actual purpose for installing and using the Pixel Code require[d] a factual undertaking," plaintiffs had "met the pleading requirements to plausibly allege the crime-tort exception applie[d]." *Id.*; *see also In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 797 (finding "[t]here is a not-insignificant chance . . . that plaintiffs may be able to show that the crime-tort exception applies" based on allegations "that the use of patient data for advertising in the absence of express written consent is criminal and tortious").

Other recent decisions from federal courts have likewise found a healthcare provider's intended violation of HIPAA's disclosure rule for marketing purposes sufficient to trigger the crime-tort exception. *Mekhail v. N. Mem'l Health Care*, No. 23CV00440KMMTNL, 2024 WL 1332260, at *5 (D. Minn. Mar. 28, 2024) (finding plaintiff's alleged violations of HIPAA's disclosure rule, among other state law violations, sufficient to invoke the crime-tort exception); *Kane v. Univ. of Rochester*, No. 23-CV-6027-FPG, 2024 WL 1178340, at *7 (W.D.N.Y. Mar. 19, 2024) (concluding that "Plaintiffs can invoke the tort-crime exception" based on allegations that "Defendant configured the Pixel to collect and disclose, among other things, that a specific user booked an appointment with a specific healthcare provider and the search terms that the user entered to find that provider"; "[t]hat information, through the c_user cookie, would be associated with a particular Facebook user"; and "that Defendant disclosed this information to enhance its marketing efforts"); *see also B.K. v. Desert Care Network et al*, No. 223CV05021SPGPDX, 2024 WL 1343305, at *6 (C.D. Cal. Feb. 1, 2024) (finding the crime-tort exception applicable based on plaintiffs' allegations that defendant intercepted communications regarding "requests to refill prescriptions and appointment scheduling inquires" in "violation of various state tort claims and state and federal laws").

BCBSA argues that use of the tracking technologies to further "marketing, advertising, and analytics purposes" does not constitute "independent illegal or actional conduct" sufficient to trigger the crime-tort exception. Mot. at 15. But courts recognize that linking intercepted communications with a person's identifying information for ad retargeting constitutes an independent illegal action. *See In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 797 (finding "that plaintiffs may be able to show that the crime-tort exception applies" based on allegations "that the use of patient data for advertising in the absence of express written consent is criminal and tortious"); *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. Mar. 12, 2021) (observing that the "association of Plaintiffs' data with preexisting user profiles is a further use of Plaintiffs' data that satisfies [the crime-tort] exception"). And this was the very purpose for which BCBSA deployed the tracking technologies on its website: to capture Plaintiffs' communications, link those communications to Plaintiffs' profiles, and retarget Plaintiffs' with advertising, all in violation of HIPAA's disclosure rule. ¶¶ 10, 61, 85, 123, 169. BCBSA's reliance on *B.K v. Eisenhower Med. Ctr.*, 2024 WL 878100 (C.D. Cal. Feb. 29, 2024), where plaintiffs did not allege an independent violation under HIPAA's disclosure rule but instead merely asserted that the defendant had acted for its own "commercial advantage," is unpersuasive.

BCBSA also argues that Plaintiffs failed to allege a violation of HIPAA's disclosure rule because "the Tech Companies identify the Plaintiffs independently and without any assistance from BCBSA." Mot. at 16. In making this argument, BCBSA does not explain how, in the absence of BCBSA's intentional deployment of the tracking technologies, TikTok and the other companies would even know Plaintiffs visited BCBSA's website. Indeed, it was BCBSA's use of the tracking technologies that triggered the disclosure of both Plaintiffs' communications and Plaintiffs' unique identifiers used to link the communications to their account profiles. ¶¶ 4, 7, 10-11, 56, 65. But for

BCBSA's use of the tracking technologies, no disclosure of Plaintiffs' communications or identifiers would have occurred. BCBSA's attempt to shift blame for causing the disclosures should fail.

Because Plaintiffs plausibly allege that BCBSA intercepted their communications for the purpose of ad retargeting in violation of HIPAA's disclosure rule, the crime-tort exception applies, and BCBSA cannot escape liability at the pleading stage. *In re Group Health Plan Litigation*, 2023 WL 8850243, at *8.

### C. TikTok and the Other Third-Party Technology Companies were Not Parties to Plaintiffs' Communications

In a last-ditch effort to defeat the wiretap claims, BCBSA argues that TikTok and the other technology companies were themselves "parties" to Plaintiffs' communications with BCBSA. Mot. at 18. According to BCBSA, the technology companies should be considered "parties" because they received duplicated communications from Plaintiffs' devices. This argument likewise fails.

The Ninth Circuit recently addressed the question whether recipients of "simultaneous, unknown duplication of GET requests" qualify as "parties" under ECPA. *In re Facebook, Inc.*, 956 F.3d at 607. In analyzing that question, the court observed that "[t]he First and Seventh Circuits have implicitly assumed that entities that surreptitiously duplicate transmissions between two parties are not parties to communications within the meaning of the Act." *Id.* In *United States v. Szymuszkiewicz*, 622 F.3d 701 (7th Cir. 2010), for example, "the Seventh Circuit considered whether a defendant violated the Wiretap Act when he employed a software that instructed his employer's email to duplicate and forward all emails the employer received to the defendant's own inbox." *Id.* (citing *Szymuszkiewicz*, 622 F.3d at 703). The Seventh Circuit "determined that, because the copies were sent contemporaneously with the original emails, the defendant had

18

intercepted the communications and could be held liable." *Id.* (citing *Szymuszkiewicz*, 622 F.3d at 706).

In surveying the case law, the Ninth Circuit also noted that the Third Circuit in *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 325 (3rd Cir. 2019)—which BCBSA relies on—had taken the opposite approach and concluded that third parties that received duplicated GET requests were considered intended recipients of the communications and were therefore "parties" to the communications. *Id.* at 608.

To decide between these competing approaches, the Ninth Circuit noted that the "paramount objective" of ECPA was to "protect effectively the privacy of communications." *Id.* (cleaned up). The court also found persuasive "legislative history evidenc[ing] Congress's intent to prevent the acquisition of the contents of a message by an unauthorized third-party or an unseen auditor." *Id.* (cleaned up). Finally, the court observed that "[p]ermitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion, allowing the exception to swallow the rule." *Id.* The court therefore adopted the "First and Seventh Circuits' understanding that simultaneous, unknown duplication and communication of GET requests do not exempt a defendant from liability under the party exception." *Id.*

This Court should follow the Seventh Circuit's reasoning in *Szymuszkiewicz* in rejecting BCBSA's minority approach to the "party" issue. The Amended Complaint makes clear that BCBSA was the only intended recipient of Plaintiffs' communications and that Plaintiffs never consented to disclosure of their communications to TikTok and the other third-party technology companies. ¶¶ 13, 25. Calling the technology companies "parties" simply because they received duplicated GET requests—triggered by BCBSA's deployment of the tracking code without

Plaintiffs' knowledge or consent—would allow the party exception "to swallow the rule." *In re Facebook, Inc.*, 956 F.3d at 608.

## II.     PLAINTIFFS STATE A CLAIM UNDER THE ILLINOIS COMPUTER TAMPERING ACT

BCBSA argues that Plaintiffs failed to plead a violation of the Illinois Computer Tampering Act ("ICTA") because they did not adequately allege removal of data causing a "loss" under the statute and otherwise failed to allege lack of consent. Mot. at 19. These arguments fail.

"Broadly speaking, the ICTA 'applies to unauthorized computer access.'" *Halperin v. Int'l Web Servs., LLC*, 123 F. Supp. 3d 999, 1009–10 (N.D. Ill. 2015) (quoting *1010 Sotelo v. DirectRevenue, LLC*, 384 F.Supp.2d 1219, 1236 (N.D. Ill. 2005)). The statute prohibits a person from "insert[ing] or attempt[ing] to insert a program into a computer . . . knowing or having reason to know that such program contains information or commands that will or may . . . remove . . . data from that computer," without "the authorization of [the] computer's owner or in excess of the authority granted." 720 Ill. Comp. Stat. Ann. 5/17-51(a)(4)(B). ICTA provides a private cause of action for anyone who "suffers loss by reason of a violation of subdivision (a)(4)" of the statute. *Id.* 5/17-51(c).

Plaintiffs allege that BCBSA violated ICTA by inserting tracking code from TikTok and the other technology companies into Plaintiffs' computers and browsers that caused the removal of data—namely, the simultaneous duplication and transmission of Plaintiffs' communications and unique identifiers to third parties. ¶¶ 54-56, 87, 92, 100, 199-200. Plaintiffs allege that BCBSA knew the tracking technologies would operate in that fashion, and, in fact, were deployed specifically for that purpose. ¶¶ 7, 10, 123. Plaintiffs further allege that they suffered "loss" in the form of disclosure of their private health information—a valuable commodity—to unauthorized third parties from whom Plaintiffs cannot retrieve the data or otherwise receive remuneration.

¶¶ 77, 105-23, 201. These specific facts plausibly state a claim under ICTA.

BCBSA's argument that Plaintiffs' data was exfiltrated with authorization fails. As discussed above, Plaintiffs never consented to disclosure of their private health information to TikTok or the other technology companies. BCBSA's Cookie Banner and Privacy Policy did not notify Plaintiffs of the disclosures, and the privacy policies of the technology companies are not properly before the Court (and do not provide "authorization" under ICTA in any event).

III.     PLAINTIFFS ADEQUATELY ALLEGE COMMON LAW CLAIMS

A.     The Filed Rate Doctrine Does Not Bar "Benefit of the Bargain" Damages

The filed rate doctrine prohibits courts from questioning rates filed with a regulatory authority. *Ne. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 707 F.3d 883, 887 (7th Cir. 2013). The doctrine serves two purposes: (1) to ensure agencies retain exclusive authority to set and determine reasonable rates; and (2) to prevent regulated entities from engaging in price discrimination between ratepayers. *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577–78 (1981); *Arsberry v. Illinois*, 244 F.3d 558, 562 (7th Cir. 2001). Plaintiffs' common law claims seeking benefit of the bargain damages do not implicate these principles, and the filed rate doctrine therefore does not apply.

At their core, Plaintiffs claims for negligence, invasion of privacy, and breach of implied contract assert that BCBSA's secret collection and disclosure of federal employees' sensitive information to third-parties, including TikTok, Meta, Google, and LinkedIn, breached legal duties or quasi-contractual obligations owed to Plaintiffs. ¶¶ 224, 231, 238-39, 242-44. No element of these claims challenges or demands that the Court pass judgment on the reasonableness of insurance premiums negotiated with OPM or overrule OPM's approval of premiums. Likewise, the Court rendering judgment on the propriety of BCBSA's data practices would not interfere with

OPM's ability to determine the reasonableness of and approve premiums going forward.

BCBSA claims the filed rate doctrine broadly bars claims for damages "alleging overcharges or the inadequate provision of services where services were provided pursuant to a filed rate." Mot. at 21. This sweeping characterization ignores authority declining to apply the filed rate doctrine simply because plaintiff's claims are incidentally related to insurance premiums. For instance, in *Gunn v. Cont'l Cas. Co.*, an insurer significantly increased premiums for long-term care insurance, despite allegedly promising not to do so, prompting allegations of fraudulent marketing and failure to comply with insurance policy terms. 622 F. Supp. 3d 694, 702 (N.D. Ill. 2022). The court rejected the insurer's argument that the filed rate doctrine barred plaintiff's claims, as "[c]ourts may consider claims that are related to rates approved by an agency but do not require the courts to reevaluate rates." *Id.* (internal quotations omitted). Consistent with this principle, the court held that determining whether an insurer "contractually promised not to raise rates" or "engaged in fraudulent marketing practices," did not require the court "to evaluate the reasonableness of the premium rate itself." *Id.*

Courts have also declined to apply the filed rate doctrine where, as here, plaintiffs alleged they did not receive the benefit of the bargain with an insurer. In *Harvey v. Centene Mgmt. Co.*, the court concluded the filed rate doctrine did not bar putative class action plaintiffs from seeking "benefit of the bargain" damages where they alleged the insurer misrepresented the adequacy of its provider network. 357 F. Supp. 3d 1073, 1079, 1084 (E.D. Wash. 2018). These damages included either a refund of the entire premium, or a partial refund equal to the difference between the value of the policy as represented and contracted for and the value of the policy as actually accepted and delivered. *Id.* at 1079. The court recognized that while the claims were "certainly related" to health insurance premiums, they did not require the court to "reevaluate the

reasonableness of such premiums," and awarding the requested damages "would not require the Court to inappropriately substitute its judgment for that of the Insurance Commissioner." *Id*. at 1084. Further, while the plaintiffs' claims were "incidental" to the approved health insurance premiums, they did not warrant application of the filed rate doctrine because plaintiffs "[did] not allege their premiums [were] too high." *Id*. Rather, the plaintiffs alleged they did not receive the services promised or that the defendants committed a consumer protection violation. *Id*.; *see also Ellsworth v. U.S. Bank, N.A.*, 908 F. Supp. 2d 1063, 1083 (N.D. Cal. 2012) ("Just because the damages are based on increased costs incurred as a result of the alleged [misconduct] does not transform a challenge to conduct and practices into a challenge to the premiums.").

Similarly, in *Friedman v. AARP, Inc.*, the plaintiff alleged that had he known UnitedHealth was making illegal commission payments to AARP in connection with the health insurance policy at-issue, he would have sought coverage from another provider for a lower rate. 283 F. Supp. 3d 873, 876, 878–79 (C.D. Cal. 2018). Again, the court declined to apply the filed rate doctrine because plaintiff's claims were "more akin to challenges to the Defendants' alleged misrepresentations, rather than challenges to the approved rate, or . . . . to whether the rate is reasonable," and "the gravamen of the complaint is not the premium rate per se, but the failure to disclose the allegedly fraudulent nature of the commission." *Id.* at 878–79.

Here, Plaintiffs allege they did not receive the benefit of the bargain where "they would have used the services of another insurance provider under the FEHB program or paid or demanded a lower price for Defendant's services," had they known about BCBSA's disclosures to TikTok and the other technology companies. ¶¶ 224, 231, 239. Thus, as in the cases above, the "gravamen" of Plaintiffs' complaint is not the premium rate per se, but whether BCBSA's undisclosed interception and disclosure of private health information breached duties or obligations owed to

23

Plaintiffs, resulting in harm. The Court is capable of ruling on this question without reevaluating the reasonableness of premiums originally approved by OPM or otherwise inappropriately substituting its judgment for OPM's.

Other aspects of BCBSA's argument also miss the mark. BCBSA selectively quotes language from the Amended Complaint stating Plaintiffs would have paid less for BCBSA's services had they known about its disclosures of their private health information and characterizes these allegations as seeking to recover "overcharges." Mot. at 23. But the Amended Complaint never uses the term "overcharge." Nor does BCBSA address the accompanying language in the Amended Complaint where Plaintiffs allege they "would not have used Defendant's services" or would have "used the services of another insurance provider under the FEHB program" had they known of BCBSA's problematic data practices. ¶¶ 224, 231, 239. Calculating benefit of the bargain damages flowing from the lost opportunity to obtain insurance from an alternative provider that did not share sensitive health data with TikTok and other third parties, would not require the Court to recalculate or second-guess the reasonableness of rates filed and approved under the OPM-BCBSA contract. The filed rate doctrine does not apply to Plaintiffs' pursuit of benefit of the bargain damages.

**B.      Plaintiffs Adequately Allege a Claim for Invasion of Privacy by Publication of Private Facts**

To state a claim for invasion of privacy based on public disclosure of private facts, a plaintiff must allege that private facts were made public and that the matter made public would be highly offensive to a reasonable person. *Karraker v. Rent-A-Ctr., Inc.*, 411 F.3d 831, 838 (7th Cir. 2005). The disclosure must be made to the public at large, or under circumstances where a special relationship exists between the plaintiff and the "public" to whom the information is disclosed. *Miller v. Motorola, Inc.*, 202 Ill. App. 3d 976, 980, 560 N.E.2d 900, 903 (1990).

BCBSA contends that Plaintiffs' sensitive information was not disclosed broadly enough to constitute public disclosure. BCBSA relies on the *Rush II* decision, which dismissed a similar privacy claim. *Kurowski v. Rush Sys. for Health*, No. 22 C 5380, 2023 WL 4707184, at *9 (N.D. Ill. July 24, 2023) ("*Rush II*"). *Rush II*, however, did not involve allegations regarding transmission of sensitive information to TikTok specifically. The Amended Complaint details how TikTok's foreign ownership presents serious risks to privacy associated with data sharing with the Chinese government—a risk so pronounced that the U.S. government has banned TikTok from official government devices. ¶¶ 4, 7, 28, 33-40, 44, 78-83. There is good reason to conclude that sharing data with some of the largest technology and advertising companies in the world, to analyze and exploit for profit, amounts to public disclosure on its own. *See In re Facebook, Inc.,* 402 F. Supp. 3d at 796–97 (observing "dissemination of your private information to tens of thousands of individuals and companies is generally going to be equivalent to making that information 'public'"). But the specific disclosures to TikTok are widespread enough to constitute public disclosure.

Additionally, the disclosures occurred in the context of a special relationship in which the exposure of private facts, although made to a smaller group, may be just as embarrassing and devastating to plaintiffs. *See Miller*, 202 Ill. App. 3d at 980 (observing that while "[t]he Restatement indicates that the required communication must be more than that made to a small group . . . some courts have recognized the need for flexibility in the application of the Restatement's theory to permit recovery for egregious conduct"). Because Plaintiffs are federal employees, sharing their sensitive information with TikTok raises significant national security and privacy concerns, ¶¶ 33-40, 78-83, more so than disclosures to the other technology companies or even certain large segments of the public. Thus, the disclosures to TikTok, in particular, are sufficient to state a claim

for invasion of privacy.

### C. Plaintiffs State a Claim for Breach of Implied Contract

An implied contract is created by the parties' conduct and requires all elements of an express contract be present—offer, acceptance, and consideration—as well as a meeting of the minds. *In re Michaels Stores Pin Pad Litig.*, 830 F. Supp. 2d 518, 531 (N.D. Ill. 2011). BCBSA declares that its Cookie Banner and Privacy Policy form an express contract, and as such, prevent Plaintiffs from bringing a claim for breach of implied contract. Mot. at 25. As discussed above, however, given the Cookie Banner's vague and general terms and Plaintiffs' lack of constructive knowledge of the Privacy Policy, those documents cannot provide a basis for a "meeting of the minds." In the absence of any express contract, Plaintiffs' claim for breach of implied contract should proceed.

More broadly, courts have declined to dismiss implied contract claims in pixel cases that allege the existence of various privacy policies. *See, e.g.*, *Doe v. Regents of Univ. of California*, 672 F. Supp. 3d 813, 821 (N.D. Cal. 2023) (finding it plausible that the "agreed upon terms [of implied contract]. . . are those spelled out in the Notice of Privacy and Privacy Statement, providing assurances."); *Allen v. Novant Health, Inc.*, No. 1:22-CV-697, 2023 WL 5486240, at *3 (M.D.N.C. Aug. 24, 2023) (privacy policy may give rise to an implied in fact contract); *In re Grp. Health Plan Litig.*, 2023 WL 8850243, at *3–4. These rulings in similar pixel cases undercut both the notion that the assumed existence of an express contract forecloses Plaintiffs' implied contract claim and that Plaintiffs here have failed to adequately allege a breach of implied contract.

Lastly, the general argument that Plaintiffs do not adequately allege a mutual intent to be bound, in addition to be being inconsistent with the pixel cases above, disregards how the affirmative act of receiving private information alone can create an implied promise not to disclose

that information. *See, e.g.*, *Kirsten v. California Pizza Kitchen, Inc.*, No. 221CV09578DOCKES, 2022 WL 16894503, at *5 (C.D. Cal. July 29, 2022) (explaining that "receipt of PII implies the recipient's assent to protect the PII sufficiently."); *Castillo v. Seagate Tech., LLC*, No. 16-CV-01958-RS, 2016 WL 9280242, at *9 (N.D. Cal. Sept. 14, 2016) ("[I]t is difficult to imagine how, in our day and age of data and identity theft, the mandatory receipt of Social Security numbers or other sensitive personal information would not imply the recipient's assent to protect the information sufficiently."). Plaintiffs allege they would not have entrusted BCBSA with their sensitive information in the absence of an implied contract that BCBSA would safeguard their data consistent with industry and regulatory standards. ¶ 235-36. Given BCBSA's disclosures to third parties, these allegations sufficiently state a claim for breach of implied contract.

### D.     Plaintiffs Adequately Allege a Claim for Negligence

BCBSA contends that Plaintiffs failed to allege the elements of negligence with requisite specificity. Mot. at 27. This argument fails.[5] To state a claim for negligence, Plaintiffs must establish BCBSA owed a duty of care, breached that duty, and the breach was the proximate cause of Plaintiffs' injuries. *Cosgrove v. Commonwealth Edison Co.*, 315 Ill. App. 3d 651, 654 (2000). Plaintiffs specifically plead each element.

As alleged, BCBSA had a duty, as a "provider of health insurance," ¶ 11, to "safeguard federal employees' Sensitive Information . . . ," ¶¶ 11, 66-67, 208-209. BCBSA breached that duty by employing various tracking technologies, including TikTok's, which "simultaneously intercept[d] and duplicate[d] [employee] communication[s], redirecting [them] to [third parties']

---

[5] BCBSA cites two cases, *Murphy v. Thomas Jefferson Univ. Hosp., Inc.*, 2023 WL 7017734 (E.D. Pa. Oct. 10, 2023) and *B.K. v. Eisenhower Med. Ctr.*, No. EDVC 23-2092- JGB, 2024 WL 878100 on this point, but these cases failed to specifically allege damages. *Murphy*, 2023 WL 7017734, at *5; *B.K.*, 2024 WL 878100, at *8. Here, Plaintiffs precisely allege they suffered damages related to their status as federal employees, along with a loss of privacy, control over medical information, and the benefit of the bargain. ¶¶ 5, 11-12, 84, 102, 105, 128-130, 210.

own servers," ¶ 67, and, once third parties had that Sensitive Information, they could use it for any purpose, ¶ 77. Plaintiffs allege injuries directly resulting from BCBSA's disclosure of their private health information, including loss of privacy, loss of the benefit of the bargain, and risks associated with their status as federal employees (including specifically alleging that the federal government banned TikTok on official devices for these reasons). *See* ¶¶ 14, 214, 78 (alleging "loss of their sensitive medical data" and "risk of blackmail and extortion by a foreign power"). These specific allegations state a claim for negligence.

## CONCLUSION

Because Plaintiffs adequately state claims for relief under statutory and common law, the Court should deny BCBSA's Motion to Dismiss the Amended Complaint in its entirety.

Respectfully submitted,

Dated: April 12, 2024

/s/ Brian C. Gudmundson
Brian C. Gudmundson
David M. Cialkowski, IL Bar No. 6255747
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
brian.gudmundson@zimmreed.com
david.cialkowski@zimmreed.com

Ryan J. Ellersick (Admitted *Pro Hac Vice*)
**ZIMMERMAN REED LLP**
14648 N. Scottsdale Road, Suite 130
Scottsdale, AZ 85254
Telephone: (480) 348-6400
Facsimile: (480) 348-6415
ryan.ellersick@zimmreed.com

*Attorneys for Plaintiffs*