**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TERESA GOUCH, DENISE SPANOS, GEORGE AMERSON, KYLE MUMMEY, and MARCIA BEASLEY, individually and on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | Case No. 1:23-cv-15709 Honorable John J. Tharp, Jr. |
| BLUE CROSS BLUE SHIELD ASSOCIATION, | |
| Defendant. | |

**DEFENDANT BLUE CROSS BLUE SHIELD ASSOCIATION'S REPLY IN SUPPORT
OF ITS MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

    I.      Plaintiffs Fail to State a Claim for Wiretapping and Eavesdropping..................... 2

            A.      Plaintiffs do not allege that BCBSA intercepted any communication for the purpose of committing an independent criminal or tortious act. ...................................................................... 2

            B.      Plaintiffs cannot vitiate their consent via BCBSA's Cookie Banner and Privacy Policy by imposing non-existent disclosure and contract formation requirements. ............................................................. 10

            C.      The court can take judicial notice of the Tech Companies' policies and those policies also demonstrate that Plaintiffs consented. ................. 13

            D.      The Tech Companies were parties to the communications ...................... 20

    II.     The Opposition Fails to Salvage Plaintiffs' Illinois Computer Tampering Act Claim. ....................................................................................................... 20

    III.    The Opposition Does Nothing to Bolster Plaintiffs' Common Law Claims. ....... 23

            A.      Plaintiffs fail to dispel the application of the filed-rate doctrine ............. 23

            B.      Plaintiffs' invasion of privacy by publication of private facts claim fails in the absence of publication.............................................................. 27

            C.      Plaintiffs fail to state a claim for breach of implied contract.................... 28

            D.      Plaintiffs' recitation of the elements necessary to establish a negligence cause of action does not suffice to state a claim...................... 29

CONCLUSION................................................................................................................ 29

DMS_US.363561914.7

## TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Anand v. Heath*,
   No. 19-CV-00016, 2019 WL 2716213 (N.D. Ill. June 28, 2019) ............................................13

*In re Anthem, Inc. Data Breach Litigation*,
   No. 15-md-02617-LHK, 2016 WL 3029783 (N.D. Cal. May 27, 2016)..........................24, 25

*Archey v. Osmose Utilities Servs., Inc.*,
   No. 20-CV-05247, 2021 WL 3367156 (N.D. Ill. Aug. 3, 2021) .............................................28

*B.K. v. Eisenhower Medical Center*,
   No. EDCV232092JGBKKX, 2024 WL 878100 (C.D. Cal. Feb. 29, 2024) ............................8

*Boddie v. Am. Broadcasting Cos., Inc.*,
   731 F.2d 333 (6th Cir. 1984) ..................................................................................................6

*Brown v. Google LLC*,
   525 F. Supp. 3d 1049 (N.D. Cal. 2021) ..................................................................................5

*Capitol Recs. Inc. v. Thomas-Rasset*,
   No. CIV 06-1497(MJD/RLE), 2009 WL 1664468 (D. Minn. June 11, 2009) ........................5

*Caro v. Weintraub*,
   618 F.3d 94 (2d Cir. 2010)......................................................................................................3

*Clark v. Prudential Ins. Co. of Am.*,
   736 F. Supp. 2d 902 (D.N.J. 2010) ......................................................................................25

*In re Doubleclick*,
   154 F. Supp. 2d 497 (S.D.N.Y. 2001)....................................................................................6

*Erickson v. Nebraska Mach. Co.*,
   2015 WL 4089849 (N.D. Cal. July 6, 2015).........................................................................14

*Fero v. Excellus Health Plan, Inc.*,
   236 F. Supp. 3d 735 (W.D.N.Y. 2017) ................................................................................23

*Fidlar Technologies v. LPS Real Estate Data Solutions, Inc.*,
   810 F.3d 1075 (7th Cir. 2016) ................................................................................................7

*Fidlar Techs. v. LPS Real Est. Data Sols., Inc.*,
   No. 4:13-CV-4021-SLD-JEH, 2016 WL 4706927 (C.D. Ill. Sept. 8, 2016) .........................22

*Friedman v. AARP*,
   283 F. Supp. 3d 873 (C.D. Cal. 2018) ..................................................................................26

ii

*Garcia v. Enter. Holdings, Inc.,*
 78 F. Supp. 3d 1125 (N.D. Cal. 2015) ...................................................................11

*Goldwasser v. Ameritech,*
 222 F.3d 390 (7th Cir. 2000) ...............................................................................27

*In re Google Inc. Cookie Placement Consumer Privacy Litig.,*
 806 F.3d 125 (3d Cir. 2015)...............................................................................3, 4

*In re Google Inc. Gmail Litig.,*
 WL 1102660, at \*18 n.13 (N.D. Cal. Mar. 18, 2014)....................................3, 9, 17

*In re Google, Inc.,*
 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ......................................................11

*Griggs-Ryan v. Smith,*
 904 F.2d 112 (1st Cir. 1990) ......................................................................... *passim*

*In re Group Health Plan Litigation,*
 No. 23-CV-267, 2023 WL 8850243 (D. Minn. Dec. 21, 2023)................................6

*Gunn v. Continental Cas. Co.,*
 622 F. Supp. 3d 694 (N.D. Ill. 2022) ..............................................................25, 26

*Halperin v. International Web Services, LLC,*
 1:13cv08573 (N.D. Ill. June 16, 2015), ECF No. 107 ...........................................23

*Halperin v. International Web Services, LLC,*
 123 F. Supp. 3d 999 (N.D. Ill. 2015) ...................................................................22

*Harvey v. Centene Mgmt. Co., LLC,*
 357 F. Supp. 3d 1073 (E.D. Wash. 2018) .......................................................26, 27

*Hepp v. Ultra Green Energy Servs.,*
 LLC, No. 13 C 4692, 2016 WL 1073070 (N.D. Ill. Mar. 18, 2016).......................14

*Kane v. University of Rochester,*
 No. 23-CV-6027-FPG, 2024 WL 1178340 (W.D.N.Y. Mar. 19, 2024)..............8, 10

*Katz-Lacabe v. Oracle Am. Inc.,*
 2024 WL 1471299 (N.D. Cal. Apr. 3, 2024) ...........................................................8

*Kurowski v. Rush Sys. for Health,*
 659 F. Supp. 3d 931, 938 (N.D. Ill. 2023) ......................................................20, 21

*Kurowski v. Rush Sys. for Health,*
 No. 22 C 5380, 2023 WL 4707184 (N.D. Ill. July 24, 2023) ...................................6

*Kurowski v. Rush System for Health*,
No. 22 C 5380, 2023 WL 8544084 (N.D. Ill. Dec. 11, 2023) ...........................................6, 27

*Marcatante v. City of Chicago*,
Ill., 657 F.3d 433,440 (7th Cir. 2011) ......................................................................................28

*Mekhail v. North Memorial Health Care*,
No. 23CV00440KMMTNL, 2024 WL 1332260 (D. Minn. Mar. 28, 2024) ...........................8

*Meredith v. Gavin*,
446 F.2d 794 (8th Cir. 1971) .......................................................................................................6

*In re Meta Pixel Healthcare Litigation*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) ..................................................................................5, 20

*Miller v. Motorola, Inc.*,
202 Ill. App. 3d 976 (1st Dist. 1990) ...................................................................................27, 28

*Moyer v. Michaels Stores, Inc.*,
No. 14 C 561, 2014 WL 3511500 (N.D. Ill. July 14, 2014) .....................................................28

*Murphy v. Thomas Jefferson Univ. Hosps.*,
2023 WL 7017734 (E.D. Pa. Oct. 10, 2023)...........................................................................29

*New v. Verizon Commc'ns, Inc.*,
635 F. Supp. 2d 773 (N.D. Ill. 2008) ......................................................................................28

*Perkins v. LinkedIn Corp.*,
53 F. Supp. 3d 1190 (N.D. Cal. 2014) ....................................................................................11

*Richardson v. Standard Guar. Ins. Co.*,
853 A.2d 955 (N.J. Super. Ct. App. Div. 2004)......................................................................25

*Rodriguez v. Google LLC*,
2021 WL 2026726 (N.D. Cal. May 21, 2021) ...........................................................................8

*Sgouros v. TransUnion Corp.*,
No. 14 C 1850, 2015 WL 507584 (N.D. Ill. Feb. 5, 2015), *aff'd*, 817 F.3d
1029 (7th Cir. 2016).................................................................................................................13

*Silver v. Stripe Inc.*,
2021 WL 3191752 (N.D. Cal. July 28, 2021).........................................................................10

*Simon v. KeySpan Corp.*,
694 F.3d 196 (2d. Cir. 2012)...................................................................................................24

*Sloan v. Anker Innovations Ltd.*,
No. 22 C 7174, 2024 WL 935426 (N.D. Ill. Jan. 9, 2024) ......................................................3

iv

*Smith v. Facebook, Inc.*,
  262 F. Supp. 3d 943 (N.D. Cal. 2017), *aff'd*, 745 F. Appx. 8 (9th Cir. 2018)................ *passim*

*Smith v. Facebook, Inc.*,
  745 F. App'x 8 (9th Cir. 2018) ......................................................................................11

*Smith v. Facebook, Inc.*,
  No. 5:16-cv-01282-EJD (N.D. Cal. filed Aug. 1, 2016), ECF No. 105 ...............................11

*United States v. Amen*,
  831 F.2d 373 (2d Cir. 1987)............................................................................................10

*United States v. Jiau*,
  734 F.3d 147 (2d Cir. 2013)..............................................................................................5

*Van Buren v. United States*,
  593 U.S. 374 (2021) .........................................................................................................22

*Zak v. Bose Corp.*,
  No. 17-CV-02928, 2019 WL 1437909 (N.D. Ill. Mar. 31, 2019).........................................3, 4

*Zak v. Bose Corp.*,
  No. 17-CV-02928, 2020 WL 2762552 (N.D. Ill. May 27, 2020) ............................................4

**Statutes, Rules & Regulations**

20 ILCS 5/17-51(c) ................................................................................................................22

720 ILCS 5/17-51 ..................................................................................................................21

720 ILCS 5/17-51(a)(4) .........................................................................................................21

720 ILCS 5/17-51(a)(4)(B) ....................................................................................................21

18 U.S.C. § 1030 ....................................................................................................................22

18 U.S.C. § 1030(e)(11).........................................................................................................22

18 U.S.C. § 2511(2)(d) ..................................................................................................... *passim*

Fed. R. Evid. 201 ...................................................................................................................14

Rule 8 .......................................................................................................................................1

**Other Authorities**

14 Cong. Rec. at 14,694..........................................................................................................6

Cookie Banner and Privacy Policy for www.fepblue.org........................................................12

v

https://help.instagram.com/155833707900388 ..........................................................19

https://policies.google.com/privacy/archive?hl=en-US ...........................................16

https://policies.google.com/privacy?hl=en-US (last accessed Apr. 25, 2024) ............17

https://web.archive.org/web/20211101000112/https://www.linkedin.com/legal/pri
        vacy-policy ...............................................................................................................15

https://web.archive.org/web/20211101002035/https://policies.google.com/privacy
        ?hl=en-US ..................................................................................................................16

https://web.archive.org/web/20211101042822/https://www.linkedin.com/legal/co
        okie-policy ................................................................................................................16

https://web.archive.org/web/20221226001920/https://www.tiktok.com/legal/page/
        us/privacy-policy/en .................................................................................................14

https://web.archive.org/web/20230107001417/https://www.tiktok.com/legal/page/
        us/privacy-policy/en .................................................................................................14

https://web.archive.org/web/20230331000342/https://www.tiktok.com/legal/page/
        us/privacy-policy/en .................................................................................................15

https://web.archive.org/web/20240101000400/https://www.tiktok.com/legal/page/
        us/privacy-policy/en .................................................................................................15

https://web.archive.org/web/20240229001612/https://www.tiktok.com/legal/page/
        us/privacy-policy/en .................................................................................................15

https://web.archive.org/web/20240425000147/https://www.tiktok.com/legal/page/
        us/privacy-policy/en .................................................................................................15

https://www.facebook.com/privacy/policy/?show_versions=1 (last accessed Apr.
        25, 2024) ...................................................................................................................18

https://www.fepblue.org/legal/privacy-policy) .........................................................12

https://www.linkedin.com/legal/privacy-policy (current LinkedIn Privacy Policy
        effective Mar. 6, 2024) (last accessed Apr. 25, 2024) ............................................16

S. Rep. No. 99-541 (1986) .............................................................................................6

DMS_US.363561914.7

## INTRODUCTION

As BCBSA[1] showed in its Memorandum in Support of its Motion to Dismiss, ECF No. 35 ("Opening Brief" or "Def. Br."), Plaintiffs' First Amended Complaint fails to state a claim for three reasons: (i) Plaintiffs' wiretap claims (Counts I, II, and IV) fail because BCBSA and the Tech Companies all disclose their use of analytics technologies and BCBSA was a party to any communications that were allegedly "intercepted" by BCBSA; (ii) Plaintiffs' computer tampering claim (Count III) fails because they allege no "tampering" with their computers and no recognizable "loss"; and (iii) Plaintiffs' common law claims (Counts V–VIII) fail because the filed-rate doctrine bars the "benefit of the bargain" damages they seek and because Rule 8 requires more than the boilerplate they assert.

In their Opposition, Plaintiffs attempt to distract the Court from these legal shortcomings by leaning into the political overtones, and they do so without any subtlety. Plaintiffs mention four times in their Opposition that TikTok is Chinese-owned. Plaintiff's Opposition, ECF No. 39 ("Pl. Br.") at 1, 5, 25. Plaintiffs use the term "national security" four times. *Id.* at 1, 4, 5, 25. And Plaintiffs devote a full paragraph of their Opposition to reciting federal, state, and local government efforts to ban TikTok on official government devices used by employees. *Id.* at 5. Any claim that "national security" motivates these Plaintiffs is belied, however, by the fact that Plaintiffs—who are current or retired federal employees—use TikTok on their personal devices despite these "concerns." *Id.* at 5, 7-8, FAC ¶¶ 20-24.

Once one sees through Plaintiffs' hypocritical alarmism, the reason for the smokescreen becomes clear: the law does not support Plaintiffs' arguments. As explained more fully below, the Opposition fails to salvage Plaintiffs' Complaint. <u>First</u>, Plaintiffs do not (and cannot) point to

---

[1] Unless specifically defined herein, capitalized terms and phrases used in this Reply have the same meaning as in BCBSA's opening brief.

1

any secondary crime or tort that BCBSA intended to commit sufficient to invoke the "crime-tort" exception" to the first-party exception to the wiretapping statutes.  <u>Second</u>, Plaintiffs cannot plead around the consent they provided to BCBSA (and the Tech Companies) by creating a new, higher standard for what BCBSA needed to disclose to Plaintiffs.  <u>Third</u>, ICTA does not extend to the alleged collection of data at issue here.  <u>Fourth</u>, Plaintiffs fail to explain why this Court should depart from the reasoning of other courts that applied the filed-rate doctrine to foreclose Plaintiffs' theory of damages for their common law claims.  <u>Fifth</u>, Plaintiffs' reliance on the conclusory assertions in their Complaint cannot overcome their failure to allege facts in support of their commons law claims.[2]

## <u>ARGUMENT</u>

### I. Plaintiffs Fail to State a Claim for Wiretapping and Eavesdropping.

BCSBA showed in its Opening Brief that Plaintiffs' wiretapping claims fail because BCBSA and the Tech Companies were parties to the communication, because Plaintiffs did not plausibly allege any intention by BCBSA to commit an independent crime or tort, and because Plaintiffs do not plausibly allege that they did not consent to the collection of their data. Def.'s Br. at 11.  Plaintiffs respond by twisting the law and allegations in the Complaint.

### A. Plaintiffs do not allege that BCBSA intercepted any communication for the purpose of committing an independent criminal or tortious act.

Plaintiffs concede (as they must) that BCBSA was a party to Plaintiffs' communications. *See* Pls.' Br. at 13.  That means that the only circumstance under which Plaintiffs can state a claim against BCBSA is if Plaintiffs can allege that BCBSA intercepted the communications "for the

---

[2] Plaintiffs do not contest dismissal of their claim for unjust enrichment.  Pls.' Br. at 2 n.1.

purpose of committing any criminal or tortious act" in violation of federal or state law. 18 U.S.C. § 2511(2)(d). Plaintiffs' Complaint does not satisfy this requirement.

<u>First</u>, Plaintiffs fail to demonstrate that BCBSA acted with the intent to commit a secondary criminal or tortious act independent of the alleged wiretapping. The crime-tort exception applies only if a plaintiff "plead[s] . . . a tortious or criminal act that is ***independent*** of the intentional act of recording." *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 145 (3d Cir. 2015) (citing *Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010)) (emphasis added); *see also* Def.'s Br. at 14-15. As explained by the Third Circuit, "all authority of which we are aware indicates that the criminal or tortious acts contemplated by [the exception] are acts ***secondary to the acquisition of the communication*** involving tortious or criminal use of the interception's fruits." *In re Google Inc.*, 806 F.3d at 145 (emphasis added).

The decision of the court in *Zak v. Bose Corp.*, No. 17-CV-02928, 2019 WL 1437909 (N.D. Ill. Mar. 31, 2019), is on point. In *Zak*, a purchaser of the defendant's products alleged that the defendant surreptitiously monitored and collected information about his music selections and then transmitted that data to third parties. The plaintiff alleged that such collection and specifically the "disclosure" to third parties violated the federal Wiretap Act, the IES, and the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), and unjustly enriched the defendant.

Relying on *In re Google Inc.* and *Caro*, the court in *Zak* disagreed that the plaintiff stated claims under the Wiretap Act and the IES, explaining that "[t]o the extent [plaintiff's] real issue is with the fact that [the defendant] allegedly collects and discloses the [data] that it legitimately receives [as a party to the communication], this complaint falls outside the purview of the Wiretap Act." *Zak*, 2019 WL 1437909 at *4. *See also Sloan v. Anker Innovations Ltd.*, No. 22 C 7174, 2024 WL 935426, at *4 (N.D. Ill. Jan. 9, 2024) ("That [d]efendants, parties to the communication,

3

then upload some of that data to a third-party cloud server does not transform [d]efendants' action into an interception under the Wiretap Act."). The court dismissed the wiretap-related claims because the plaintiff failed to plausibly allege that the defendant "intercepted a communication with the purpose of committing a crime or tort *independent* from the alleged interception." *Id.* (emphasis added).[3] *Zak* thus stands for the proposition that dissemination of information is not sufficiently independent from the collection of that same information to support an invocation of the crime-tort exception.

Like in *Zak*, the complaint here asserts claims related to the alleged collection and dissemination of data. As Plaintiffs explain, "BCBSA's unlawful interception and *disclosure* of employee health information violated federal and state wiretap laws." Pls.' Br. at 1 (emphasis added). Like in *Zak*, the alleged disclosure is not "secondary to the acquisition of the communication," but rather intertwined with it. *In re Google Inc.*, 806 F.3d at 145. Indeed, while Plaintiffs point to alleged violations of HIPAA as evidence of BCBSA's alleged intent to commit a criminal or tortious act, in so doing they concede that any alleged violations of HIPAA were not *independent* of the alleged wiretapping—they argue that "[t]he Amended Complaint exhaustively details how BCBSA acted with intent to violate HIPAA *by* intercepting Plaintiffs' communications." Pls.' Br. at 14 (emphasis added). Because Plaintiffs' own briefing shows that the alleged violations of HIPAA are not independent of the wiretapping, Plaintiffs' claims fail.

Plaintiffs' authority does not support a different result. Plaintiffs cite two cases for the proposition that "courts recognize that linking intercepted communications with a person's identifying information for ad retargeting constitutes an independent illegal action." Pls.' Br. at

---

[3] The Court in *Zak* ultimately dismissed the wiretap-related claims with prejudice after the plaintiff's second amended complaint failed to cure these deficiencies. *Zak v. Bose Corp.*, No. 17-CV-02928, 2020 WL 2762552, at *3 (N.D. Ill. May 27, 2020).

4

17.  But in *Brown v. Google LLC*, 525 F. Supp. 3d 1049 (N.D. Cal. 2021), the court nowhere addressed the need for a secondary, independent act.  On the contrary, it looked solely to the purpose of the interception.  *Id.* at *1067.  Worse yet for Plaintiffs is *In re Meta Pixel Healthcare Litigation*, 647 F. Supp. 3d 778 (N.D. Cal. 2022).  In this case, the court looked solely to the purpose of the interception but then, more significantly, rejected the plaintiff's argument that the crime-tort exception applied and denied plaintiff's motion for a preliminary injunction.  *Id.* at 796-797.  Indeed, the word "independent" appears nowhere in *In re Meta* and appears in *Brown* only twice:  once with regard to the relationship between phrases in Google's privacy disclosures, and once in a quote from the complaint about "data points."  *See Brown* at 1056 & 1065.

Second, Plaintiffs do not allege sufficient facts to make a plausible allegation that BCBSA installed technology on its website for the ***purpose*** of violating HIPAA or any other law in order to harm or injure Plaintiffs.  This "for the purpose of" requirement (18 U.S.C. § 2511(2)(d)) imposes a high threshold:  the crime-tort exception was "aimed at monitoring for invidious purposes such as blackmail [or] stealing business secrets."  *Capitol Recs. Inc. v. Thomas-Rasset*, No. CIV 06-1497(MJD/RLE), 2009 WL 1664468, at *4 (D. Minn. June 11, 2009).  Indeed, as the Second Circuit has explained, the crime-tort exception "is to be construed narrowly . . . [and] confined to instances where the recording party intends to use the recording to harm or injure a recorded party, such as to blackmail, threaten, or publicly embarrass the recorded party."  *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013).

These decisions are consistent with the legislative history of the Federal Wiretap Act, where members of Congress provided examples of the kind of conduct that the crime-tort exception was supposed to guard against.  For example, Senator Hart explained that § 2511(2)(d) was intended to prohibit recordings, inter alia, "for the purpose of blackmailing the other party."

14 Cong. Rec. at 14,694; *see also Boddie v. Am. Broadcasting Cos., Inc.*, 731 F.2d 333, 338 (6th Cir. 1984) (discussing the same). The legislative history makes clear that the intent behind the "purpose" requirement is on par with criminal *mens rea*. S. Rep. No. 99-541 (1986) ("As used in the Electronic Communications Privacy Act, the term 'intentional' is narrower than the dictionary definition of 'intentional.' 'Intentional' means more than that one voluntarily engaged in conduct or caused a result. Such conduct or the causing of the result must have been the person's conscious objective."); *see also In re Doubleclick*, 154 F. Supp. 2d 497, 515 (S.D.N.Y. 2001) (exception is "to be construed narrowly, covering only acts accompanied by a specific contemporary intention to commit a crime or tort"); *Meredith v. Gavin*, 446 F.2d 794, 799 (8th Cir. 1971) (explaining that the crime-tort exception applies to "evil" acts).

Plaintiffs argue that they have cleared this high bar with the conclusory assertion that BCBSA "acted with intent to violate HIPAA." Pls.' Br. at 14. Plaintiffs are wrong.[4] As BCBSA explained in its Opening Brief, BCBSA's Cookie Banner discloses the use of cookies and links to the Privacy Policy, which explains the use of Google Analytics and that social media companies "can record that you have visited this page and could use this information to serve you relevant ads." Def.'s Br. at 12. These disclosures (which Plaintiffs concede are within the scope of the pleadings) are facts that undercut Plaintiff's conclusion of law.

---

[4] Plaintiffs cite *In re Group Health Plan Litigation*, No. 23-CV-267 (JWB/DJF), 2023 WL 8850243, at *8 (D. Minn. Dec. 21, 2023), for the proposition that it is sufficient to allege that a defendant's actions violated HIPAA. Pls.' Br. at 15. But the court in *In re Group Health Plan Litigation* did not, as it should have, first address whether those alleged violations are "independent" of the wiretapping. Likewise in *Kurowski v. Rush System for Health*, No. 22 C 5380, 2023 WL 8544084 (N.D. Ill. Dec. 11, 2023), which Plaintiffs cite for the same proposition. Pls.' Br. at 15. While the court in *Kurowski* acknowledged in a prior decision that "it is well established that exception only applies where the defendant allegedly committed a tortious or criminal act independent from the act of recording itself," the court in *Kurowski* did not in that decision or its subsequent decision address what that means. *Kurowski v. Rush Sys. for Health*, No. 22 C 5380, 2023 WL 4707184, at *4 (N.D. Ill. July 24, 2023).

The Seventh Circuit's decision in *Fidlar Technologies v. LPS Real Estate Data Solutions, Inc.*, 810 F.3d 1075 (7th Cir. 2016), is instructive. In that case, the Seventh Circuit examined what a plaintiff must show to demonstrate that a defendant acted "with the intent to defraud" in a case alleging unauthorized collection of data. The court explained that under federal statutes it had previously considered (such as the wire fraud statute), it required a showing that the defendant "acted willfully and with specific intent to deceive or cheat, usually for the purpose of getting financial gain for himself or causing financial loss to another." *Id.* at 1079. "Because direct evidence of intent is often unavailable, intent to defraud "may be established by circumstantial evidence and by inferences drawn from examining the scheme itself which demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension." *Id.* The Seventh Circuit also looked for guidance to the legislative history. *Id.*

In holding that "no reasonable juror could infer that [the defendant] had an intent to defraud," the court examined "the 'scheme' itself." *Id.* at 1080. The Seventh Circuit found that if the defendant had intended to defraud the plaintiff, it would have, among other things "conceal[ed] its use of a web-harvester." *Id.* As the court explained, "[t]ypically, a person who is concealing fraudulent activity will take unusual, out of the ordinary steps to do so." *Id.* at 180 n.2.

Here, the statutory language and legislative history of the Wiretap Act makes clear that having a "purpose" to commit a crime or a tort requires a demonstration of *mens rea* level intent. And as Plaintiffs argue repeatedly in their Opposition, the gravamen of their Complaint is that BCBA allegedly operates "surreptitiously" to collect their data. Pls.' Br. at 6, 10. But the "scheme" Plaintiffs allege makes no sense: notwithstanding Plaintiffs' conclusory assertions, BCBSA did not conceal its use of the technology, but rather disclosed its use of the technology in

its Cookie Banner and Privacy Policy. *See infra* pp. 9-10. Plaintiffs' theory is implausible on its face.

Plaintiffs at best allege that BCBSA intended to use the technology for marketing, advertising, and analytics purposes. Def.'s Br. at 15. BCBSA argued in its Opening Brief that that is not enough to plausibly allege that BCBSA intended to commit a crime or tort and cited *B.K. v. Eisenhower Medical Center*, No. EDCV232092JGBKKX, 2024 WL 878100, at *1 (C.D. Cal. Feb. 29, 2024). Plaintiffs counter that allegations of intent to use the technology for marketing, advertising, and analytics purposes *are* enough to support the assertion that BCBSA intended to violate HIPAA and cite *Mekhail v. North Memorial Health Care*, No. 23CV00440KMMTNL, 2024 WL 1332260, at *1 (D. Minn. Mar. 28, 2024) and *Kane v. University of Rochester*, No. 23-CV-6027-FPG, 2024 WL 1178340 (W.D.N.Y. Mar. 19, 2024).

Plaintiffs' reliance on *Mekhail* and *Kane* is misplaced. Neither addressed the high bar required for alleging the "purpose" needed to invoke the crime-tort exception. Rather, the court in *Mekhail* acknowledged the split in authority: some courts have held that that the crime-tort exception is per se inapplicable where a defendant's motivation is pecuniary, whereas others have not. *Mekhail*, 2024 WL 1332260, at *5 n.4 (citing cases). BCBSA submits that the better approach is to apply the crime-tort exception as it was meant by Congress to be applied and require Plaintiffs to demonstrate more than a pecuniary interest to invoke the exception. Marketing does not meet this threshold, and "the fact data collection or sales might at some later point be deemed tortious does not justify application of the crime-tort exception." *See Katz-Lacabe v. Oracle Am. Inc.*, No. 22-cv-04792-RS, 2024 WL 1471299, at *3 (N.D. Cal. Apr. 3, 2024).[5]

---

[5] *See also id.* ("Plaintiffs fail to plausibly allege Oracle's underlying motivation in collecting and selling data about internet users was anything other than to generate revenue."); *Rodriguez v. Google LLC*, No. 20-cv-04688-RS, 2021 WL 2026726, at *6 n.8 (N.D. Cal. May 21, 2021) (finding crime-tort exception inapplicable where Google's alleged interceptions occurred with the consent of app developers and were

<u>Third</u>, in any event, Plaintiffs' allegations of criminal and tortious acts are conclusory and insufficient. As noted above, because Plaintiffs cannot cite any allegation that BCBSA collected data for an independent purpose, Plaintiffs attempt to bootstrap themselves into a claim by asserting that the collection ***was*** the tortious or criminal purpose: "[b]y embedding the tracking technologies on its Website and disclosing the content of federal employee communications relating to symptoms, conditions, treatments, doctors, and other Sensitive Information, Defendant had a purpose that was tortious, criminal, and designed to violate state and federal laws." Pls.' Br. at 14 (quoting FAC ¶ 166). This is insufficient to state a claim: this "allegation" of purpose is just a formulaic recitation of the elements of the claim: the language of the statute prohibits interception "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). Plaintiffs just change the order of "tortious" and "criminal" and substitute "state and federal laws for "the Constitution or laws of the United States or of any State." That does not turn Plaintiffs' elemental recitation into an allegation of fact.

Citing to this same conclusory assertion, Plaintiffs then argue that "[t]he Amended Complaint then lists various tort and criminal laws that BCBSA intended to violate." Pls.' Br. at 14. But the only law Plaintiffs specifically identify is HIPAA and as BCBSA explained in its Opening Brief, Plaintiffs have not plausibly alleged a HIPAA violation. *See* Def.'s Br. at 15-18. Specifically, BCBSA could not have disclosed individually identifiable health information in violation of HIPAA because, among other things, Plaintiffs were browsing a public website and Plaintiffs have not alleged that BCBSA was able to identify them and have not plausibly alleged

---

financially motivated); *In re Google Inc. Gmail Litig.*, No. 13–MD–02430–LHK, 2014 WL 1102660, at *18 n.13 (N.D. Cal. Mar. 18, 2014) ("[T]he tort or crime exception cannot apply where the interceptor's 'purpose has plainly not been to perpetuate torts on millions of Internet users, but to make money.'").

that BCBSA had a reasonable basis to believe that the information could be used to identify them. *Id.*[6] Plaintiffs fail to respond to this point, instead emphasizing their conclusory allegations that BCBSA "acted with intent" to violate HIPAA and arguing that BCBSA is "attempt[ing] to shift blame." Pls.' Br. at 18.

### B. Plaintiffs cannot vitiate their consent via BCBSA's Cookie Banner and Privacy Policy with non-existent disclosure and contract formation requirements.

To state an IES or CIPA claim, Plaintiffs must sufficiently allege a lack of consent. And to state an IES claim, Plaintiffs must also allege surreptitious collection. *See* Def.'s Br. at 11. BCBSA demonstrated in its Opening Brief that the Cookie Banner and Privacy Policy on the Public Website expressly disclose the use of third-party social media cookies, including the specific names of various social media entities. *Id.* at 11-12. Plaintiffs argue more from BCBSA was required, but Plaintiffs are wrong.

In interpreting the Wiretap Act, courts have held that "Congress intended the consent requirement to be construed broadly." *Griggs-Ryan v. Smith*, 904 F.2d 112, 116 (1st Cir. 1990) (citing 18 U.S.C. § 2511(2)(d)); *United States v. Amen*, 831 F.2d 373, 378 (2d Cir. 1987) (same). Plaintiffs admit this, agreeing that consent can be either explicit or implicit. Pls.' Br. at 9 (quoting *In re Google, Inc.*, 2013 WL 5423918, at *12 (N.D. Cal. Sept. 26, 2013)). While Plaintiffs acknowledge this standard, they fail to meaningfully address the cases BCBSA cited dismissing wiretap-related claims on the basis of a cookie banner or privacy policy. *See* Def.'s Br. at 12-13 (citing *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 955 (N.D. Cal. 2017), *aff'd*, 745 F. Appx. 8 (9th Cir. 2018); *Silver v. Stripe Inc.*, 2021 WL 3191752, at *4 (N.D. Cal. July 28, 2021); *Garcia*

---

[6] This, too, distinguishes the cases cited by Plaintiffs. For example, in *Kane*, the court examined the allegations regarding the precise nature of the information disclosed and determined that it was plausible that there was "a reasonable basis to believe that the information can be used to identify the individual" in violation of HIPAA. *Kane*, 2024 WL 1178340, at *6.

*v. Enter. Holdings, Inc*., 78 F. Supp. 3d 1125, 1136 (N.D. Cal. 2015); *Perkins v. LinkedIn Corp*., 53 F. Supp. 3d 1190, 1213 (N.D. Cal. 2014)). Instead, Plaintiffs offer several meritless arguments.

First, Plaintiffs attempt to muddy the waters by erecting and knocking down a strawman. Plaintiffs argue that BCBSA's Cookie Banner and Privacy Policy are insufficient because they do not disclose "the interception and disclosure of substantive health information to a foreign-owned technology company and other social media giants." Pls.' Br. at 10-11. But Plaintiffs point to no authority requiring such granularity. Indeed, in one of the cases they fail to address—*Smith v. Facebook, Inc*.—both the district court and the Ninth Circuit rejected this precise argument.

In *Smith*, the plaintiffs challenged the collection of data from visitors to the webpages of healthcare providers. 262 F. Supp. 3d at 947. The plaintiffs argued that "Facebook's policies are too 'vague' and 'broad' to be enforceable" (*id.* at 954) because "Facebook failed to disclose that it collects [health-related] PII in this way." Plaintiffs' Opposition to Defendants' Motion to Dismiss, *Smith v. Facebook, Inc*., No. 5:16-cv-01282-EJD (N.D. Cal. filed Aug. 1, 2016), ECF No. 105. The court disagreed because "Facebook's Data Policy discloses the precise conduct at issue in this case" by disclosing the collection of "information," and explained that while "[t]he meaning of 'information' might be broad—it could include any data transmitted when the visitor's browser connects to Facebook's servers, including cookies, referer headers, and all the parts that combine to form a browser fingerprint," "***a contractual term is not ambiguous just because it is broad***." *Smith*, 262 F. Supp. 3d at 954 (emphasis added). The Ninth Circuit affirmed and agreed: "[p]laintiffs claim that—though they gave general consent to Facebook's data tracking and collection practices—they did not consent to the collection of health-related data due to its 'qualitatively different' and 'sensitive' nature. We do not agree that the collected data is so different or sensitive." *Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018).

11

As in *Smith*, the Cookie Banner and Privacy Policy for www.fepblue.org make clear that BCBSA collects and shares "information" with social media companies using cookies and pixels, and even identifies several by name as examples in the Privacy Policy (https://www.fepblue.org/legal/privacy-policy):[7]



**Second**, Plaintiffs rely on legal conclusions to overcome facts in the pleadings that undermine their claims. For example, Plaintiffs cite their allegation that "BCBSA deployed the tracking technologies surreptitiously," that the technology was "hidden" and "operated secretly." Pls.' Br. at 10. But as set out in BCBSA's Opening Brief, these are just conclusions that cannot overcome the fact that the technologies are disclosed explicitly in BCBSA's Cookie Banner and Privacy Policy. Def.'s Br. at 11-14.

---

[7] The Court should not credit Plaintiffs' conclusion that the expectations of a "reasonable federal employee" are governed by the "federal government's broad efforts to ban TikTok on official government devices," particularly given Plaintiffs' admissions that they all have TikTok accounts. Pls.' Br. at 11.

Third, Plaintiffs conflate notice and consent with contract formation. Plaintiffs cite *Anand v. Heath*, No. 19-CV-00016, 2019 WL 2716213, at *3 (N.D. Ill. June 28, 2019) and *Sgouros v. TransUnion Corp.*, No. 14 C 1850, 2015 WL 507584 (N.D. Ill. Feb. 5, 2015), *aff'd*, 817 F.3d 1029 (7th Cir. 2016), for the proposition that the Cookie Banner and Privacy Policy are unenforceable browsewrap agreements. Pls.' Br. at 11. But in both *Anand* (decided by this Court) and *Sgouros*, the defendants were arguing that the consumer defendants had agreed to an arbitration clause/class action waiver, and the courts were assessing whether there was a meeting of the minds sufficient to compel arbitration. *Anand*, 2019 WL 2716213, at *1; *Sgouros*, 2015 WL 507584 at *1. The courts were not determining whether a consumer had notice of and either explicitly or implicitly consented to the collection and disclosure of website browsing information.

## C. The court can take judicial notice of the Tech Companies' policies and those policies also demonstrate that Plaintiffs consented.

BCBSA showed in its Opening Brief that the Tech Companies' contract terms and policies doom Plaintiffs' claims. Def.'s Br. at 8-9. Plaintiffs argue in response that the Court cannot take judicial notice of those policies because the TikTok policy was recently updated and that courts have rejected the argument that plaintiffs can provide consent to the collection of data via Tech Companies' policies. Pls.' Br. at 11-12. Plaintiffs are wrong.

First, Plaintiffs do not contest that as account holders at the Tech Companies, they agreed to the terms and conditions and privacy policies governing their interactions with the Tech Companies. And they do not contest the authenticity or accuracy of the Tech Companies' policies. Rather, pointing solely to the TikTok policy, they argue only that the Court should not consider the Tech Companies' policies because "it is unclear which version of the terms may apply." Pls.' Br. at 12. While Plaintiffs are correct that the most recent version of the TikTok privacy policy states that it was last updated on March 28, 2024, they are wrong to state that that fact precludes

the court from considering the Tech Companies' privacy policies: "Courts have taken judicial notice of the contents of web pages available through the Wayback Machine as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned, see Fed. R. Evid. 201." *Hepp v. Ultra Green Energy Servs., LLC*, No. 13 C 4692, 2016 WL 1073070, at *2 (N.D. Ill. Mar. 18, 2016) (Durkin, J.) (quoting *Erickson v. Nebraska Mach. Co.*, 2015 WL 4089849, at *1 (N.D. Cal. July 6, 2015) (collecting authority)).

Here, the period at issue is from November 2021 through the present (FAC ¶ 139) and the Wayback Machine provides the Court with the language of each policy during that period.

*TikTok*:  The TikTok Privacy Policy (last updated June 2, 2021)[8] states:

> **Cookies**
>
> We and our service providers and business partners use cookies and other similar technologies (e.g. web beacons, flash cookies, etc.) ("Cookies") to automatically collect information, measure and analyze which web pages and advertisements you click on and how you use the Platform, enhance your experience using the Platform, improve the Platform, provide you with advertising on the Platform and elsewhere across your devices, and measure the effectiveness of advertisements. Cookies enable the Platform to provide certain features and functionality. Web beacons are very small images or small pieces of data embedded in images, also known as "pixel tags" or "clear GIFs," that can recognize Cookies, the time and date a page is viewed, a description of the page where the pixel tag is placed, and similar information from your computer or device. To learn how to disable Cookies, see the "Your choices" section below.
>
> We and our service providers and business partners may link your contact or account information with your activity on and off our Platform across all your devices, using your email or other log-in or device information. Our service providers and business partners may use this information to display advertisements on our Platform and elsewhere online and across your devices tailored to your interests, preferences, and characteristics. We are not responsible for the privacy practices of these service providers and business partners, and the information practices of these service providers and business partners are not covered by this Privacy Policy.

The next iteration, updated January 1, 2023, similarly states:[9]

---

[8] https://web.archive.org/web/20221226001920/https://www.tiktok.com/legal/page/us/privacy-policy/en (last visited Apr. 25, 2024).
[9] https://web.archive.org/web/20230107001417/https://www.tiktok.com/legal/page/us/privacy-policy/en (last visited Apr. 25, 2024).

14

> • **Cookies.** We and our service providers and business partners use cookies and other similar technologies (e.g., web beacons, flash cookies, etc.) ("Cookies") to automatically collect information, measure and analyze how you use the Platform, including which pages you view most often and how you interact with content, enhance your experience using the Platform, improve the Platform, provide you with advertising, and measure the effectiveness of advertisements and other content. We and our partners also use Cookies to promote the Platform on other platforms and websites. Cookies enable the Platform to provide certain features and functionality. Web beacons are very small images or small pieces of data embedded in images, also known as "pixel tags" or "clear GIFs," that can recognize Cookies, the time and date a page is viewed, a description of the page where the pixel tag is placed, and similar information from your computer or device. To learn how to disable certain Cookies, see the "Your Choices →" section below.
>
> We may link your contact or account information with your activity on and off our Platform across all your devices, using your email or other log-in or device information. We may use this information to display advertisements on our Platform tailored to your interests, preferences, and characteristics.

This language did not change in the March 21, 2023 update,[10] in the May 22, 2023 update,[11] in the January 24, 2024 update,[12] or in the March 24, 2024 update.[13]

Throughout the entirety of the class period, TikTok therefore has told TikTok account holders that TikTok and its business partners use cookies and pixels to automatically collect information about users and that TikTok "may link your contact or account information with your activity on and off our Platform across all of your devices, using your email or other log-in or device information" that it may use to "display advertisements."  The policies of the other tech companies are similarly consistent:

*LinkedIn*:  The LinkedIn Privacy Policy (effective August 11, 2020)[14] states:

---

[10] https://web.archive.org/web/20230331000342/https://www.tiktok.com/legal/page/us/privacy-policy/en (last visited Apr. 25, 2024).

[11] https://web.archive.org/web/20240101000400/https://www.tiktok.com/legal/page/us/privacy-policy/en (last visited Apr. 25, 2024).

[12] https://web.archive.org/web/20240229001612/https://www.tiktok.com/legal/page/us/privacy-policy/en (last visited Apr. 25, 2024).

[13] https://web.archive.org/web/20240425000147/https://www.tiktok.com/legal/page/us/privacy-policy/en (last visited Apr. 25, 2024).

[14] https://web.archive.org/web/20211101000112/https://www.linkedin.com/legal/privacy-policy (last visited Apr. 25, 2024).

## 1.4 Cookies and Similar Technologies

 We collect data through cookies and similar technologies.

As further described in our Cookie Policy, we use cookies and similar technologies (e.g., pixels and ad tags) to collect data (e.g., device IDs) to recognize you and your device(s) on, off and across different services and devices where you have engaged with our Services. We also allow some others to use cookies as described in our Cookie Policy. If you are outside the Designated Countries, we also collect (or rely on others who collect) information about your device where you have not engaged with our Services (e.g., ad ID, IP address, operating system and browser information) so we can provide our Members with relevant ads and better understand their effectiveness. Learn more. You can opt out from our use of data from cookies and similar technologies that track your behavior on the sites of others for ad targeting and other ad-related purposes. For Visitors, the controls are here.

This section of the Privacy Policy has been the same throughout the entirety of the class period.[15]   In addition, LinkedIn's Cookie Policy (also effective August 11, 2020)[16] provides additional information about third-party use of "cookies" and "pixels" in connection with LinkedIn, including for "personalized advertising" and "analytics and research."

**Google**:  Google's Privacy Policy (effective July 1, 2021),[17] which provides links to each archived version, including a comparison of changes,[18] also discloses the collection of data about users from websites that use Google Analytics.

---

[15] *Compare id. with* https://www.linkedin.com/legal/privacy-policy (current LinkedIn Privacy Policy effective Mar. 6, 2024) (last visited Apr. 25, 2024).

[16] https://web.archive.org/web/20211101042822/https://www.linkedin.com/legal/cookie-policy (last visited Apr. 25, 2024).

[17] https://web.archive.org/web/20211101002035/https://policies.google.com/privacy?hl=en-US (last visited Apr. 25, 2024).

[18] https://policies.google.com/privacy/archive?hl=en-US (last visited Apr. 25, 2024).

> We use data for analytics and measurement to understand how our services are used. For example, we analyze data about your visits to our sites to do things like optimize product design. And we also use data about the ads you interact with, including your related Google Search activity, to help advertisers understand the performance of their ad campaigns. We use a variety of tools to do this, including Google Analytics. When you visit sites or use apps that use Google Analytics, a Google Analytics customer may choose to enable Google to link information about your activity from that site or app with activity from other sites or apps that use our ad services.

A comparison of changes to Google's most recent Privacy Policy (effective March 28, 2024) reveals no material changes:[19]

> We use data for analytics and measurement to understand how our services are used. For example, we analyze data about your visits to our sites to do things like optimize product design. And we also use data about the ads you interact with, including your related Google Search activity, to help advertisers understand the performance of their ad campaigns. We use a variety of tools to do this, including Google Analytics. When you visit sites or use apps that use Google Analytics, a Google Analytics customer may choose to enable Google to link information about your activity from that site or app with activity from other sites or apps that use our ad services.

**Facebook/Meta**: In *Smith*, the court relied on the following statements in Facebook's privacy policies:

> We collect information when you visit or use third-party websites and apps that use our Services (like when they offer our Like button or Facebook Log In or use our measurement and advertising services). This includes information about the websites and apps you visit, your use of our Services on those websites and apps, as well as information the developer or publisher of the app or website provides to you or us.
>
> . . . .
>
> Cookies are small files that are placed on your browser or device by the website or app you're using or ad you're viewing. Pixel tags (also called clear GIFs, web beacons, or pixels) are small blocks of code on a webpage or app that allow them to do things like read and place cookies and transmit information to us or our partners. The resulting connection can include information such as a device's IP address, the time a person viewed the pixel, an identifier associated with the

---

[19] https://policies.google.com/privacy?hl=en-US (last visited Apr. 25, 2024).

browser or device and the type of browser being used.

. . . .

Things like Cookies and similar technologies (such as information about your device or a pixel on a website) are used to understand and deliver ads, make them more relevant to you, and analyze products and services and the use of those products and services.

For example, we use cookies so we, or our affiliates and partners, can serve you ads that may be interesting to you on Facebook Services or other websites and mobile applications.

*Smith*, 262 F. Supp. 3d at 954.

Contrary to Plaintiffs' argument that it cannot be determined which versions of the policy apply, Meta publicly posts all previous versions of its privacy policies applicable throughout the class period:[20]



---

All of these disclose Meta's use of cookies and include the statement (or a variation of the statement with increasing detail) that the *Smith* court found critical: "We collect information when you visit or use third-party websites and apps that use our Services."[21]

*Instagram*:  Instagram's Data Policy makes clear that it is identical to the Facebook Privacy Policy.  Specifically, at the top of the Data Policy is a statement that "we've updated our policy," with a link to "read it here," which re-routes to the Meta Privacy Policy.[22]

Second,  Plaintiffs exaggerate the law in order to downplay the significance of the Tech Companies' terms.  Plaintiffs assert that "*courts*" have "rejected BCBSA's argument that plaintiffs consent via the privacy policies of the technology companies."  Pls.' Br. at 12 (emphasis added).  But Plaintiffs cite the decision of only one court:  *In re Meta Pixel Healthcare Litigation*, 647 F. Supp. 3d 778 (N.D. Cal. 2022).  And in that case, that lone district court made clear that it was addressing allegations not present here and not present in *Smith v. Facebook, Inc.*:  the presence of a pixel on a patient portal.  As the court explained, "*Smith* involved users browsing through

---

[21] Data Policy as of Sep. 29, 2016, https://www.facebook.com/privacy/policy/version/20160929/ (last visited Apr. 25, 2024); *see also* Data Policy as of Jan. 4, 2022, https://www.facebook.com/privacy/policy/version/20220104/ (last visited Apr. 25, 2024) ("Advertisers, app developers, and publishers can send us information through Meta Business Tools they use, including our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel. These partners provide information about your activities off of our Products—including information about your device, websites you visit, purchases you make, the ads you see, and how you use their services—Whether or not you have an account or are logged into our Products."); Privacy Policy as of July 26, 2022, https://www.facebook.com/privacy/policy/version/5066055233450651/ (last visited Apr. 25, 2024) ("We'll use information that advertisers, businesses and other partners provide us about activity off Meta Products that we have associated with you to personalize ads that we show you on Meta Products, and on websites, apps and devices that use our advertising services.  We receive this information whether or not you're logged in or have an account on our Products."); Privacy Policy as of January 1, 2023, https://www.facebook.com/privacy/policy/version/540 7378522724295/ (last visited Apr. 25, 2024) ("We'll use information that advertisers, businesses and other partners provide us about activity off Meta Products that we have associated with you to personalize ads that we show you on Meta Products, and on websites, apps and devices that use our advertising services.  We receive this information whether or not you're logged in or have an account on our Products.").

The quoted language from the Privacy Policy as of January 1, 2023, is unchanged in the Privacy Policy as of June 15, 2023 (*See* https://www.facebook.com/privacy/policy/version/5601719079934335/ (last visited Apr. 25, 2024)) up through the current Privacy Policy as of December 27, 2023. https://www.facebook.com/privacy/policy (last visited Apr. 25, 2024).

[22] https://help.instagram.com/155833707900388 (last visited Apr. 25, 2024).

websites providing healthcare information to the public at large, not users navigating to patient portals on healthcare providers' websites. The act of navigating to a patient portal on a healthcare provider's website is not the general internet browsing contemplated in *Smith*." *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 793.

### D. The Tech Companies were parties to the communications.

As BCBSA explained in its Opening Brief, the communications at issue were between Plaintiffs and the Tech Companies. Def.'s Br. at 18-19 (citing *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 143 (3d Cir. 2015)). Plaintiffs argue that a 2020 decision from the Ninth Circuit, reaching a different conclusion, is more persuasive and the Court should follow it. Pls.' Br. at 18 (citing *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 596 (9th Cir. 2020)). Specifically, *In re Facebook* cites with approval to a decision of the Seventh Circuit in *United States v. Szymuszkiewicz*, 622 F.3d 701, 705 (7th Cir. 2010), *as amended* (Nov. 29, 2010), which Plaintiff contends dictates the outcome here. Plaintiff is wrong.

The Court in *Kurowski* already addressed and rejected the argument asserted by Plaintiffs: that *Szymuszkiewicz* is dispositive. *See Kurowski v. Rush Sys. for Health*, 659 F. Supp. 3d 931, 938 (N.D. Ill. 2023). According to the court in *Kurowski*, the issue before it was "who the intended recipient of the communication was," and not, as in *Szymuszkiewicz*, "the contemporaneousness of the alleged interception." 659 F. Supp. 3d at 938. Consequently, the court in *Kurowski* rejected the plaintiffs' invitation to follow *In re Facebook* and *Szymuszkiewicz*.

As in *Kurowski*, the issue here is not the contemporaneousness of the interception, but the identity of the parties. And while the court in *Kurowski* found that several tech companies in that case were ***not*** parties to the communication, two key facts distinguish that holding. <u>First</u>, the allegations at issue in *Kurowski* encompassed the deployment of technology on the MyChart patient portal (*id.* at 934)—a fact that provides a strong basis to allege that health-related

20

communications were not intended to be delivered to another party. Second, the court in *Kurowski* did not have before it the privacy policies of the technology companies (as does the Court here) showing that the plaintiffs consented and agreed to communications with the tech companies.

## II.   The Opposition Fails to Salvage Plaintiffs' Illinois Computer Tampering Act Claim.

BCBSA established in its Opening Brief that Plaintiffs' ICTA claim is not viable because Plaintiffs fail to sufficiently establish any of the three elements of the claim. Specifically, Plaintiffs have not sufficiently alleged: (i) that BCBSA acted "knowingly and without authorization" or "in excess of the authority granted" to (ii) insert a program into Plaintiffs' computers "knowing or having reason to know" that such program would "damage or destroy" the computer, "alter, delete, or remove a computer program or data from that computer," or "cause loss to the users of that computer," or (iii) that Plaintiffs "suffer[ed] loss by reason of a violation." *See* Def.'s Br. at 19-20 (citing 720 ILCS 5/17-51).

In response, Plaintiffs insist that they did (Pls.' Br. at 20-21) but quote no allegations in their Complaint in support of their assertions. For example, a key element of an ICTA claim is that the unlawful conduct occurred **on** a plaintiff's computer. *See, e.g.*, 720 ILCS 5/17-51(a)(4)(B) (prohibiting the "alter[ation], delet[ion], or remov[al] [of] a computer program or data ***from*** that computer) (emphasis added). But the Complaint makes clear that the conduct at issue is alleged to have occurred not on Plaintiff's computer, but on BCBSA's Public Website. Plaintiff alleges, for example, that BCBSA deployed "the tracking code from TikTok and other companies on its Website," (FAC ¶ 11), that "[w]hen the TikTok Pixel is embedded in a website's Source Code, it causes the user's web browser to simultaneously transmit communications directed to the website to also go to TikTok's servers" (FAC ¶ 50), and that the data at issue was not exfiltrated from Plaintiff's computers, but rather "Plaintiffs entered data on [BCBSA's] website." FAC ¶ 169.

Another key element of an ICTA claim is suffering "a loss." Plaintiffs argue that they suffered a loss "in the form of disclosure of their private health information—a valuable commodity—to unauthorized third parties." Pls.' Br. at 20. Plaintiffs cite no authority in support of this novel reading, nor could they—such a reading of "loss" via removal of data would render meaningless the statute's distinction between alleging the elements of a claim (which includes demonstrating removal of data) and alleging a private cause of action (which requires "suffer[ing] loss by reason of a violation." *Compare* 720 ILCS 5/17-51(a)(4) *with* 20 ILCS 5/17-51(c).

While there is limited authority interpreting the ICTA, there is voluminous authority interpreting "its federal analogue, the Computer Fraud and Abuse Act ('CFAA'), 18 U.S.C. § 1030." *Fidlar Techs. v. LPS Real Est. Data Sols., Inc.*, No. 4:13-CV-4021-SLD-JEH, 2016 WL 4706927, at *6 (C.D. Ill. Sept. 8, 2016). Under the CFAA, "loss" is "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* at § 1030(e)(11). The Supreme Court has explained that this definition encompasses solely "technological harms—such as the corruption of files" but does not extend to "misuse of sensitive information." *Van Buren v. United States*, 593 U.S. 374, 392 (2021).

Ultimately, Plaintiffs cite no decisions in support of their arguments except one case for the unhelpful (to them) proposition that "[b]roadly speaking, the ICTA 'applies to unauthorized computer access.'" Pls.' Br. at 20 (quoting *Halperin v. International Web Services, LLC*, 123 F. Supp. 3d 999, 1009–10 (N.D. Ill. 2015)). But the decision in *Halperin* undercuts Plaintiffs' argument: the court in *Halperin* **dismissed** the plaintiff's ICTA claim, after which the plaintiff

22

abandoned the case.  Minute Entry, *Halperin v. International Web Services, LLC*, 1:13cv08573 (N.D. Ill. June 16, 2015), ECF No. 107.

**III.    The Opposition Does Nothing to Bolster Plaintiffs' Common Law Claims.**

       **A.    Plaintiffs fail to dispel the application of the filed-rate doctrine.**

Plaintiffs cite several inapposite cases in their attempt to convince this Court that the filed-rate doctrine does not bar their claims seeking benefit-of-the-bargain damages.  But Plaintiffs do not attempt to distinguish or even address the cases cited by BCBSA that are directly on point and that demonstrate the filed-rate doctrine does apply to preclude Plaintiffs' common law claims.

<u>First</u>, Plaintiffs fail to address *Fero v. Excellus Health Plan, Inc.*, 236 F. Supp. 3d 735 (W.D.N.Y. 2017), a closely analogous case where the U.S. District Court for the Western District of New York held that the filed-rate doctrine applied to bar a state law claim against BCBSA by federal employee health benefit plan enrollees like Plaintiffs here arising out of a data breach following a cyberattack against a Blue Cross Blue Shield-affiliated company.  The plaintiffs in *Fero* alleged BCBSA violated a state deceptive trade practices law and sought to recover for injuries identical to those alleged by Plaintiffs here, including "'the loss of their legally protected interest in the confidentiality and privacy of their [personally identifiable information] and [personal health information], and the loss of the benefit of their respective bargains.'"  *Id.* at 779. When assessing the viability of the federal employee health benefit plan enrollees' claim, the *Fero* court correctly determined that awarding such damages would require the court to second-guess the insurance premium rates set by OPM in violation of the filed-rate doctrine.  When reaching that holding, the court recognized the need to strictly apply the doctrine regardless of the nature of the cause of action alleged:

> "When the filed rate doctrine applies, it is rigid and unforgiving.  Indeed, some have argued that it is unjust.  It does not depend on the culpability of the defendant's conduct or the possibility of inequitable results, ***nor is it affected by the nature of***

***the cause of action the plaintiff seeks to bring***.  It applies whenever a claim would implicate its underlying twin principles of preventing carriers from engaging in price discrimination as between ratepayers and preserving the exclusive role of federal agencies in approving rates.  And when the doctrine applies, it bars both state and federal claims."

*Id.* at 780 (quoting *Simon v. KeySpan Corp.*, 694 F.3d 196, 205 (2d. Cir. 2012) (emphasis added)).

Plaintiffs' claims here alleging breaches of "legal duties or quasi-contractual obligations" by BCBSA and seeking to recover benefit-of-the-bargain damages, including those allegedly "flowing from the lost opportunity to obtain insurance from an alternative provider that did not share sensitive health data" due to those breaches, clearly implicate BCBSA's OPM-approved rates and call on this Court to second-guess those rates.  Pls.' Br. at 21, 24.  Calculating lost opportunity damages requires an evaluation of the rates based on the value of the services provided.  Stating that claims do not implicate the OPM-approved rates does not make that so.  *Id.* at 21-22.

Similarly, Plaintiffs avoid *In re Anthem, Inc. Data Breach Litigation*, No. 15-md-02617-LHK, 2016 WL 3029783 (N.D. Cal. May 27, 2016), a case against BCBSA and others very similar to the instant litigation that involved a cyberattack and data security breach on a BCBSA-affiliated company's database containing enrollees' personal health and other sensitive information.  The plaintiffs in that case, like Plaintiffs here, filed multiple state common law claims, including breach of contract seeking benefit-of-the-bargain losses.  Like Plaintiffs here, the plaintiffs in *In re Anthem, Inc.* tried to avoid dismissal under the filed-rate doctrine by arguing they were not challenging the rates charged by the defendants for health insurance, but were seeking compensation for breach of what was promised to them.  *Id.* at *24; Pls.' Br. at 23-24 ("[T]he 'gravamen' of Plaintiffs' complaint is not the premium rate per se, but whether BCBSA's undisclosed interception and disclosure of private health information breached duties or obligations owed to Plaintiffs, resulting in harm.").

The U.S. District Court for the Northern District of California rejected the plaintiffs' attempt to avoid application of the filed-rate doctrine, stating the plaintiffs' argument "'would [inevitably] require the Court to determine what rate would have been reasonable and thereby interfere with [the] rate-making process.'" *In re Anthem, Inc.*, 2016 WL 3029783 at \*24 (quoting *Clark v. Prudential Ins. Co. of Am.*, 736 F. Supp. 2d 902, 919 (D.N.J. 2010)). According to the court, "[p]laintiffs' request for Benefit of the Bargain Losses naturally represents a refund for the portion of [p]laintiffs' premiums that should have, but did not, go towards data security." *Id.* at \*23. The court further recognized that the filed-rate doctrine "'precludes a claim for damages which would *indirectly* cause the application of rates different from the filed rates.'" *Id.* at \*24 (quoting *Richardson v. Standard Guar. Ins. Co.*, 853 A.2d 955, 967 (N.J. Super. Ct. App. Div. 2004) (emphasis in original)). Based on these principles, the court dismissed the claim, holding that "[p]laintiffs' request for Benefit of the Bargain Losses inextricably implicates the filed-rate doctrine [and] [p]laintiffs are barred from recovering such damages." *Id.* The same rationale applies to bar Plaintiffs' state law claims seeking benefit-of-the-bargain damages.

Second, BCBSA's argument that the filed-rate doctrine bars Plaintiffs' common law claims does not rest merely on the fact that those claims relate to insurance, as Plaintiffs try to argue. Pls.' Br. at 22. To the contrary, Plaintiffs' claims for negligence, invasion of privacy, breach of implied contract, and unjust enrichment all directly or indirectly seek benefit-of-the-bargain damages, which implicate the reasonableness of BCBSA's OPM-approved rates and, therefore, the filed-rate doctrine. The cases cited by Plaintiffs do not hold otherwise.

*Gunn v. Continental Cas. Co.*, 622 F. Supp. 3d 694 (N.D. Ill. 2022) (Pls.' Br. at 22), involved questions of whether the defendant insurance company had contractually promised not to raise rates and whether it engaged in fraudulent marketing. *Id.* at 702. In contrast to this case,

the plaintiff in *Gunn* was not challenging the reasonableness of the insurance rates, but rather the defendant's "conduct in marketing and selling the policy and failing to comply with its terms—by promising a nationwide rate class but nonetheless seeking premium increases without regard to that promise." *Id.* The court determined that it did not have to evaluate the reasonableness of the rate to answer the questions at issue, and rejected the application of the filed-rate doctrine. *Id.*

Another case relied upon by Plaintiffs, *Friedman v. AARP*, 283 F. Supp. 3d 873 (C.D. Cal. 2018) (Pls.' Br. at 23), is likewise distinguishable and irrelevant. *Friedman* involved allegations of fraudulent marketing practices and misrepresentations by defendants AARP and UnitedHealth Group, Inc. in relation to the sale of Medigap health insurance policies. The plaintiff claimed he overpaid for his Medigap policy because defendants failed to disclose that UnitedHealth paid AARP a fee, characterized by the plaintiff as an insurance commission and by the defendants as a royalty, for use of the AARP name in marketing and selling the coverage. The court declined to apply the filed-rate doctrine to dismiss plaintiff's claims under California's Unfair Competition Law and for money had and received and conversion, finding that those claims are "more akin to challenges to [d]efendants' alleged misrepresentations, rather than challenges to the approved rate." *Id.* at 878. Unlike the instant case, *Friedman* did not involve benefit-of-the-bargain damages.

The third, nonprecedential case Plaintiffs cite, *Harvey v. Centene Mgmt. Co., LLC*, 357 F. Supp. 3d 1073 (E.D. Wash. 2018) (Pls.' Br. at 22), is unpersuasive and contrary to the law in the Seventh Circuit. The plaintiff in *Harvey* asserted claims for breach of contract and violation of the Washington State Consumer Protection Act, alleging that the defendants' healthcare provider network was deficient. The court declined to apply the filed-rate doctrine to dismiss the claims, reasoning that the plaintiff was not "directly attacking" the filed rate at issue, but instead was

claiming the defendants "did not deliver the insurance services for which the Insurance Commissioner approved the premiums." *Id.* at 1083-84. To reach this holding, the court set aside Washington State Supreme Court precedent on point and instead cited to a law review article.

The filed-rate doctrine as construed and applied in this Circuit does not require a "direct attack" on a filed rate, and *Harvey* and the other distinguishable cases cited by Plaintiffs should not be given any weight. Indeed, contrary to holding in *Harvey*, the Seventh Circuit in *Goldwasser v. Ameritech*, 222 F.3d 390, 398 (7th Cir. 2000), held that the filed-rate doctrine barred claims seeking damages resulting from a defendant's allegedly inadequate provision of services based on its failure to carry out responsibilities under governing law. In sum, this Court should dismiss Plaintiffs' common law claims under the filed-rate doctrine for the reasons set forth by BCBSA.

**B.    Plaintiffs' invasion of privacy by publication of private facts claim fails in the absence of publication.**

BCBSA already explained that Plaintiffs cannot state a claim for invasion of privacy by publication of private facts because any alleged publication was "not to the public at large or to so many persons that the matter must be regarded as one of general knowledge." Def.'s Br. at 24-25 (quoting *Kurowski*, 2023 WL 8544084, at \*9). Plaintiffs argue in response that *Kurowski* "did not involve allegations regarding transmission of sensitive information to TikTok specifically," and that "specific disclosures to TikTok are widespread enough to constitute public disclosure." Pls.' Br. at 25. Plaintiffs cite no authority in support of this argument, nor could they—it is wrong.

Plaintiffs also argue that the disclosures allegedly occurred "in the context of a special relationship." Pls.' Br. at 25. Plaintiffs assert a "special relationship" existed because "Plaintiffs are federal employees" and "sharing their information with TikTok raises significant national security and privacy concerns." *Id.* But this is not the "special relationship" referred to in the lone case Plaintiffs cite—*Miller v. Motorola, Inc.*, 202 Ill. App. 3d 976, 980-81 (1st Dist. 1990). Rather,

27

in *Miller*, the court explained that disclosure must still be to "the public" but that "[s]uch a public might be the general public, if the person were a public figure, or a particular public such as fellow employees, club members, church members, family, or neighbors, if the person were not a public figure." *Id.* Plaintiff cites no authority for the proposition that disclosure to TikTok is disclosure to **any** "public."

     **C.**    **Plaintiffs fail to state a claim for breach of implied contract.**

BCBSA argued in its Opening Brief that because Plaintiffs agreed to BCBSA's Cookie Banner and Privacy Policy, an express contract exists that forecloses Plaintiffs' breach of implied contract claim because "[a]n implied contract claim cannot coexist with an express contract on the same subject. *Marcatante v. City of Chicago, Ill.*, 657 F.3d 433,440 (7th Cir. 2011). To overcome BCBSA's argument, Plaintiffs argue themselves out of their claim for breach of implied contract.

As Plaintiffs agree, "[i]n Illinois, in order to prove an implied contract the party asserting the contract must show the same elements as an express contract, as well as a meeting of the minds and a mutual intent to contract." *New v. Verizon Commc'ns, Inc.*, 635 F. Supp. 2d 773, 782–83 (N.D. Ill. 2008). But despite agreeing with this standard, Plaintiffs argue in their Opposition that the terms of the contract are "vague and general," that Plaintiffs "lack[ed] constructive knowledge of the Privacy Policy," and there was no "meeting of the minds." Pls.' Br. at 26. Plaintiffs thus agree that they fail to plead the existence of an implied contract.

Finally, even if Plaintiffs could prove the existence of an implied contract and a breach of its terms, their claim would still fail for failure to allege an injury-in-fact. For a breach of implied contract claim to survive, a plaintiff must allege "actual monetary damage." *Archey v. Osmose Utilities Servs., Inc.*, No. 20-CV-05247, 2021 WL 3367156, at *2 (N.D. Ill. Aug. 3, 2021) (dismissing breach of implied contract claim for failure to allege actual loss or injury from a cyberattack); *Moyer v. Michaels Stores, Inc.*, No. 14 C 561, 2014 WL 3511500, at *7 (N.D. Ill.

28

July 14, 2014).  The "benefit of the bargain," as vaguely alluded to as a loss by Plaintiffs, does not suffice to establish an injury-in-fact.  *Archey*, 2021 WL 3367156 (rejecting argument that a plaintiff may allege mere benefit of the bargain as a loss supporting a breach of implied contract claim).

### D.  Plaintiffs' recitation of the elements necessary to establish a negligence cause of action does not suffice to state a claim.

BCBSA showed in its Opening Brief Plaintiffs' allegations of negligence are entirely conclusory.  Def.'s Br. at 27 (citing *Murphy v. Thomas Jefferson Univ. Hosps., Inc.*, 2023 WL 7017734, at *5 (E.D. Pa. Oct. 10, 2023) (granting motion to dismiss pixel lawsuit for, inter alia, failure to state a negligence cause of action with requisite specificity)).  In response, Plaintiffs quote the same conclusory allegations and make the conclusory assertion that these "precisely allege" the elements.  Pls.' Br. at 27 & n.5.  The Opposition, therefore, does nothing to salvage Plaintiffs' insufficiently pled negligence claim.

### <u>CONCLUSION</u>

For these reasons, this Court should dismiss the complaint with prejudice.

29

Dated:  April 26, 2024

Respectfully submitted,

By: /s/ *Justin O. Kay*
     Justin O. Kay
     Ambria D. Mahomes
     Faegre Drinker Biddle & Reath LLP
     320 S. Canal Street, Suite 3300
     Chicago, IL  60606
     Telephone:  (312) 569-1000
     Facsimile:  (312) 569-3000
     Email:  justin.kay@faegredrinker.com
     Email:  ambria.mahomes@faegredrinker.com


     Zoe K. Wilhelm (Pro Hac Vice)
     Faegre Drinker Biddle & Reath LLP
     800 Century Park East, Suite 1500
     Los Angeles, CA  90067
     Telephone:  (310) 203-4000
     Facsimile:  (310) 229-1285
     Email:  zoe.wilhelm@faegredrinker.com

     Andrew M. Taylor (Pro Hac Vice)
     Faegre Drinker Biddle & Reath LLP
     2200 Wells Fargo Center
     90 S. 7th Street
     Minneapolis, MN  55402
     Telephone:  (612) 766-7000
     Facsimile:  (612) 766-1600
     Email:  andrew.taylor@faegredrinker.com

     *Attorneys for Defendant*
     *Blue Cross Blue Shield Association*