**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TERESA GOUCH, DENISE SPANOS, GEORGE AMERSON, and KYLE MUMMEY, individually and on behalf of all others similarly situated, | ) ) ) ) ) | No. 23 C 15709 |
| Plaintiffs, | ) ) | Judge John J. Tharp, Jr. |
| v. | ) ) | |
| BLUE CROSS BLUE SHIELD ASSOCIATION, | ) ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

The Blue Cross Blue Shield Association (BCBSA) is one of the largest providers of health insurance for federal employees nationwide. It maintains a public website, fepblue.org, that contains information about plan coverage, treatment options, and physician specialties. The plaintiffs in this case are federal employees enrolled in BCBSA plans who browsed fepblue.org for healthcare-related information. They allege that BCBSA recorded and transmitted their browsing data to third-party technology and social networking companies without their consent in violation of California, Illinois, and federal law. They purport to represent a nationwide class of similarly situated federal employees, as well as a smaller California class. BCBSA moves to dismiss the complaint for failure to state a plausible claim for relief. *See* Mot. to Dismiss, ECF No. 34. For the reasons set forth in the opinion below, the motion is granted in part and denied in part. The plaintiffs are granted leave to amend, consistent with this opinion, by September 4, 2026.

**BACKGROUND**

Before proceeding further, it will be useful to provide some background on internet communications. Every website is hosted by a computer server, which holds the website's

contents. If an individual internet user wishes to browse those contents, their internet browser must engage in a series of communications with the website server. Those communications generally take the form of HTTP requests and responses. A HTTP request is sent from the user's internet browser to the website server, specifying the URL that corresponds to the contents of the website that they want to access. The web server responds by sending back a web page, a text file, or other data. Every website is governed by its source code: a set of instructions that tells the internet browser how to behave when the user takes certain actions. As relevant here, a website's source code can command a user's internet browser to duplicate the HTTP requests sent to the web server and send them to third parties, giving the third party a full picture of the user's browsing activities. That type of code is sometimes referred to as a "pixel."

The plaintiffs allege that fepblue.org's source code includes pixels that duplicate HTTP requests sent to the BCBSA server and send them to TikTok, Meta, Google, and LinkedIn ("the Tech Companies"). According to plaintiffs, the duplicated requests include more than the URL for requested fepblue.org webpages. They also include unique identifiers, like the user's IP address and computer model, and "cookies" (text files that store data regarding the user's activities on the Tech Companies' own websites). The Tech Companies can use that data to match individuals' searches on fepblue.org with individual social media accounts on their platforms and create targeted marketing campaigns for advertisers (including BCBSA).

## DISCUSSION

The plaintiffs allege that BCBSA's implementation of the Tech Companies' pixels violates the Electronic Communications and Privacy Act (ECPA), the Illinois Eavesdropping Statute (IES), the Illinois Computer Tampering Act (ICTA), and the California Invasion of Privacy Act (CIPA) (Counts I-IV). They also assert several common law theories of recovery: negligence, invasion of

privacy by publication of fact, and breach of implied contract (Counts V-VII).[1] BCBSA moves to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

At the pleading stage, a complaint need only contain a "short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), as well as "sufficient factual matter" to state a facially plausible basis for relief, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although a court must assume the truth of all well-pled allegations and draw all reasonable inferences in the plaintiff's favor, it should not accept a complaint's legal or conclusory statements as true. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

## I.     Wiretapping Statutes

The Court begins with an analysis of the plaintiffs' claims under the California, Illinois, and federal wiretapping statutes. Though the statutes differ in meaningful respects, each contains an exception to liability for parties to the recorded communications. *See* 18 U.S.C. § 2511(2)(d)*; Facebook Tracking*, 956 F.3d at 607 (citing Cal. Penal Code § 631(a)); *Kurowski v. Rush Sys. for Health*, 683 F. Supp. 3d 836, 853 (N.D. Ill. 2023) (*Kurowski II*) (citing 720 ILCS 5/14-2(a)(3), 5/14-6). Each also recognizes a potential defense to liability where the parties consent to the recording. *See* 18 U.S.C. § 2511(2)(d) (no liability "where one of the parties to the communication has given prior consent"); Cal. Penal Code § 631(a) (prohibiting wiretapping "without the consent of all parties to the communication"); 720 ILCS 5/14-2(a)(3) (precluding liability for interceptions by nonparties made "with the consent of all parties to the private electronic communication").

The frameworks for analyzing party status and consent are substantially the same across the ECPA, the IES, and CIPA. *See, e.g.*, *In re TikTok, Inc. In-App Browser Priv. Litig.*, No. 24 C

---

[1] Plaintiffs do not contest dismissal of Count VIII (unjust enrichment).

2110, 2024 WL 4367849, at *16 (N.D. Ill. Oct. 1, 2024); *Freifeld et. al. v. Epsilon Data Management, LLC.*, No. 2 C 9984, at *2, *4 (N.D. Ill. June 15, 2026). The Court begins with a general analysis of those issues before addressing the specific elements of each statute.

### A.     Party Status

The plaintiffs' wiretapping claims require the Court to consider the party status of (1) BCBSA, and (2) the Tech Companies. The Court concludes that the former is a party to the communications at issue, while the latter is not.

The plaintiffs and BCBSA seem to agree that being "[an] intended recipient to the communication" makes a person a party to that communication. *Kurowski v. Rush Sys. for Health*, 659 F. Supp. 3d 931, 938 (N.D. Ill. 2023) (*Kurowski I*). "The exception applies even to an intended recipient that duplicates and forwards the communication to a third party." *Okash v. Essentia Health*, No. 23 C 482 (JRT/LIB), 2024 WL 1285779, at *3 (D. Minn. Mar. 26, 2024). Here, the plaintiffs sent HTTP requests to the BCBSA website server as they browsed fepblue.org. That makes BCBSA a party to the HTTP requests, regardless of what it did with the requests after it received them. *See Kurowski I*, 659 F. Supp. at 938.

Whether or not the Tech Companies are parties is more complicated. The plaintiffs clearly did not "intend" to communicate with the Tech Companies in the same way that they "intended" to communicate with BCBSA. However, courts have recognized that a person may still be a "'party' to the communication . . . when [they are] a participant, even if [they are] not an ***intended*** participant, and even if [they] became a participant 'through a fraud in the inducement.'" *Zak v. Bose Corp.*, No. 17 C 2928, 2019 WL 1437909, at *3 (N.D. Ill. Mar. 31, 2019) (citing *United States v. Pasha*, 332 F.2d 193, 198 (7th Cir. 1964) and *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 143 (3d Cir. 2015)) (emphasis in original). In *Pasha*, for

4

example, a police officer recorded a telephone conversation with a criminal defendant in which he impersonated the defendant's coconspirator. The court held that the party-exception applied, notwithstanding the officer's deception, because "the officer was the immediate party to the call. The [defendant] intended his words to reach the officer, albeit the [defendant] thought he was someone else." *Pasha*, 332 F.2d at 198.

BCBSA attempts to frame the present allegations as a similar case of mistaken identity, but that argument is not persuasive. *Pasha* stands for a relatively straightforward principle: a person is a party to a communication if the communication is ***necessarily*** directed at them. A spoken conversation requires two parties: the sender of the communication (the speaker) and the receiver of the communication (the listener). Without the listener, there is no conversation, so whoever the listener is, is a party. The underlying principle remains the same in the context of electronic communications. The plaintiff must have affirmatively sent some data to the purported party's server as a necessary condition of their use of the technology at hand. *See In re TikTok*, 2024 WL 4367849 at *12. To access content on fepblue.org, the plaintiffs necessarily had to send HTTP requests to the BCBSA server. But the same is not true with respect to the Tech Companies. Accordingly, the Tech Companies are not parties to the communications here.

### B.    Consent to Recording

The next issue that bears on the plaintiffs' wiretapping theories is whether plaintiffs consented to the recording. "Consent" within the meaning of the wiretapping statutes "can be explicit or implied, but any consent must be actual." *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1063 (N.D. Cal. 2021) (citation omitted). BCBSA points to two sets of disclosures as evidence that the plaintiffs consented to its data sharing practices: (1) fepblue.org's cookie banner and

privacy policy, and (2) the Tech Companies' respective privacy policies. The Court considers each in turn.

Fepblue.org's cookie banner appears on all of its webpages. It states, in its entirety: "We use cookies on this website to give you the best experience and measure website usage. By continuing to use this website, you consent to these cookies. For more information, view our privacy policy." The words "privacy policy" hyperlink to the policy itself. As relevant here, the policy discloses that BCBSA "may use pixel tags . . . on fepblue.org to track the actions of users on the Website." It further discloses that social networking websites "like Facebook, Instagram, or LinkedIn can record that you have visited this page and could use this information to serve you relevant ads."

The Court easily concludes that the cookie banner, by itself, does not provide adequate notice of BCBSA's data sharing practices. Indeed, it makes no mention of third-party data sharing at all. The privacy policy, however, presents a trickier question. BCBSA contends that the plaintiffs implicitly consented to the policy—and the data sharing practices disclosed within it— by browsing the website. The plaintiffs present two arguments in response. First, they attack the contents of the privacy policy as too vague. In their view, no reasonable person would interpret the policy to suggest that BCBSA shared health-related data, as opposed to other kinds of data, with third parties. That contention, however, fails as a matter of common sense. Fepblue.org provides information about health insurance plans. All browsing activity on its website necessarily relates to healthcare in some form or another. To specify that shared data might concern that subject would be to state the obvious.[2] The plaintiffs cite several cases for the proposition that a

---

[2] Had BCBSA shared individually-identifiable health information (IIHI) with the Tech Companies, additional disclosures would certainly be needed, as would the plaintiffs' express

more specific disclaimer was needed, but they are distinguishable. In *Calhoun v. Google LLC*, 526 F. Supp. 3d 605 (N.D. Cal. 2021), for example, the privacy policy made "specific representations that could suggest to a reasonable user that Google would ***not*** engage in the alleged data collection." *Id.* at 621 (emphasis added). *See also Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1064 (N.D. Cal. 2021) (same). The plaintiffs point to no such language here. And in *Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836 (N.D. Cal. 2014), the privacy policy was inadequate because it did not state that shared data could be used for advertising purposes. *Id.* at 847. But here, the privacy policy explicitly states that third parties may use the data to that end. The Court therefore concludes that BCBSA's privacy policy covers the conduct alleged in this case.

That the policy covers the conduct, however, is not enough. The plaintiffs must have consented to the policy. On that point, the plaintiffs raise their second argument. They begin by explaining that the policy is a "browsewrap" agreement because the website never prompted them to click any "Accept" or "Agree" button. *See Anand v. Heath*, No. 19 C 16, 2019 WL 2716213, at *3 (N.D. Ill. June 28, 2019) (browsewrap agreement exists where a party is purported to have assented "simply by using the website") (citation omitted). To find such agreements enforceable, courts generally require "(i) conspicuous hyperlinks or texts of agreements and (ii) [] explicit text referencing terms of agreements or instructing users that they are assenting to agreements." *Sgouros v. TransUnion Corp.*, No. 14 C 1850, 2015 WL 507584, at *6 (N.D. Ill. Feb. 5, 2015), *aff'd*, 817 F.3d 1029 (7th Cir. 2016). Here, the plaintiffs argue, the second element is missing: the

---

consent. But as the Court explains below, the information at issue here does not constitute IIHI. As such, no additional disclosures were required. *See Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018) (rejecting "stringent disclosure requirements" for data concerning health-related searches on public websites).

cookie banner hyperlinks to the policy, but it does not inform a user that they consent to the terms of the policy by continuing to browse the website.

BCBSA concedes that no valid browsewrap agreement was formed but contends that the issue is beside the point. The meaning of "consent," it argues, does not turn on contract law and should be construed broadly in the wiretapping context. The Court is somewhat sympathetic to that argument. Much of the authority on browsewrap agreements concerns the enforceability of online contracts, like arbitration clauses in websites' terms of use. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014); *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1030 (7th Cir. 2016). For a contract to be enforceable, there must be a "meeting of the minds" and an intent to be bound. *Ocean Atl. Dev. Corp. v. Aurora Christian Schs., Inc.*, 322 F.3d 983, 995 (7th Cir. 2003). That seems to be a different question—with a potentially higher standard—than the question of whether a party engaged in "acts that tend to prove that a party knows of, or assents to, encroachments on the routine expectation that [communications] are private." *People v. Ceja*, 204 Ill. 2d at 350, 789 N.E.2d at 1241 (2003) (discussing "implied consent" inquiry under the IES). *See also Griggs-Ryan v. Smith*, 904 F.2d 112, 117 (1st Cir. 1990) (articulating same standard under the federal statute and noting that "the circumstances relevant to an implication of consent will vary from case to case"). Nevertheless, in cases like the one at hand, many district courts view the inquiries as one and the same. *See, e.g.*, *Podraza v. Nourish, Inc.*, No. 25 C 50356, 2026 WL 1078554, at *7 (N.D. Ill. Apr. 20, 2026); *Silver v. Stripe Inc.*, No. 20 C 8196-YGR, 2021 WL 3191752, at *4 (N.D. Cal. July 28, 2021).

Ultimately, this Court need not decide the propriety of using contract law in wiretapping cases to resolve the matter before it. Even if governed by a different or less stringent standard, "[i]mplied consent [to be recorded] is not constructive consent. Rather, implied consent is 'consent

8

in fact' which is inferred 'from surrounding circumstances indicating that the [party] knowingly agreed to the surveillance.'" *Griggs-Ryan*, 904 F.2d at 116-17 (quoting *United States v. Amen*, 831 F.2d 373, 378 (2d Cir.1987)). In other words, the fact that the cookie banner notified plaintiffs of the existence of the policy is not enough. When using the website as alleged, the plaintiffs must have encountered some indication, in the cookie banner or elsewhere, that at least suggested the kind of third-party data sharing at issue here. Because they did not, the Court cannot conclude they consented to the recording of their communications by continuing to browse.

But BCBSA does not rest its argument on the fepblue.org privacy policy alone. It also points to the Tech Companies' respective privacy policies, which make similar disclosures.[3] These disclosures also cover the conduct at issue, but the same problem of consent arises. It is undisputed that each plaintiff created and maintained accounts on the Tech Companies' platforms. By doing so, BCBSA contends, they manifested assent to the data tracking and data sharing practices disclosed in the policies. The Court concedes that the act of affirmatively creating and maintaining an account is a far stronger indication of "consent in fact" than merely browsing a website. But much about the policies remains unclear. For example, BCBSA does not explain how the Tech Companies' policies are presented to users when they create an account. Nor is it clear when the plaintiffs created their own accounts, or what policies were in place at that time. *See, e.g.*, *In re TikTok*, 2024 WL 4367849, at *9. ("Any retroactive disclosure in a later-issued version [of a

---

[3] The plaintiffs argue that the Court cannot properly consider the Tech Companies' privacy policies, which BCBSA presents in the form of achieved webpages through the "Wayback Machine." However, the Court agrees with other district courts that have found such archived webpages to constitute "facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See Hepp v. Ultra Green Energy Servs., LLC*, No. 13 C 4692, 2016 WL 1073070, at *2 (N.D. Ill. Mar. 18, 2016). Accordingly, it takes judicial notice of the policies.

privacy policy] would be insufficient to establish effective prior consent."). Accordingly, at least at this stage, the Court declines to find that the plaintiffs' consented to the recording and transmission of their communications.

### C.  Individual Statutes

Having determined the issues of party status and consent, the Court considers how those elements affect BCBSA's liability under the California, Illinois, and federal statutes.

### 1.  California Invasion of Privacy Act

CIPA "prohibits the interception of wire communications and disclosure of the contents of such intercepted communications." *Tavernetti v. Superior Court*, 22 Cal. 3d 187, 583 P.2d 737, 739 (1978). As relevant here, the statute makes it unlawful to "by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, read[], or attempt[] to read, or [] learn the contents or meaning of any [] communication while the same is in transit," or "use, or attempt to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained." Cal. Penal Code § 631(a). Because CIPA only prohibits interceptions by third parties, a party to the communication at issue cannot be held liable for any direct violation of the statute. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020); *Warden v. Kahn*, 160 Cal. Rptr. 471, 475 (1979). CIPA provides, however, for derivative liability with respect to anyone "who aids, agrees with, employs, or conspires with any person or persons to unlawfully do [] any of the acts or things mentioned [] in this section."

The plaintiffs seek to hold BCBSA liable on an aiding and abetting theory, alleging that it "willfully facilitated and aided the [Tech Companies'] interception and collection of Plaintiffs' and the California Class's Sensitive Information by embedding the tracking code on the Website."

*See* Compl. ¶ 212, ECF No. 21. As already explained, BCBSA was a party to the recorded communications, but the Tech Companies were not. Moreover, the plaintiffs did not consent to the recording. Because BCBSA does not advance any other arguments that would defeat liability under CIPA, the Court concludes that the plaintiffs have stated a plausible claim for relief under the statute.

### 2. Illinois Eavesdropping Statute

The IES makes it unlawful for a person to "knowingly and intentionally . . . intercept, record, or transcribe, in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties to the private electronic communication." 720 ILCS 5/14-2(a)(3). A defendant may be liable for violating the statute directly or for violating the statute as another party's principal. *Id.* § 5/14-1(b). The plaintiffs' allege that BCBSA violated the statute in a principal capacity by facilitating the Tech Companies' collection of plaintiffs' data. Compl. ¶ 191.

*"Surreptitious Manner" Requirement*

Party status and consent function the same way in the IES as they do in CIPA. However, the IES contains an additional requirement: the recording must be done "in a surreptitious manner." Thus, even where a plaintiff does not consent to the recording of a communication by a non-party, the recording is not unlawful if it is not "surreptitious." *Cook Au Vin, LLC v. Mid-Century Ins. Co.*, 2023 IL App (1st) 220601, ¶ 14 ("The plain language of the eavesdropping statute [] requires consent only if the eavesdropping device is used in a *surreptitious* manner . . . Plaintiff's lack of consent is not a factor unless we find that [the defendant] made a surreptitious recording.") (emphasis in original). The IES defines "surreptitious" as "obtained or made by stealth or deception, or executed through secrecy or concealment." 720 ILCS 5/14-1(g). Courts generally

find a recording to be surreptitious where there is no indication that the recording is being done. *See Alholm v. Vrdolyak L. Grp., LLC*, No. 22 CV 1820, 2026 WL 1194954, at *15 (N.D. Ill. May 1, 2026) (collecting cases).

This Court is not aware of any Illinois authority interpreting the "surreptitious" requirement in the context of electronic communications. However, the Tech Companies' conduct does not appear to fall within the statute's definition. The first clause—"obtained by stealth or deception"— seems to require some degree of trickery. Although the plaintiffs adequately allege that they did not consent to being recorded, they do not present any facts to suggest they were **deceived** into being recorded. Nor did the Tech Companies obtain the plaintiffs' data through "secrecy or concealment." The plaintiffs describe the tracking code as "secretly operat[ing] in the background, invisible to visitors to the website." Compl. ¶ 51. But all code "operates in the background" and is thus "invisible" in some sense. That does not mean it was deployed in secret—particularly where, as here, BCBSA and the Tech Companies openly disclose their data sharing practices in their respective privacy policies. Because the text of the IES plainly does not cover the Tech Companies' conduct, BCBSA cannot be liable for violating § 5/14-2(a)(3) as their principal, or for using information obtained in violation of the statute, *see* § 5/14-2(a)(5). Moreover, because the plaintiffs have not sufficiently alleged any surreptitious conduct, they have also failed to state a claim under § 5/14-2(a)(4) (prohibiting possession of any device that is "primarily useful for the purpose of the surreptitious . . . transcription of private electronic communications").

### 3. The Electronic Communications Protection Act

The ECPA makes it unlawful to "(a) intentionally intercept[], endeavor[] to intercept, or procure[] any other person to intercept or endeavor to intercept, any wire, oral or electronic communication." 18 U.S.C. § 2511(1)(a). Like CIPA and the IES, *see supra* pp. 10-11, the ECPA

12

precludes liability for parties to the communication. But unlike those statutes, the ECPA's civil cause of action only extends to direct violators. *Id.* § 2520(a). Thus, the plaintiffs cannot hold BCBSA liable for aiding and abetting the Tech Companies or acting as their principal. *Kirch v. Embarq Mgmt. Co.*, 702 F.3d 1245, 1247 (10th Cir. 2012); *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 169 (5th Cir. 2000). A party still may be liable, however, if it intercepted the communication "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). The plaintiffs argue that the so-called "crime-tort exception" applies here.

*Crime-Tort Exception*

The plaintiffs allege that BCBSA intercepted and transmitted the communications with the purpose of violating the Health Insurance Portability and Accountability Act (HIPAA). Compl. ¶ 130-38. HIPAA makes it unlawful to disclose a person's individually identifiable health information (IIHI) to a third party without receiving proper written consent. 42 U.S.C.A. § 1320d(6). IIHI is defined as any information received by a healthcare provider that "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and— (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual." *Id.*

The Court concludes that the plaintiffs have not plausibly alleged the disclosure of IIHI in this case. Fepblue.org is a public website. The plaintiffs searched the site for general information that anyone could have viewed, regardless of their own diagnoses or particular health needs. Plaintiff Gouch, for example, "search[ed] for doctors and dentists" and "specific symptoms and conditions, such as back pain and knee pain." Compl. ¶ 20. Plaintiff Mummey

13

"researched . . . diabetes, hypertension, hyperlipidemia, and weight management." *Id.* ¶ 23. Those searches do not fall within HIPAA's ambit. IIHI must relate to the "physical or mental health or condition ***of an individual***." That might include "the name and location of [an individual's] personal physician, as well as her physician's specialty," *Kurowski v. Rush Sys. for Health*, No. 22 C 5380, 2023 WL 8544084 (*Kurowski III*), at *3 (N.D. Ill. Dec. 11, 2023), "data relating to [an individual's] heart issues and high blood pressure," *Doe v. Regents of Univ. of California*, 672 F. Supp. 3d 813, 816 (N.D. Cal. 2023), or an individual's status as a patient within a hospital system, *Hartley v. Univ. of Chicago Med. Ctr.*, No. 22 C 5891, 2025 WL 2802317, at *3 (N.D. Ill. Oct. 1, 2025). But it does not include the fact that an individual viewed a doctor's profile or typed a symptom or disease into a search bar. *See, e.g., id.* at *6 (no IIHI in "find a physician" webpage searches); *Nguyen v. Abbott Lab'ys, Inc.*, No. 24 C 8289, 2025 WL 2299753, at *5 (N.D. Ill. Aug. 8, 2025) (no IIHI in searches containing "specific phrases related to [a user's] medical condition" on a public website). The fact that the Tech Companies can match the searches to individual accounts on their platforms using cookies and other identifiers does not change the analysis. A search for information is just that: an inquiry. The fact that Plaintiff Mummey typed "diabetes" into a search bar does not mean that he has diabetes. Indeed, the complaint itself does not say whether Plaintiff Mummey or any of the named plaintiffs has been diagnosed with any of the conditions they searched on fepblue.org, or whether they scheduled appointments with the any of the physicians they looked up.

HIPAA only protects "information that unequivocally provides a window into an individual's personal medical history" like "personally identifiable patient records." *Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018). That does not include general searches for information, particularly where the plaintiffs do not explain the relevance of that information to

their own healthcare. Because the plaintiffs have not alleged the commission of any crime or tort, the Court need not reach the parties' arguments concerning the exception's other requirements. The crime-tort exception does not apply.

## II.     Illinois Computer Tampering Act

The Court next turns to the plaintiffs' claims under the ICTA. That statute makes it unlawful to "knowingly and without the authorization of a computer's owner or in excess of the authority granted to him or her . . . insert a program into a computer [that] contains information or commands that will or may . . . (A) damage or destroy that computer . . . (B) alter, delete, or remove a computer program or data from that computer . . . or (C) cause loss to the users of that computer or the users of a computer which accesses or which is accessed by such program." 720 ILCS 5/17-51(a)(4).

The plaintiffs argue that BCBSA violated subsections (B) and (C). But as a threshold matter, they have not shown that BCBSA inserted any program "into a computer." The pixels, as described in the complaint, are pieces of code embedded in fepblue.org's source code. *See, e.g.*, Compl. ¶ 50. ("Once the TikTok Pixel is embedded in a website's Source Code . . . TikTok is able to intercept a user's online communications with a website where the TikTok pixel is embedded."). The complaint does not explain how the pixel transitions from being "embedded in a website" to being "inserted into a computer" as "computer" is defined in the ICTA.[4]

Furthermore, BCBSA's incorporation of the pixels in febblue.org's source code did not result in the harms described in subsections (B) or (C). Taking subsection (B) first, the plaintiffs'

---

[4] *See* 720 ILCS 5/17-0.5 (defining "computer" as "a device that accepts, processes, stores, retrieves, or outputs data and includes, but is not limited to, auxiliary storage, including cloud-based networks of remote services hosted on the Internet, and telecommunications devices connected to computers").

argue that BCBSA "alter[ed] or remove[ed] data from [their] computers and browsers . . . by directing [their] computers and browsers to simultaneously redirect communications . . . to TikTok, Meta, Google, and LinkedIn." Compl. ¶ 200. The plaintiffs stretch the meaning of the phrase "alter, delete, or remove" too far. "To alter" means "[t]o make (a person or thing) otherwise or different in some respect; to modify."[5] And "to remove" means "[t]o move or take (something) away from a place."[6] Here, the plaintiffs do not allege that the tracking code modified or displaced any data such that they could no longer access it. Rather, they contend that the code caused duplicates of the data to be transmitted to the Tech Companies. That conduct simply does not fall within the meaning of the plain text of subsection (B).

Moving to subsection (C), the plaintiffs argue that the code caused a "loss" in the form of the "disclosure of their Sensitive Information to unauthorized third parties." Compl. ¶ 201. Little authority exists interpreting the ICTA, and none—as far as this Court is aware—sheds any light on the meaning of "loss" in subsection (C). Nevertheless, courts have noted the similarities between the ICTA and its federal analogue, the Computer Fraud and Abuse Act (CFAA), 18 U..S.C. § 1030. *See, e.g.*, *Fidlar Techs. v. LPS Real Est. Data Sols., Inc.*, 810 F.3d 1075, 1085 (7th Cir. 2016). The federal statute confines "loss" to costs incurred by "technological harms—such as the corruption of files," which do not include the "misuse of sensitive information." *Van Buren v. United States*, 593 U.S. 374, 392 (2021). There is reason to believe that the ICTA's definition of "loss" is similar. Subsections (A) and (B) of  the provision concern conduct that "damage[s]" a computer or "alter[s], delete[s], or remove[s]" its data. The doctrine of *noscitur a sociis*, as

---

[5] *Alter*, Oxford English Dictionary, https://www.oed.com/dictionary/alter_v?tab=meaning_and_use.

[6] *Remove*, Oxford English Dictionary, https://www.oed.com/dictionary/remove_v?tab=meaning_and_use.

recognized under Illinois law, instructs courts to interpret one element of a list in light of its other elements. *See, e.g.*, *Dynak v. Bd. of Educ. of Wood Dale Sch. Dist. 7*, 2020 IL 125062, ¶ 22. Applying that principle here, subsection (C) should be interpreted to concern similar technological harms, like the corruption or destruction of a computer or its contents—not the mere misappropriation of private information. As such, this Court declines to extend the definition of "loss" in the ICTA to the kind of harms alleged here.

Because the plaintiffs have not alleged conduct that falls within the purview of the ICTA, the Court does not consider whether BCBSA engaged in that conduct "without the authorization of a computer's owner or in excess of the authority granted to him or her."

## III.    Common Law Claims

In addition to their statutory claims, the plaintiffs allege negligence, breach of implied contract, and invasion of privacy by publication of fact. For each common law theory, they plead so-called benefit of the bargain damages, contending that they would have paid less for BCBSA's services or picked another insurance provider had they known that BCBSA was deploying the Tech Companies' tracking code on fepblue.org. *See* Compl. ¶¶ 224, 231, 236. In other words, they claim they paid more for BCBSA's services than the services were worth.

Although BCBSA does not raise the point, it is worth noting that the only "service" relevant to this case is the maintenance of a public website, which cost the plaintiffs nothing to use. But to the extent that the service might be incorporated into the plaintiffs' insurance premiums, BCBSA contends that their claims implicate the filed rate doctrine, which "prohibits courts . . . from questioning a rate that has been filed with a federal regulator." *Ne. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 707 F.3d 883, 887 (7th Cir. 2013). Here, that federal regulator would be the Office of Personnel Management (OPM), which has the authority to "contract for or

17

approve" insurance plans offered by private carriers to federal employees. 5 U.S.C. §§ 8903-8903a. All such plans must "contain a detailed statement of benefits offered and shall include such maximums, limitations, exclusions, and other definitions of benefits as [OPM] considers necessary or desirable." *Id.* § 8902(d). Plan rates must "reasonably and equitably reflect the cost of the benefits provided" and should be set in a manner "consistent with the lowest schedule of basic rates generally charged for new group health benefit plans issued to large employers." *Id.* § 8902(i).

BCBSA contends that, in this case, an award of damages would amount to an impermissible determination that the federally-approved rates for BCBSA's FEHB plans were too high. It points to two cases in which district courts found the filed rate doctrine to bar analogous claims: *In re Anthem, Inc. Data Breach Litig.*, No. 15 MD 02617-LHK, 2016 WL 3029783 (N.D. Cal. May 27, 2016) and *Fero v. Excellus Health Plan, Inc.*, 236 F. Supp. 3d 735 (W.D.N.Y. 2017). Plaintiffs in both cases (also participants in government-approved healthcare plans) alleged that their insurers failed to institute sufficient data privacy measures, resulting in large scale data breaches. The *Anthem* court found that the filed doctrine barred the claim for benefit of the bargain losses because such an award would "naturally represent[] a refund for the portion of Plaintiffs' premiums that should have, but did not, go towards data security." *See* 2016 WL 3029783 at *23. The *Fero* court reached a similar conclusion, explaining that the plaintiffs had put the court "in a position of determining the reasonableness of the rates approved by OPM in light of the data breach." 236 F. Supp. 3d at 780.

The plaintiffs argue that the gravamen of their complaint challenges "BCBSA's undisclosed interception and disclosure of private health information" and not "the reasonability of the rate per se." Resp. Mot. 29-30, ECF No. 39. But the *Anthem* court rejected that very argument. *See* 2016 WL 3029783, at *24. Moreover, as the Second Circuit has explained, "[w]hen

18

the filed rate doctrine applies, it is rigid and unforgiving . . . It does not depend on the culpability of the defendant's conduct or the possibility of inequitable results, nor is it affected by the nature of the cause of action the plaintiff seeks to bring." *Simon v. KeySpan Corp.*, 694 F.3d 196, 205 (2d Cir. 2012) (citations omitted). The doctrine even bars claims for damages based on criminal conduct if the award would implicitly undermine a government-approved rate. *See South Branch LLC v. Commonwealth Edison Co.*, 46 F.4th 646 (7th Cir. 2022) (applying doctrine to claim that unlawful bribes inflated government-approved ComEd rates); *AT & T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 535 (3d Cir. 2006) ("[T]here is no fraud exception to the filed rate doctrine."). As such, the Court is inclined to agree with BCBSA that the filed rate doctrine applies in this case. Although the crux of the plaintiffs' allegations concerns the lawfulness of BCBSA's conduct, a damages award would seem to necessarily implicate the reasonableness of the OPM-approved FEHB premiums.

Ultimately, however, the Court need not definitively resolve the issue. Even if the filed-rate doctrine did not apply, the plaintiffs have not stated a plausible claim for relief with respect to any common law theory. Start with negligence. The plaintiffs' argue that BCBSA breached its duty as a healthcare provider to safeguard the plaintiffs' IIHI. Compl. ¶¶ 218-19, 223. But as the Court has already explained, the plaintiffs have not plausibly demonstrated the disclosure of any such information. *See supra* Part I.C(3). The plaintiff's theory for breach of implied contract fares no better, as it too presumes the disclosure of IIHI. *See* Compl. ¶¶ 235, 238 ("An implicit part of the agreement was that Defendant would safeguard Plaintiffs' and Class Members' [IIHI] consistent with industry and regulatory standards and state and federal law . . . Defendant breached

these implied contracts by disclosing Plaintiffs' and Class Members' [IIHI] to various third parties.").[7]

The plaintiffs' final common law theory, invasion of privacy by publication of fact, also fails. To prevail on that theory, a plaintiff must demonstrate that: "(1) publicity was given to the disclosure of private facts; (2) the facts were private and not public facts; and (3) the matter made public would be highly offensive to a reasonable person." *Johnson v. K Mart Corp.*, 311 Ill. App. 3d 573, 579, 723 N.E.2d 1192, 1197 (2000). The first element requires a showing that the "communication [was] made to the public at large," or alternatively, that the communication was made to a smaller group with whom the plaintiff has a "special relationship," making the disclosure particularly upsetting. *Miller v. Motorola, Inc.*, 202 Ill. App. 3d 976, 980, 560 N.E.2d 900, 903 (1990). The Tech Companies cannot plausibly be considered "the public at large." *See Kurowski II*, 683 F. Supp. 3d at 849. Nor is the Court persuaded by the plaintiffs' argument that the national security concerns that arise from TikTok's Chinese ownership give rise to the kind of "special relationship" recognized in *Miller*.[8] Even if they did, the transmitted data does not confirm that the plaintiffs are federal employees (fepblue.org is a public website, so anyone can access it) or reveal any information about the plaintiffs' own health conditions. Accordingly, there has been no publication of fact sufficient to state a claim for invasion of privacy.

---

[7] The plaintiffs refer to IIHI as "Sensitive Information" throughout the complaint. *See* Compl. ¶ 5. Because the Court uses IIHI, it inserts that language here for the sake of consistency.

[8] In *Miller*, the Court seemed to be merely recognizing that a disclosure of sensitive facts to smaller communities of which the plaintiff is a part, like churches, neighborhoods, and workplaces, can be equally as upsetting as disclosure of those facts to a broader public consisting of hundreds of people that the plaintiff does not know. *See* 202 Ill. App. 3d at 981, 560 N.E.2d at 903.

\*    \*    \*

In sum, the plaintiffs have stated a plausible basis for relief under CIPA, but they have failed to allege any other plausible theory of recovery. The motion to dismiss is denied with respect to Plaintiff Gouch, who brings the CIPA claim on behalf of the putative California class. The motion to dismiss is granted without prejudice with respect to Plaintiffs Spanos, Amerson, and Mummey, who only assert claims under the other theories.

Date: August 7, 2026

John J. Tharp, Jr.
United States District Judge