**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Teresa Gouch, Denise Spanos, George Amerson, and Kyle Mummey, individually and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Blue Cross Blue Shield Association,<br><br>Defendant. | Case No. 1:23-cv-15709<br><br>The Honorable John J. Tharp, Jr.<br><br>**CLASS ACTION SECOND AMENDED COMPLAINT**<br><br>Jury Trial Demanded<br><br>**REDACTED PUBLICLY AVAILABLE VERSION** |

Plaintiffs ("Plaintiffs"), on behalf of themselves and all others similarly situated, file this Class Action Second Amended Complaint against Defendant Blue Cross Blue Shield Association ("Defendant" or "BCBS"), and in support state the following:

## INTRODUCTION

1. This case is about the serious privacy and national security threat posed by Defendant's unauthorized disclosure of federal employees' sensitive medical information to third parties, including TikTok, Meta, Google, and LinkedIn, among others (the "Tech Companies").

2. Through a contract with the federal government, BCBS provides health insurance to over 5.5 million federal employees, retirees, and their families across the U.S. and overseas.[1] This includes employees at all levels of the executive and judicial branches of the government. Given its role as the largest health insurance provider for the federal workforce, Defendant has access to vast amounts of sensitive medical information.

[1] https://www.fepblue.org/about-us

3. As part of its offerings to federal employees, Defendant operates a website, www.fepblue.org, (the "Website"), where it allows federal employees to shop for insurance plans, find doctors, and research specific symptoms and conditions, such as "Mental Health" and "Pregnancy."

4. The Website also includes a participant login page (the "Portal"), which can only be accessed with a username, password, and authentication code. In the Portal, users can submit medical claims, check the status of claims, dispute claims, check coverage for specific treatments, and review benefits, among other activities related to individual user's particularized health situation.

5. Unbeknownst to the federal employees visiting the Website and the Portal, BCBS allows the Tech Companies to secretly intercept and record the employees' communications and activities on the Website and Portal in real-time, including specific searches for sensitive health-related topics.

6. Plaintiffs bring this class action on behalf of a class of federal employees, retirees, and their family members (collectively "federal employees") impacted by Defendant's secret and unauthorized disclosure of their Individually Identifiable Health Information ("IIHI") to the Tech Companies.

7. Despite Plaintiffs filing the original Complaint in this case in November 2023, BCBS continues to deploy Tracking Tools (as defined below) on the Website and Portal to intercept federal employees' communications with BCBS and use the data for ad retargeting and data analytics.

8. Defendant's disclosure of IIHI allowed the Tech Companies to identify and know that specific federal employees were subscribers or patients of a "health plan," under HIPPA, were seeking confidential medical care, and were inquiring about treatment for specific conditions.

9. Plaintiffs and the Class never consented to, authorized, or otherwise agreed to allow Defendant to disclose their IIHI to anyone other than those reasonably believed to be part of BCBS, acting in some healthcare capacity.

10. As a direct and proximate result of Defendant's unauthorized disclosure of Plaintiffs' and the Class's IIHI, Plaintiffs and the Class Members have suffered injury and harm, including invasions of privacy associated with the loss of their sensitive medical data; statutory damages; and the imminent and ongoing substantial risk of their IIHI being exposed to third parties.

11. Plaintiffs and the Class bring this action to recover for the harm they suffered and assert the following claims: violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511; violations of the California Invasion of Privacy Act, Cal. Penal Code § 630, *et seq.*; Negligence; and Invasion of Privacy.

**JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because the Second Amended Complaint asserts claims pursuant to Defendant's violations of ECPA, 18 U.S.C. § 2511.

13. This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

14. This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

15. Venue is proper under 18 U.S.C. § 1391(b)(1) because Defendant's principal place of business is in this District.

## PARTIES

16. **Plaintiff Teresa Gouch** is a resident of California. At all relevant times, Plaintiff Gouch was a federal employee who received health insurance from Defendant under the Federal Employee Program. Plaintiff Gouch maintained accounts with TikTok, Facebook, Instagram, and Google, and remained logged in to her accounts when browsing the internet. From approximately 2020 to the present, Plaintiff Gouch visited Defendant's Website and Portal while in California using her personal computer and cell phone to search for doctors and dentists, including by typing words into the Website's "search" bar. Some of the doctors and dentists she searched for included [redacted] Plaintiff Gouch also searched for information about her personal health symptoms and conditions, such as [redacted]. On the Portal, Plaintiff Gouch checked the status of claims; printed temporary insurance cards; searched for in-network providers for particular procedures, treatments, and medications; and responded to prompts from BCBS to review plan changes and respond to messages. After visiting Defendant's Website and Portal, Plaintiff Gouch received ads on Facebook and Tiktok about medicines, supplements, medical research programs, doctors in her area, health insurance, and Blue Cross Blue Shield.

17. **Plaintiff Denise Spanos** is a resident of South Carolina. At all relevant times, Plaintiff Spanos was a retired federal employee who received health insurance from Defendant

under the Federal Employee Program. Plaintiff Spanos maintained accounts with TikTok, Facebook, Instagram, and Google, and remained logged in to her accounts when browsing the internet. Plaintiff Spanos also maintained a LinkedIn account but did not remain logged in. For many years and up to the present, Plaintiff Spanos visited Defendant's Website and Portal while in South Carolina using her personal computer or cell phone to search for prescription information, health plan information, and health assessments, including by typing words into the Website's "search" bar in order to find relevant subpages on the Website. Some of Plaintiff Spanos's searches related to [redacted] and [redacted] based on her own personal health conditions. Plaintiff Spanos also used the Website to search for doctors, including doctors specializing in [redacted] for her own personal health conditions. On the Portal, Plaintiff Spanos checked the status of claims, reviewed benefits information, searched for prescriptions and drug pricing, and completed a health assessment. After visiting Defendant's website, Plaintiff Spanos received Facebook ads about [redacted].

18. **Plaintiff** George Amerson is a resident of Texas. At all relevant times, Plaintiff Amerson was a federal employee who received health insurance from Defendant under the Federal Employee Program. Plaintiff Amerson maintained accounts with TikTok, Facebook, Instagram, LinkedIn, and Google, and remained logged in to his accounts when browsing the internet. For many years and up to the present, Plaintiff Amerson visited Defendant's Website and Portal while in Texas using his personal computers and cell phone to search for doctors, including by typing words into the Website's "search" bar. On the Portal, Plaintiff Amerson checked the status of claims, reviewed coverage options, searched for in-network physicians, and reviewed costs for particular medical procedures.

19. **Plaintiff Kyle Mummey** is a resident of Pennsylvania. At all relevant times, Plaintiff Mummey was a federal employee who received health insurance from Defendant under the Federal Employee Program. Plaintiff Mummey maintained accounts with TikTok, Facebook, Instagram, LinkedIn, and Google, and remained logged in to his accounts when browsing the internet. From approximately December 2021 to the present, Plaintiff Mummey visited Defendant's Website and Portal while in Pennsylvania using his personal computer to search for doctors, including [redacted] Plaintiff Mummey also used the website to shop for health insurance plans and to research symptoms and conditions based on his personal health situation, including [redacted]. On the Portal, Plaintiff Mummey checked the status of claims, reviewed benefits information, inquired about health rewards, and explored options for health coaching. After visiting Defendant's website, Plaintiff Mummey received ads related to his health information on TikTok, Facebook, Instagram, and while browsing the internet.

20. Plaintiffs reasonably expected that their online communications with Defendant were between them and Defendant, would remain private, and would not be shared with third parties without their consent.

21. **Defendant Blue Cross Blue Shield Association** is an Illinois corporation with its principal place of business in Chicago, Illinois. According to its website, the "Blue Cross Blue Shield Association is a national association of 34 independent, community-based and locally operated Blue Cross Blue Shield companies. The Association owns and manages the Blue Cross and Blue Shield trademarks and names in more than 170 countries around the world. The

Association also grants licenses to independent companies to use the trademarks and names in exclusive geographic areas."[2]

22. The Blue Cross Blue Shield Association also administers the Federal Employee Program, which provides health insurance to the federal workforce through BCBS's 34 community-based companies.[3] The Blue Cross Blue Shield Association negotiates annually with the U.S. Office of Personnel Management to determine the benefits and premiums for the Federal Employee Program.[4] BCBS's statutory agent is Scott Nehs, 225 N. Michigan Ave., Chicago, IL 60601.

## FACTUAL BACKGROUND

### A. The Tracking Tools Intercept and Record Internet Communications

23. The Tech Companies' advertising revenues flow from their ability to sell highly targeted and curated advertisements and provide companies like BCBS with sophisticated data analytics related to its website visitors. To target and curate advertising campaigns and produce details analytics reports, the Tech Companies rely on the massive trove of data they extract from users who interact with websites that deploy technologies like the Meta Pixel, the TikTok Pixel, the LinkedIn Insight Tag, and Google Analytics (collectively the "Tracking Tools"), which follow individuals around as they browse the internet and intercept their online communications.[5]

24. Defendant uses the Tracking Tools to make its marketing and advertising more effective, to conduct data analytics, and, thereby, to increase its profitability.

---

[2] https://www.bcbs.com/about-us/the-blue-cross-blue-shield-system
[3] https://www.fepblue.org/about-us
[4] *Id.*
[5] *See, e.g.*, https://www.consumerreports.org/electronics-computers/privacy/tiktok-tracks-you-across-the-web-even-if-you-dont-use-app-a4383537813/

### *i. Background on internet communications*

25. Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the internet. Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

26. Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

27. Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

a. HTTP Request: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies. POST Requests can send a large amount of data outside of the URL (for instance, uploading a PDF for filing a motion to a court).

b. Cookies: a small text file that can be used to store information on the client device that can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

c. HTTP Response: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

28. An individual's HTTP Request essentially asks the Defendant's Website to retrieve certain information (such as a specific webpage). The HTTP Response sends the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the individual's screen as they navigate a website.

29. Every website is composed of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

30. Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the user of the web browser. When the Tracking Tools are embedded in a website's Source Code, they cause the user's web browser to simultaneously transmit communications directed to the website to also go to the Tech Companies' servers. In this way, the Tech Companies are able to intercept a user's online communications with a website where the Tracking Tools are embedded.

***ii. The TikTok Pixel***

31. The TikTok Pixel is a piece of code that companies can embed in their websites to transmit information to TikTok about user activities on the website.[6] Once the TikTok Pixel is installed on a website, the Pixel secretly operates in the background, invisible to visitors to the website, while it intercepts and records the user's communications with the website.

[6] https://ads.tiktok.com/help/article/tiktok-pixel

32. By default, the TikTok Pixel collects the following information: the timing of when actions on the website take place (like when a page is viewed); the user's IP address; the device make, model, operating system, and browser information for the user; third-party cookies to match the user's website communications to an identified person on TikTok; pages viewed on the website; buttons clicked on the website; and content typed into "search" bars.[7] Beyond these standard collection efforts, a website owner can also customize the TikTok Pixel to collect additional information about a website visitor's activities and transmit that information to TikTok.[8]

33. Because the TikTok Pixel is invisible to the website visitor, the data collection occurs without the visitor's knowledge or consent.

34. By secretly recording and transmitting data to TikTok—without the user's knowledge or consent—the TikTok Pixel acts much like a traditional wiretap. When individuals visit a website via an HTTP Request to the website's server, the server sends an HTTP Response including the Markup that displays the webpage visible to the user along with the invisible Source Code that includes the TikTok Pixel. At that point, the website owner, in essence, hands individuals visiting its website a tapped device. Once the webpage is loaded into the individual's browser, the TikTok Pixel quietly waits for private user communications on the webpage to trigger the code-based wiretap. The TikTok Pixel then simultaneously intercepts those communications intended only for Defendant and transmits the communications to TikTok.

35. TikTok uses cookies and other unique identifiers intercepted by the TikTok Pixel to match a website visitor's communications and activities with a particular individual.

[7] *Id.*; *see also* https://ads.tiktok.com/help/article/standard-events-parameters?lang=en
[8] https://ads.tiktok.com/help/article/standard-events-parameters?lang=en

36. When an individual with a TikTok account visits a website that uses the TikTok Pixel, the Pixel intercepts the individual's communications and transmits them to TikTok along with unique first and third-party cookies. TikTok can then "match[] [the] visitors on [the] website with people on TikTok."[9]

37. Even when an individual does not have a TikTok account, when they visit a website that uses the TikTok Pixel, the Pixel intercepts the individual's communications and transmits the information to TikTok.[10] On information and belief, TikTok can then match the communications to a particular individual through a process called "fingerprinting."[11]

38. The process of "fingerprinting" has been described as follows:

> The exact configuration of lines and swirls that make up your fingerprints are thought to be unique to you. Similarly, your browser fingerprint is a set of information that's collected from your phone or laptop each time you use it that advertisers can eventually link back to you. It takes information about your browser, your network, your device and combines it together to create a set of characteristics that is mostly unique to you.[12]

39. "By combining all this information into a fingerprint, it's possible for advertisers to recognize you as you move from one website to the next. Multiple studies looking at fingerprinting have found that around 80 to 90 percent of browser fingerprints are unique."[13] In addition, "[o]nce established, someone's fingerprint can potentially be combined with other personal information—such as linking it with existing profiles or information murky data brokers hold about you."[14]

---

[9] https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?redirected=2
[10] https://www.consumerreports.org/electronics-computers/privacy/tiktok-tracks-you-across-the-web-even-if-you-dont-use-app-a4383537813/
[11] https://www.wired.com/story/browser-fingerprinting-tracking-explained/
[12] *Id.*
[13] *Id.*
[14] *Id.*

40. A job posting for TikTok's Ads Signals team highlights TikTok's objective of harvesting consumer data from the internet at large. The posting states that the "team's vision is to understand customers' behavior by collecting their online/*offline activity* from varied sources and connecting them across devices using robust Identity graph in a privacy compliant way."[15] An identity graph "is a database that houses all the known identifiers that correlate with individual customers. Across a consumer's journey, one or many personal identifiers may be associated with an individual — email addresses, a physical address, mobile phone numbers, device IDs, account usernames, customer IDs, loyalty numbers and an ever-changing array of cookies picked up in browsers. The ID graph collects these identifiers and connects them to the customer's profile and any related data points, including behavioral data like browsing activity or purchase history."[16]

41. TikTok uses the information it collects through the TikTok Pixel to provide advertisers—like BCBS—with custom or lookalike audiences for purposes of targeted advertising campaigns.[17] TikTok can also sell the personal data it collects to data brokers and other third parties. Indeed, a recent analysis found that TikTok shared its users' data more than any other social media app, and it was unclear where the data went.[18]

### B. Defendant Used the TikTok Pixel to Intercept and Disclose Federal Employees' IIHI to TikTok

42. Federal employees in the executive and judicial branches receive healthcare benefits through the Federal Employees Health Benefits ("FEHB") Program. The U.S. Office of Personnel Management ("OPM") administers the FEHB Program and contracts with private

---

[15] https://careers.tiktok.com/position/7132529118268442893/detail (emphasis added)
[16] https://signal.co/blog/6-things-about-id-graphs/
[17] https://ads.tiktok.com/help/article/ad-targeting?redirected=2
[18] https://www.cnbc.com/2022/02/08/tiktok-shares-your-data-more-than-any-other-social-media-app-study.html

insurance companies to provide insurance plans consistent with the program's requirements.[19]

43. BCBS dominates the market under the FEHB Program, dwarfing other private insurance companies that contract with OPM. According to a study by the U.S. Government Accountability Office, "Blue Cross Blue Shield was the largest FEHB[] insurer in 93% of counties in 2000 and 98% of counties in 2015."[20]

44. The landing page for Defendant's Website confirms that it is "the # 1 health insurance choice for federal employees, retirees and their families," as reflected in ***Figure 1***:




***Figure 1: Landing Page of Defendants' Website***

45. As the "#1 health insurance choice" for federal employees, BCBS was entrusted with protecting and safeguarding federal employees' Sensitive Information. Yet while government agencies have warned about aggressive data collection practices of sensitive information, Defendant has secretly deployed the TikTok Pixel on its Website to intercept the sensitive medical information of federal employees and transmit that information to TikTok.

---

[19] https://www.opm.gov/healthcare-insurance/healthcare/
[20] https://www.gao.gov/products/gao-18-52

46. Defendant's use of the TikTok Pixel on its Website—where federal employees can research specific symptoms and conditions, inquire about treatments, shop for insurance plans, and communicate other sensitive health-related information to their health insurer—is a flagrant breach of Defendant's duty to safeguard federal employees' IIHI and constitutes a blatant violation of state and federal privacy laws.

47. Visitors to Defendants' Website can research symptoms, conditions, and treatments by navigating to designated subpages, as well as by typing information into the "search" bar on the Website. As a visitor navigates Defendant's Website, the visitor's browser sends HTTP requests to Defendant's webserver asking the server to display health-related information to the visitor. What the visitor does not know is that, with each communication from the visitor's browser to the Defendant's webserver, the TikTok Pixel simultaneously intercepts and duplicates the communication, redirecting it to TikTok's own servers.

48. As an example of how the TikTok Pixel operates on Defendant's Website, consider a federal employee who navigates to the "Manage Specific Conditions" subpage and selects "Mental Health." By clicking on "Mental Health," the employee's browser sends an HTTP request to Defendant's webserver to display the information on the "Mental Health" subpage. Unbeknownst to the employee, that communication is also intercepted and re-directed to TikTok via the TikTok Pixel, as reflected in ***Figures 2*** and ***3***:




*Figure 2: Display of "Mental Health" subpage*




*Figure 3: Display of content intercepted by TikTok*

49. As reflected in ***Figure 3***, the TikTok Pixel intercepts and transmits to TikTok the URL information showing that the user was researching topics related to "Behavioral-Health," along with the specific date and time of the communication.

50. Similarly, instead of selecting "Mental Health," on the "Manage Specific Conditions" subpage, if the federal employee clicked on "Pregnancy," the employee's browser would send an HTTP request to Defendant's webserver to display the page shown in ***Figure 4***:




***Figure 4: Display of "Pregnancy" subpage***

51. Because Defendant deploys the TikTok Pixel on its Website, the federal employee's online communication is simultaneously intercepted and re-directed to TikTok, as shown in ***Figure 5***:




***Figure 5: Display of content intercepted by TikTok***

52. As another example, rather than navigating to the "Manage Specific Conditions" page, if a federal employee instead typed words into the Website's "search" bar regarding sensitive health-related topics, such as "addiction" or "depression," the employee's browser would send an HTTP request to Defendant's webserver to display the following information about those topics, and the employee's communications would be intercepted and redirected to TikTok, as shown in ***Figures 6*** and *7*:




*Figure 6: Display of "addiction" query intercepted by TikTok*




*Figure 7: Display of "depression" query intercepted by TikTok*

53. A federal employee who shops for different health plans on Defendant's Website is also subject to TikTok's illegal surveillance. If an employee selected the "FEP Blue Focus," plan, for example, the lowest-cost plan that is supposed to be "easy on your wallet," the employee's communications with Defendant would result in the following page being displayed, and TikTok would also receive the same information via the TikTok Pixel, as shown in ***Figure 8***:




***Figure 8: Display of "FEP Blue Focus" plan information intercepted by TikTok***

54. If the federal employee had a TikTok account, each online communication with Defendant (as reflected in the above examples) would be transmitted to TikTok along with unique identifiers that TikTok could use to match the communications with a TikTok account and identified user.

55. Based on that information, TikTok would know the exact day and time that an identified federal employee researched specific health-related topics, including particular symptoms and conditions such as "Mental Health," "Pregnancy," and "addiction."

56. Even if the employee did not have a TikTok account, the TikTok Pixel would transmit the employee's communications to TikTok with cookies and other unique identifiers that make up the employee's "fingerprints,"—including, for example, the employee's IP address and

identifiers associated with the employee's browser and device—which TikTok could combine with other data harvested from the internet at large in an effort to identify the employee through a robust identity graph.

57. Once TikTok had that information, it could use it for any purpose, and the federal employee would have no way of deleting or retrieving the sensitive data.

### C. Defendant's Disclosure of Federal Employees' IIHI to TikTok Raises Serious Privacy and National Security Concerns

58. The U.S. Government took swift and decisive steps to mitigate the privacy and security concerns related to TikTok's data-harvesting campaign while the company was owned by ByteDance, including a ban on the use of TikTok on official devices and systems for members of Congress, members of the executive branch, and federal contractors.[21]

59. These preventative actions arose out of widespread bipartisan concerns over TikTok's close ties to China and the serious risk that the massive amounts of personal data TikTok collected would end up in the hands of the Chinese government. Referring to the White House's February 2023 announcement banning TikTok on government devices, the Office of Management and Budget stated, "[this is a] critical step forward in addressing the risks presented by the app to sensitive government data."[22]

60. Those risks include the threat of blackmail or extortion of federal employees in sensitive positions. An August 2020 Executive Order from the White House declared that TikTok's "data collection threatens to allow the Chinese Communist Party access to Americans'

---

[21] This ban was recently lifted in light of TikTok's transfer of ownership to an American-owned joint venture in January 2026 necessitated by the Protecting Americans from Foreign Adversary Controlled Applications Act, which was enacted in April 2024.
[22] https://apnews.com/article/technology-politics-united-states-government-ap-top-news-business-95491774cf8f0fe3e2b9634658a22e56

personal and proprietary information — potentially allowing China to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage."[23]

61. National security and cybersecurity experts echoed the same concerns.[24] A computer scientist at Vanderbilt University described how this could play out: "If you're a government employee, and somebody can figure out you have access to some sensitive information or some sensitive budget things, and they can get blackmail information because they know what websites you look at or who you talk to . . . [y]ou can imagine people being more susceptible in those situations."[25] A professor at Cornell University similarly commented that, through TikTok's data-collection practices, "China could conduct surveillance on specific users, [or] collect compromising, blackmail-worthy information."[26]

62. Defendant's disclosure of federal employees' IIHI to TikTok exacerbated those concerns. While the U.S. government took steps to protect against the risks of TikTok's collection of federal employees' personal data, Defendant secretly left the back door wide open, allowing TikTok to gather IIHI related to employees' specific symptoms and conditions. In doing so, Defendant subjected federal employees to the loss of their IIHI and to the risk of blackmail and extortion by a foreign power.

---

[23] https://trumpwhitehouse.archives.gov/presidential-actions/executive-order-addressing-threat-posed-tiktok/
[24] https://apnews.com/article/technology-china-united-states-national-security-government-and-politics-ac5c29cafaa1fc6bee990ed7e1fe5afc
[25] https://newjerseymonitor.com/2022/12/21/tiktok-ban-for-federal-workers-close-to-becoming-law-following-flurry-of-state-bans/
[26] https://news.cornell.edu/media-relations/tip-sheets/tiktok-ban-reasonable-given-threat-chinese-surveillance

63. To compound the harm, federal employees' IIHI harvested via the TikTok Pixel could potentially be combined with massive amounts of personal data exfiltrated by China-based actors in connection with the 2015 hack on OPM systems (which breached millions of federal employees' background security checks), as well as other hacking operations originating from China. As one commentator highlighted:

> By combining personnel data with travel records, health records, and credit information, Chinese intelligence has amassed in just five years a database more detailed than any nation has ever possessed about one of its adversaries. The data and its layers work both to identify existing US intelligence officers through their personnel records and travel patterns as well as to identify potential weaknesses—through background checks, credit scores, and health records—of intelligence targets China may someday hope to recruit.[27]

### D. Defendant Uses Other Tracking Tools that Disclose Federal Employees' IIHI to Meta, Google, and LinkedIn

64. In addition to its use of the TikTok Pixel, Defendant's Website uses Tracking Tools from at least three other Tech Companies that result in the unauthorized disclosure of federal employees' IIHI. The Tracking Tools include: (1) the Meta Pixel, (2) Google Analytics, and (3) the LinkedIn Insight Tag.

65. These three Tracking Tools work in substantially the same manner as the TikTok Pixel. They all intercept and redirect the website user's communications with Defendant's Website—including specific URL information showing the pages visited, buttons clicked, and search queries conducted by visitors—to unauthorized third parties. On information and belief, Meta, Google, and LinkedIn then match the communications with account holders for purposes of targeted advertising or otherwise monetizing the user data. The disclosures to Meta, Google, and LinkedIn constitute violations of federal employees' privacy rights under state and federal law.

[27] https://www.wired.com/story/china-equifax-anthem-marriott-opm-hacks-data/

### *i. Meta Pixel*

66. Like the TikTok Pixel, the Meta Pixel is a piece of code that website developers can incorporate into their websites to track user activities. The Meta Pixel records a user's IP address, pages viewed (such as specific URL information), buttons clicked, search queries, and other user activities on a website. Like TikTok, Meta is able to link a user's online communications to a specific Facebook account holder through cookies and other unique identifiers.

67. Meta does this by placing cookies in the web browsers of users logged into their services. The "c_user" cookie, for example, contains a numerical value known as the Facebook ID, which uniquely identifies a Facebook user. When a Facebook user visits the Defendant's Website while logged-in to their Facebook account, the Meta Pixel transmits the user's private web communications with the Defendant along with the "c_user" cookie. Meta can then use this information to match the web communications with the user's Facebook ID.

68. Even if a user does not have a Facebook account or is not logged-in to Facebook when browsing the Defendant's Website, the Meta Pixel transmits the user's web communications with Defendant's Website to Meta along with a unique identifier associated with another cookie called the "_fbp" cookie. Meta can then use that unique identifier, along with other persistent cookies, to link the user's web communications with the user's Facebook ID. And if a user who does not have a Facebook account later creates an account, Meta may be able to associate the user's historical browsing history intercepted via the Pixel and "_fbp" cookie to the newly created account.

69. As an example of how the Meta Pixel operated on Defendant's website, consider a federal employee who navigated to the "Coronavirus Resource Center" page. To access that page, the employee's browser would send a GET request to Defendant's webserver to display the page shown in ***Figure 9***:




***Figure 9: Display of "Coronavirus Resource Page"***

70. Because Defendant deploys the Meta Pixel on its Website, the communication from the employee's browser to Defendant's webserver would be intercepted and transmitted to Meta along with unique identifiers, such as the c_user and _fbp cookies, which Meta could use to match the communication to a Facebook account, as shown in ***Figure 10***:

▼ Request Headers

| | |
|---|---|
| :authority: | www.facebook.com |
| :method: | GET |
| :path: | /tr/?id=479804515526087&ev=PageView&dl=https%3A%2F%2Fwww.fepblue.org%2Fcoronavirus-updates%2Fcoronavirus-updates&rl=https%3A%2F%2Fwww.fepblue.org%2F&if=false&ts=1696267287105&sw=1920&sh=1080&v=2.9.131&r=stable&ec=0&o=28&fbp=fb.1.1692721945349.1723650543&er=empty&it=1696267286949&coo=false&exp=a1&rqm=GET |
| :scheme: | https |
| Accept: | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| Accept-Encoding: | gzip, deflate, br |
| Accept-Language: | en-US,en;q=0.9 |
| Cache-Control: | no-cache |
| Cookie: | sb=UuDkZH5T8Pguey3DQbgBOZHW; datr=VeDkZB6ZIJIG73XyPOIDfLjS; c_user=[redacted] xs=28%3AV3U7Wbc3HTA-aA%3A2%3A1695142176%3A-1%3A-1; fr=0pZwqaOjCjx9fBASR.AWXo_9ws9rAJBIH9QdQHvOb-k78.BIAiPz.iG.AAA.0.0.BICdEi.AWUIp6lyEAI |
| Pragma: | no-cache |
| Referer: | https://www.fepblue.org/ |

***Figure 10: Display of information intercepted by Meta***

71. As shown in ***Figure 10***, the specific URL information revealing the substance of the employee's communication ("coronavirus updates") is intercepted and transmitted to Meta along with the cookies used to match the communication to a Facebook account.

***ii. Google Analytics***

72. Like the TikTok Pixel and the Meta Pixel, Google Analytics consists of code that website developers can install on their websites to track user activity. Whenever a user visits a website that is running Google Analytics, Google's code directs the user's browser to send a separate and concurrent communication to Google without the user's knowledge.

73. The information that is intercepted and transmitted to Google via the Google Analytics code includes: the URL of the specific webpage the user is trying to access; the user's IP address; the User-agent, which identifies the user's device platform and browser; the user's geolocation, if available; the Referrer, which is the URL of the page on which the user clicked a link to access a new page; event data, which describes how users interact with a website, for

example, whether they saw an ad or played a video; and the actual search queries on the site. In this way, Google Analytics tells Google exactly what a user's browser communicated to the website.

74. Like the TikTok Pixel and the Meta Pixel, the user's communications to the website are transmitted to Google together with cookies and other unique identifiers that Google can use to match the communications to individuals who use Google's services.

75. As an example of how Google Analytics operates on Defendant's website, consider a federal employee who searches for a doctor by specialty and selects "Gambling addiction." By making that selection, the employee's browser sends a GET request to Defendant's webserver to display a list of providers who specialize in "Gambling addiction." At the same time, Google's code causes the employee's browser to send the same communication to Google, as shown in ***Figure 11***:

| ▾ Request Headers | |
|---|---|
| :authority: | www.google-analytics.com |
| :method: | GET |
| :path: | /collect?<br>v=1&_v=j101&a=893867354&t=event&_s=8&dl=https%3A%2F%2Fprovider.fepblue.org%2Fapp%2Fpublic%2F&dr=https%3A%2F%2Fwww.fepblue.org%2F&dp=%2Fapp%2Fpublic%2Fone%2F&ul=en-us&de=UTF-8&dt=Find%20Care%20-%20Federal%20Employee%20Program&sd=24-bit&sr=1920x1080&vp=1920x963&je=0&ec=Search%20Experience&ea=Autocomplete%20Selected%20%2What&el=Gambling%20Addiction&_u=SACAAAABAAAAAAgnJAC~&cid=736890046.1692721945&tid=UA-47964423-1&_gid=245766697.1696266955&cd6=Not%20Set&cd11=Not%20Set&cd10=Captured%20in%20ELS&cd22=EN&cd25=Not%20Set&cd8=Captured%20in%20ELS&cd3=BCBSAFEP&cd17=Not%20Set&cd24=Member&cd5=Captured%20in%20ELS&cd18=Not%20Set&cd1=Not%20Set&cd15=HEALTHSPARQ&cd9=Captured%20in%20ELS&cd16=PRODUCTION-prd2&cd4=BCBSA_I&cd2=BCBSAFEP&cd28=Public&cd41=Not%20Set&cd43=Mozilla%2F5.0%20(Windows%20NT%2010.0%3B%20Win64%3B%20x64)%20AppleWebKit%2F537.36%20(KHTML%2C%20like%20Gecko)%20Chrome%2F117.0.0.0%20Safari%2F537.36&cd29=Not%20Set&cd31=Not%20Set&cd12=Not%20Set&cd33=2023-10-02T17%3A35%3A53.940%2B00%3A00&cd34=2023-10-02T10%3A35%3A53.940-07%3A00&cd35=b9545a13-f5d8-4a45-8652-ab39b6fa6aee&cd37=SPECIALTY&cd40=Daisy&cd26=Home&cd39=25&z=1138121929 |
| :scheme: | https |
| Accept: | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| Accept-Encoding: | gzip, deflate, br |
| Accept-Language: | en-US,en;q=0.9 |
| Cache-Control: | no-cache |
| Pragma: | no-cache |
| Referer: | https://provider.fepblue.org/ |

***Figure 11: Information intercepted by Google***

### *iii. LinkedIn Insight Tag*

76. LinkedIn is the largest social media platform geared specifically to professionals. LinkedIn boasts a membership of approximately 980 million users in more than 200 countries and territories worldwide. Like other social media companies, LinkedIn generates substantial revenue through its advertising program, bringing in more than $3 billion in revenue in 2021. For companies looking to advertise, LinkedIn pitches its ability to "[r]each the right audience," through "[p]recise and powerful audience targeting."[28] This allows companies and advertisers to "[t]arget [their] ideal customer based on traits like their job title, company name or industry, and by professional or personal interests."[29]

77. LinkedIn's ability to provide advertisers with precise target audiences comes from information users provide to LinkedIn as well as information LinkedIn learns about its users using online tracking technology.

78. One of LinkedIn's online tracking tools is the LinkedIn Insight Tag. According to LinkedIn, "[t]he LinkedIn Insight Tag is a piece of lightweight JavaScript code that [companies] can add to [their] website to enable in-depth campaign reporting and unlock valuable insights about [their] website visitors."[30] The LinkedIn Insight Tag "enables the collection of data regarding members' visits to [a] website, including the URL, referrer, IP address, device and browser characteristics (User Agent), and timestamp."[31]

79. The LinkedIn Insight Tag also transmits various cookies and unique identifiers to LinkedIn that allow LinkedIn to match the user's activity on the website to the user's LinkedIn

---

[28] https://business.linkedin.com/marketing-solutions/ad-targeting
[29] *Id.*
[30] https://www.linkedin.com/help/lms/answer/a427660
[31] What data does my website send through this tag and how is it used? https://www.linkedin.com/help/lms/answer/a427660

account. And if the user does not have a LinkedIn account, the data still includes unique identifiers, such as the user's IP address and device and browser characteristics.[32]

80. As an example of how the LinkedIn Insight Tag operated on Defendant's website, consider a federal employee who types "cancer coverage" into the Website's search bar. By typing that information into the search bar, the employee's browser transmits a GET request to the Defendant's webserver to display information about "cancer coverage," and the LinkedIn Insight Tag causes the browser to transmit the same information to LinkedIn along with various cookies that LinkedIn can use to match the communication to an identified user, as shown in ***Figure 12***:

| ▾ Request Headers | |
|---|---|
| :authority: | px4.ads.linkedin.com |
| :method: | GET |
| :path: | /collect?<br>v=2&fmt=js&pid=512394&time=1696281866094&url=https%3A%2F%2 www.fepblue.org%2Fsearch%3Fkeyword%3<br>Dcancer%2520coverage&e_ipv6=AQKZe0ehnnXdeQAAAYryRwLWM2S_RWVD0cdmJoeiRenTMgNKDGhp95gD4lf9jE6lF<br>XSYtpENIjRZAla_ToS3lYpuqqSNYQ |
| :scheme: | https |
| Accept: | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| Accept-Encoding: | gzip, deflate, br |
| Accept-Language: | en-US,en;q=0.9 |
| Cache-Control: | no-cache |
| Cookie: | bcookie="v=2&8bf67e77-63d8-4608-8087-73f5c0d77915"; li_sugr=3e084b6f-e026-4088-9a01-7b37c4fb269d;<br>_guid=016520f5-1a59-42e1-88b4-394e81ca07fc; visit=v=1&M; UserMatchHistory=AQLdJI7fwvFpUgAAAYrxY3w7-<br>X6e5ZG4XAuLTo8-HDpubxj1KOp6sc2zHzv_J_6d-<br>Ra43xn3b5wJr7s1WMbXQgMEieoo5oH5yXIMOuhPiaJ62EjqWjo1B_C2lwt0Zy68IH-<br>zMJwDwLLWkWDGb0Cv0pMeziRlgEg-<br>8GZQrvRFxA1ZQbNufFIXRG8h8d6QqxT0aaZzKX21EUnh1JewleEmutwsAgi9PlcOVz4iNT-<br>TM5NJL7tjhcXuSalR4Mqr0krrQ0S8DsssQXpgx-MDKtsJRc4lJSXVp3oowtyMev7E3Klx5C1UuS9sdQeRGRy8u8J-<br>OE26DmW9cWdy4oMgxVidsVp3wkPOG0c;<br>AnalyticsSyncHistory=AQKZ19j3YDBhEwAAAYrxY3w8i_CJujVw98ExR6ae3KsweSkqbk3p2BcfDllzXrq5To9mx98ID65J3W<br>wYJDTn6Q;<br>lidc="b=VGST09:s=V:r=V:a=V:p=V:g=2665:u=1:x=1:i=1696266943:t=1696353343:v=2:sig=AQEcz_HkWcopeaSbjjAeap<br>aUTSMEkmCu" |
| Pragma: | no-cache |
| Referer: | https://www.fepblue.org/ |

***Figure 12: Information intercepted by LinkedIn***

[32] *See id.*

81. By disclosing federal employees' IIHI to third-party Tech Companies—including TikTok, Meta, Google, and LinkedIn—without the employees' knowledge or consent, Defendant breached its duty to safeguard medical information against unauthorized dissemination and violated employees' privacy rights under state and federal law.

**E. BCBS Deploys Tracking Tools on the Portal**

82. BCBS not only implements the Tracking Tools on the public Website, but also behind the authenticated login screen in the Portal.

83. For example, to this day, Defendant continues to run Google Analytics tracking in the Portal, collecting IIHI about confirmed federal employees[33] who are subscribers and patients of BCBS—the individuals with login credentials to a Portal account.

84. On information and belief, BCBS deployed Google Analytics within the Portal throughout the relevant Class Period, both before and after the filing of the original Complaint in this case.

85. When a user is logged into the Portal, there is no doubt that the user has a subscriber or patient relationship with Defendant as a federal employee and is communicating information related to that user's personal healthcare needs.

86. Defendant's present deployment of Google Analytics within the Portal is illustrated by the below screenshots of Portal network activity.

87. Figure 13, below, shows a screen capture of the login page for the BCBS Portal. The windows on the right show the firing of Google Analytics on this page, including the capturing of the information that the user is on the Portal login page (see the red boxes added for clarity).

[33] Only federal employees obtain health insurance from Defendant.




*Figure 13: Portal Login Page Intercepted by Google Analytics*

88. After a user's username and password are entered, BCBS directs the user to an identity verification page, shown in Figure 14 below.

89. At the top of the webpage, it states that the webpage is part of the Federal Employee Program, it shows a redacted version of the user's personal email address associated with the account ("We sent an email to te*******h@yahoo.com"), and asks the user to verify their identity with a six-digit pin sent to their personal email.

90. The fact that the user is logging in to the Portal is captured by Google Analytics, which BCBS has installed and continues to run on the account verification page, as highlighted in the red box annotations in Figure 14 below.




*Figure 14: Account Verification Captured by Google Analytics*

91. Once a user enters the Portal, the Google Analytics code deployed by BCBS would necessarily transmit to Google information sufficient to know that a user is a federal employee, a member of the Federal Employee Program, and an active subscriber or patient of BCBS.

92. BCBS's tracking does not stop there. Google Analytics follows users across their visit to the Portal, aggregating information, transmitting it to the Tech Companies, generating financial benefits for Defendant, and violating Plaintiffs' and the Class Members' privacy.

93. For example, Figure 15 shows that Google Analytics continues to run on the Portal page that shows a user which medical claims have been approved up to two years prior.




***Figure 15: Medical Claims Approval Records Captured by Google Analytics***

94. BCBS also deploys Google Analytics on the claim form where users submit new requests for coverage, as shown in Figure 16.




*Figure 16: Claims Submission Form Captured by Google Analytics*

95. The same is true for specific coverage pages that users would access when seeking coverage information for their particularized healthcare needs, such as "allergy shots," as reflected in Figure 17.




*Figure 17: Google Analytics Capturing Allergy Shot Coverage Inquiry*

96. Google Analytics also captures when a user inquires about their pharmacy claims, as reflected in Figure 18.




*Figure 18: Google Analytics Capturing Allergy Shot Coverage Inquiry*

97. Similarly, Google Analytics captures when a user checks the order status of prescriptions, as reflected in Figure 19.




*Figure 19: Google Analytics Capturing Prescription Order Status*

98. As another example, Google Analytics captures if a user is disputing a medical claim, as reflected in Figure 20.




*Figure 20: Google Analytics Capturing Claim Dispute*

99. The above screenshots are just a sample of the Google Analytics tracking within the Portal. Various other activities and online communications that reveal IIHI are likewise transmitted to Google from within the Portal given BCBS's deployment of Google Analytics.

100. BCBS intentionally deploys Google Analytics within the Portal despite knowing that users' IIHI is being transmitted to Google. BCBS knows this because, in addition to the warnings from various governmental entities such as the Federal Trade Commission ("FTC") and the U.S. Department of Health and Human Services ("HHS"), Google also explicitly warns HIPAA-covered entities like BCBS that Google Analytics collects information that can be

considered protected health information under HIPAA.[34]

101. Google specifically states that customers like BCBS should not install Google Analytics on either "authenticated pages" (like the Portal) or even on "unauthenticated pages" (like the Website).[35]

102. In addition to the explicit statements from Google discouraging the installation of Google Analytics on the Portal and the Website, multiple courts in this District have found that deploying Google Analytics on health-related websites gives rise to a plausible claim under the ECPA.[36]

**F. Exposure of IIHI Creates a Substantial Risk of Harm**

103. The FTC has recognized that consumer data is a lucrative (and valuable) form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour underscored this point by reiterating that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[37]

104. The FTC has also issued, and regularly updates, guidelines for businesses to implement reasonable data security practices and incorporate security into all areas of the business. According to the FTC, reasonable data security protocols require, among other things: (1) using industry tested and accepted methods; (2) monitoring activity on networks to uncover unapproved

[34] See https://support.google.com/analytics/answer/13297105?hl=en.
[35] *Id.*
[36] *See, e.g.*, *A.D. v. Aspen Dental Mgmt., Inc.*, No. 24 C 1404, 2024 WL 4119153, at *1 (N.D. Ill. Sept. 9, 2024); *Kurowski v. Rush Sys. for Health*, No. 22 C 5380, 2024 WL 3455020, at *6 (N.D. Ill. July 18, 2024); *McClain v. Cap. Vision Servs., LLC*, No. 25 CV 7675, 2026 WL 710926, at *4 (N.D. Ill. Mar. 13, 2026); *Allen v. Midwest Express Care, Inc.*, No. 24-CV-05348, 2025 WL 2240253, at *3 (N.D. Ill. Aug. 6, 2025).
[37] https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf

activity; (3) verifying that privacy and security features function properly; and (4) testing for common vulnerabilities or unauthorized disclosures.[38]

105. The FTC cautions businesses that failure to protect personal information of consumers and the resulting privacy breaches can destroy consumers' finances, credit history, and reputations, and can take time, money and patience to resolve the effect.[39] Indeed, the FTC treats the failure to implement reasonable and adequate data security measures as an unfair act or practice prohibited by Section 5(a) of the FTC Act. These harms are in addition to the serious privacy and national security threats posed by the disclosure of federal employees' IIHI to TikTok specifically.

106. As an example of the FTC's strong position on patient health information, the FTC recently filed a lawsuit against a major telehealth provider, Hims, alleging that "Hims [] shared consumers' health information via third-party tracking technologies that automatically shared certain 'Events'—the actions of visitors on Hims' website—with those companies."[40] That is the same conduct Plaintiffs allege here.

**G. Plaintiffs' and the Class's IIHI is Valuable**

107. The personal and health information of Plaintiffs and the Class is valuable and has become a highly desirable commodity. Indeed, one of the world's most valuable resources is the exchange of personal data.[41]

108. Business News Daily reported that businesses collect personal data (i.e., gender, web browser cookies, IP addresses, and device IDs), engagement data (i.e., consumer interaction

[38] https://www.ftc.gov/business-guidance/resources/start-security-guide-business
[39] https://www.myoccu.org/sites/default/files/pdf/taking-charge-1.pdf
[40] https://www.ftc.gov/news-events/news/press-releases/2026/07/ftc-states-act-against-hims-hers-deceptive-unlawful-privacy-practices
[41]https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

with a business's website, applications, and emails), behavioral data (i.e., customers' purchase histories and product usage information), and attitudinal data (i.e., consumer satisfaction data) from consumers.[42] Companies then use this data to impact the customer experiences, modify their marketing strategies, publicly disclose or sell data, and even to obtain more sensitive data that may be even more lucrative.[43]

109. The power to capture and use customer data to manipulate products, solutions, and the buying experience is invaluable to a business's success. Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[44]

110. In 2013, the Organization for Economic Cooperation and Development ("OECD") even published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[45] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[46]

111. OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e., $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55."[47]

---

[42] https://www.businessnewsdaily.com/10625-businesses-collecting-data.html
[43] *Id.*
[44] https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data
[45] https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf
[46] *Id.* at 25.

[47] *Id.*

112. Unlike financial information, such as credit card and bank account numbers, personal health information cannot be easily changed. Dates of birth and social security numbers are given at birth and attach to a person for the duration of his or her life. Medical histories are inflexible. For these reasons, these types of information are the most lucrative and valuable.[48]

113. Consumers place a considerable value on their personal information and the privacy of that information. One 2002 study determined that U.S. consumers highly value a website's protection against improper access to their personal information, between $11.33 and $16.58 per website. The study further concluded that to U.S. consumers, the collective "protection against error, improper access, and secondary use of personal information is worth between $30.49 and $44.62.[49] This data is approximately twenty years old, and the dollar amounts would likely be exponentially higher today.

114. Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[50]

115. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[51]

---

[48] https://www.dme.us.com/2020/07/21/calculating-the-value-of-a-data-breach-what-are-the-most-valuable-files-to-a-hacker/

[49] https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf

[50] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Industry*, TIME (Jan. 9, 2017), https://time.com/4588104/medical-data-industry/ (last visited Jan. 26, 2024).

[51] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited Jan. 26, 2024).

116. Indeed, numerous marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information.

117. There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

118. Several companies have products through which they pay consumers for a license to track their data. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

119. Facebook also has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

120. Additionally, healthcare data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[52]

---

[52] Tori Taylor, *Hackers, Breaches, and the Value of Healthcare Data, SecureLink* (June 30, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers.

121. Defendant's privacy violations exposed a variety of IIHI, including medical conditions, symptoms, treatments sought, physicians, search queries, patient status, and activity within the Portal.

122. IIHI, like that exposed here, is likely even more valuable than Social Security numbers and just as capable of being misused.[53] Personal health information can be ten times more valuable than credit card information.[54] This is because one's personal health history, including prior illness, surgeries, diagnoses, mental health, prescriptions, and the like cannot be changed or replaced, unlike credit card information and even, under difficult circumstances, Social Security numbers.[55]

123. Indeed, prescription records, blood tests, doctor notes, hospital visits, and insurance records are all sold to commercial companies, which gather years of health information on hundreds of millions of people and then sell it to other industries, like pharmaceutical companies who use the information to sell more drugs.[56]

124. Some industry insiders and journalists are even calling hospitals the "brokers to technology companies" for their role in data sharing in the $3 trillion healthcare sector.[57] "Rapid

[53] *FBI Cyber Division Bulletin: Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI (April 8, 2014), https://publicintelligence.net/fbi-health-care-cyber-intrusions/#:~:text=(U)%20Cyber%20actors%20will%20likely,records%20in%20the%20black%20market. (last visited Jan. 26, 2024).

[54] Tim Greene, *Anthem hack: Personal data stolen sells for 10x Price of Stolen Credit Card Numbers*, https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Jan. 26, 2024)).

[55] *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Jan. 26, 2024).

[56] https://time.com/4588104/medical-data-industry/

[57] https://www.wsj.com/articles/hospitals-give-tech-giants-access-to-detailed-medical-records-11579516200

digitization of health records … have positioned hospitals as a primary arbiter of how much sensitive data is shared."[58]

125. Third-party Tech Companies, like TikTok, Meta, Google, and LinkedIn, generate a substantial portion of their revenue through highly targeted advertising—a valuable service that is enabled by entities like Defendant sharing information about their users' online activities. Entities, like Defendant, likewise benefit financially from the collection and sharing of user data by increasing sales or customer acquisitions while also reducing advertising costs.[59] Through Defendant's conduct described herein, Plaintiff and the Class lost the benefit and financial value of their private data, while Defendant unjustly benefited.

### H. Plaintiffs and the Class Had a Reasonable Expectation of Privacy in Their Interaction with Defendant's Website

126. Consumers are concerned about entities, like Defendant, collecting their data and assume the data they provide, particularly highly sensitive medical data, will be kept secure and private.

127. In a survey related to internet user expectations, most website visitors indicated they assume their detailed interactions with a website will only be used by the website and not be shared with a party they know nothing about.[60] As such, website visitors reasonably expect that their interactions with a website should not be released to third parties unless explicitly stated.[61]

128. The majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its'

---

[58] *Id.*
[59] https://www.facebook.com/business/tools/meta-pixel/case-studies
[60]https://www.prnewswire.com/news-releases/cujo-ai-recent-survey-reveals-us-internet-users-expectations-and-concerns-towards-privacy-and-online-tracking-301064970.html
[61] Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, THE INFORMATION SOCIETY, 38:4, 257, 258 (2022).

customers' data.[62] A March 2000 BusinessWeek/Harris Poll found that 89% of respondents were uncomfortable with web tracking schemes where data was combined with an individual's identity.[63] The same poll found that 63% of respondents were uncomfortable with web tracking even where the clickstream data was not linked to personally identifiable information.[64] A July 2000 USA Weekend Poll showed that 65% of respondents thought that tracking computer use was an invasion of privacy.[65]

129. Patients and website users act consistently with their expectation of privacy. For example, following a new rollout of iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[66]

130. Like the greater population, Defendant's patients and prospective patients would expect the highly sensitive *health* information they provided to Defendant through its Website and Portal to be kept secure and private.

131. Further, given the U.S. government's prior actions to prevent the disclosure of sensitive government information to TikTok and avoid the risks of blackmail or extortion, federal employees would reasonably expect that the largest health insurance contractor under the FEHB program would not disclose IIHI to TikTok.

---

[62] https://archive.epic.org/privacy/survey/
[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] https://www.wired.co.uk/article/apple-ios14-facebook

### I. Defendant's Conduct Violated HIPAA

132. Under HIPAA, individuals' health information must be:

> properly protected while allowing the flow of health information needed to provide and promote high quality health care and to protect the public's health and well-being. The Privacy Rule strikes a balance that permits important uses of information while protecting the privacy of people who seek care and healing.[67]

133. HIPAA is a "federal law that required the creation of national standards to protect sensitive patient health information from being disclosed without the patient's consent or knowledge."[68]

134. HHS issued the Privacy Rule "to implement the requirement" of HIPAA.[69] "The Privacy Rule standards address the use and disclosure of individuals' health information—called 'protected health information' by organizations subject to the Privacy Rule — called 'covered entities,' as well as standards for individuals' privacy rights to understand and control how their health information is used."[70]

135. BCBS is a "covered entity" subject to HIPAA and the Privacy Rule. A "covered entity" means a "health plan," a "health care clearinghouse," or a "health care provider who transmits any health information in electronic form in connection with a transaction covered by" relevant HIPAA regulations. 45 C.F.R. § 160.103 ("Covered entity"). "Health Plan," means "an individual or group plan that provides, or pays the cost of, medical care," including "[t]he Federal

[67] https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html
[68]https://www.cdc.gov/phlp/publications/topic/hipaa.html#:~:text=Health%20Insurance%20Portability%20and%20Accountability%20Act%20of%201996%20(HIPAA),-On%20This%20Page&text=The%20Health%20Insurance%20Portability%20and,the%20patient's%20consent%20or%20knowledge
[69] https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html
[70] *Id.*

Employees Health Benefits Program," which BCBS administers on behalf of federal employees. *See id.* ("Health plan").

136. "The Privacy Rule protects from unauthorized disclosure all 'individually identifiable health information' held or transmitted by a covered entity or its business associate, in any form or media, whether electronic, paper, or oral."[71] "Individually identifiable health information" is information, (1) that relates to: the individual's past, present or future physical or mental health or condition; the provision of health care to the individual; or the past, present, or future payment for the provision of health care to the individual; and (2) that identifies the individual or for which there is a reasonable basis to believe it can be used to identify the individual.[72]

137. The information transmitted to the Tech Companies through the Tracking Tools deployed by BCBS constitutes IIHI. Plaintiffs' visits to the BCBS website to inquire about and exchange online communications concerning their own personal health situations, including by accessing the Portal, necessarily relate to their individual past, present, or future physical or mental health or condition, and likewise necessarily relate to the provision of health care to those Plaintiffs. And because the Tech Companies can identify Plaintiffs and other users of the BCBS website and Portal through cookies and other unique identifiers—including Google being able to identify users who, like Plaintiffs, accessed and navigated the Portal—the information is "individually identifiable" under the Privacy Rule.

---

[71] https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html
[72] *Id.*

138. Further, Defendant made these unauthorized disclosures without obtaining HIPAA-compliant consent from Plaintiffs and the Class. Under 45 C.F.R. § 164.508(c)(1), for a HIPAA authorization of disclosure to be valid, it must:

a. Describe the specific PHI the patient is authorizing be shared;

b. Name the entities authorized to make the disclosure;

c. Name the persons or entities to whom disclosure may be made;

d. Describe the purpose of the requested use or disclosure;

e. Contain an expiration date; and

f. Contain a signature and date.

139. Defendant did not obtain HIPAA-compliant authorization from Plaintiffs and the Class by obtaining their signatures to disclose their IIHI to the Tech Companies.

## CLASS PERIOD

140. For purposes of this Class Action Second Amended Complaint, the Class Period corresponds to the period between November 2021 and the present and runs until such date as the Court enters an Order certifying any Count of this Class Action Second Amended Complaint for class action treatment.

## CLASS ALLEGATIONS

141. Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and all others similarly situated, as representatives of the following Classes:

<u>Nationwide class</u>

> All persons participating in the FEHB program whose IIHI was disclosed to a third-party through Defendant's Website or Portal without authorization or consent during the Class Period.

<u>California class</u>

> All residents of California participating in the FEHB program whose IIHI was disclosed to a third-party through Defendant's Website or Portal without authorization or consent during the Class Period.

142. Excluded from the Classes are Defendant; officers, directors, and employees of Defendant; any entity in which Defendant has a controlling interest in, is a parent or subsidiary of, or which is otherwise controlled by Defendant; and Defendant's affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assignees. Also excluded are the Judges and Court personnel in this case and any members of their immediate families.

143. Plaintiffs reserve the right to modify and/or amend the Class definitions as necessary.

144. All members of the proposed Classes are readily identifiable through Defendant's records.

145. All requirements for class certification under Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3) are satisfied.

146. **Numerosity.** The members of the Classes are so numerous that joinder of all members of the Classes is impracticable. Plaintiffs are informed and believe that the proposed Classes includes over one million people. The precise number of Class Members is unknown to Plaintiffs but may be ascertained from Defendant's records.

147. **Commonality and Predominance.** This action involves common questions of law and fact to the Plaintiffs and Class Members, which predominate over any questions only affecting individual Class Members. These common legal and factual questions include, without limitation:

a. Whether Plaintiffs' and Class Members' communications with Defendant's Website were unlawfully intercepted and disclosed to third parties;

b. Whether the interception and disclosure of Plaintiffs' and Class Members' communications were consensual;

c. Whether Defendant deployed the Tracking Tools for the purpose of disclosing IIHI to third parties;

d. Whether Plaintiffs and the Class suffered ascertainable and cognizable injuries as a result of Defendants' misconduct;

e. Whether Plaintiffs and the Class are entitled to recover damages; and

f. Whether Plaintiffs and the Class are entitled to other appropriate remedies including injunctive relief.

148. Defendant engaged in a common course of conduct giving rise to the claims asserted by Plaintiffs on behalf of themselves and the Classes. Individual questions, if any, are slight by comparison in both quality and quantity to the common questions that control this action.

149. **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Sensitive Information, like that of every other Class member, was improperly disclosed by Defendant. Defendant's misconduct impacted all Class Members in a similar manner.

150. **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interest of the members of the Classes and have retained counsel experienced in complex consumer class action litigation and intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes.

151. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. The adjudication of this

controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims. There will be no difficulty in managing this action as a class action, and the disposition of the claims of the Class Members in a single action will provide substantial benefits to all parties and to the Court. Absent a class action, individual patients like Plaintiffs would find the cost of litigating their claims prohibitively high and would have no effective remedy for monetary relief.

152. Class Certification under Fed. R. Civ. P. 23(b)(2) is also appropriate. Defendant has acted or refused to act on grounds that apply generally to the Classes, thereby making monetary, injunctive, equitable, declaratory, or a combination of such relief appropriate. As Defendant continues to engage in the practices described herein, the risk of future harm to Plaintiffs and the Classes remains, making injunctive relief appropriate. The prosecution of separate actions by all affected individuals with dealings similar to Plaintiffs', even if possible, would create a substantial risk of (a) inconsistent or varying adjudications with respect to individual employees, which would establish potentially incompatible standards of conduct for Defendant, and/or (b) adjudications with respect to individual employees which would, as a practical matter, be dispositive of the interests of the other employees not parties to the adjudications, or which would substantially impair or impede the ability to protect the interests of the Classes. Further, the claims of individual employees in the defined Classes are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses.

## CLAIMS

### COUNT I
### VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA") 18 U.S.C. § 2511(1), *et seq.*
### (On Behalf of Plaintiffs and the Nationwide Class)

153. Plaintiffs re-allege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

154. The primary purpose of ECPA is to protect the privacy of communications.

155. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of ECPA.

156. Electronic Communications. The transmission of IIHI between Plaintiffs and Class Members and Defendant's Website and Portal are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate . . . commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

157. Content. ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8). Plaintiffs' and Class Members' IIHI—including information about symptoms, conditions, treatments, patient status, and navigation within the Portal—constitute "content" under ECPA.

158. Interception. ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

159. Electronical, Mechanical, or Other Device. ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5).

160. The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiffs' and Class Members' browsers;

b. Plaintiffs' and Class Members' computing devices;

c. Defendant's web-servers; and,

d. The tracking technology code deployed by Defendant to effectuate the interception of Plaintiffs' and Class Members' communications.

161. By utilizing and embedding the Tracking Tools from the Tech Companies on its Website and Portal, Defendant intentionally intercepted the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

162. The intercepted content included, but was not limited to, communications from Plaintiffs and Class Members constituting IIHI, such as symptoms, conditions, treatments, patient status, and navigation within the Portal (e.g., reviewing claim forms, claim reviews, prescription order status, and coverage for specific treatments).

163. Unauthorized Purpose. The contents of Plaintiffs' and Class Members' electronic communications were intentionally intercepted for the purpose of committing tortious or criminal acts in violation of the Constitution or laws of the United States or of any State. Indeed, Defendant's primary purpose for deploying the Tracking Tools was to disclose users' electronic communications to the Tech Companies for ad retargeting and data analytics. Such disclosure violates 42 U.S.C. § 1320d-6(a)(3), which provides criminal penalties against a person who "knowingly . . . discloses individually identifiable health information to another person." As

outlined above, the information BCBS disclosed to the Tech Companies through the Tracking Tools constitutes IIHI because it relates to Plaintiffs' personal health or conditions—including navigating the Portal—and is individually identifiable given the various cookies and unique identifiers transmitted to the Tech Companies.

164. Defendant was not acting under color of law to intercept Plaintiffs' and the Class Members' electronic communications.

165. Plaintiffs and Class Members did not authorize Defendant to intercept the content of their communications for purposes of invading Plaintiffs' privacy via the Tracking Tools. Nor did Plaintiffs and Class Members consent to the disclosure of their sensitive medical information to unauthorized third parties.

166. A person who violates § 2511(1)(a) is liable for $10,000 in statutory damages to any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used.

167. Defendant is liable to Plaintiffs and Class Members for violations of the ECPA.

168. Based on the foregoing, Plaintiffs and Class Members seek statutory damages and all other relief as the Court may deem just and proper, including all available monetary relief, injunctive and declaratory relief, any applicable penalties, and reasonable attorneys' fees and costs.

**COUNT II**
**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA") Cal. Penal Code § 630, *et seq.***
**(On behalf of Plaintiff Gouch and the California Class)**

169. Plaintiff re-alleges and incorporates by reference every allegation contained in the paragraphs above as though fully stated herein.

170. The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code §§ 630 to 638.

171. CIPA begins with its statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Pen. Code § 630.

172. California Penal Code § 631(a) imposes liability on:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section . . . .

173. At all relevant times, Defendant has been a "person" within the scope of CIPA. Cal. Penal Code §631(a).

174. Defendant aided, employed, agreed with, and conspired with TikTok, Meta, Google, and other third-party Tech Companies to track and intercept Plaintiff's and the Class Members' internet communications while using Defendant's Website and Portal. Defendant's conduct allowed unauthorized third parties to read and learn about the contents or meaning of any message, report, or communication from Plaintiff and the California Class while the same was in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within California.

175. Defendant intentionally inserted an electronic device (the tracking technology code) that, without the knowledge and consent of Plaintiff and the California Class, recorded and transmitted their confidential communications with Defendant to third parties.

176. Defendant willfully facilitated and aided the interception and collection of Plaintiff's and the California Class's IIHI by embedding the tracking code on the Website.

177. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the tracking code falls under the broad catch-all category of "any other manner":

a. The computer codes and programs TikTok, Meta, Google, and LinkedIn used to track Plaintiff's and the California Class's communications while they were navigating the Website or Portal;

b. Plaintiff's and the California Class's browsers;

c. Defendant's Website, Portal, and webserver;

d. Plaintiff's and the California Class's computing and mobile devices;

e. The web and ad servers from which TikTok, Meta, Google, and LinkedIn tracked and intercepted Plaintiff's and the California Class's communications while they were using a web browser to access or navigate the Website or Portal;

f. The computer codes and programs used by TikTok, Meta, Google, and LinkedIn to effectuate its tracking and interception of Plaintiff's and the California Class's communications while they were using a browser to visit the Website or Portal; and

g. The plan Defendant, TikTok, Meta, Google, and LinkedIn carried out to effectuate their tracking and interception of Plaintiff's and the California Class's communications while they were using a web browser to visit the Website or Portal.

178. As a result of the above violations and pursuant to CIPA Section 637.2, Defendant is liable to Plaintiff and the California Class for the greater of: a) treble actual damages related to their loss of privacy in an amount to be determined at trial; or b) for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

179. Under the statute, Defendant is also liable for reasonable attorneys' fees, litigation costs, and injunctive and declaratory relief.

## COUNT III
## NEGLIGENCE
## (On Behalf of Plaintiffs and the Nationwide Class)

180. Plaintiffs re-allege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

181. At all relevant times, Defendant owed Plaintiffs and Class Members a duty to act with reasonable care to secure and safeguard their IIHI from unauthorized disclosure to third parties. Defendant took on this obligation by soliciting and obtaining IIHI from Plaintiffs and the Class on its Website or Portal and maintaining the information on its system and networks.

182. Among these duties, Defendant was expected:

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the IIHI in its possession;

b. To protect Plaintiffs' and Class Members' IIHI using reasonable and adequate security procedures and systems compliant with industry-standard practices;

c. To implement processes to quickly detect unauthorized disclosures and to timely act on warnings about such disclosures; and

d. To promptly notify Plaintiffs and Class Members of any unauthorized disclosure that affected or may have affected their IIHI.

183. It was reasonably foreseeable and highly likely that disclosure of federal employees' IIHI to third-party technology companies would cause a loss of privacy and loss of control over employees' personal medical data. It was especially foreseeable and likely that disclosing federal employees' sensitive medical information to TikTok would violate employees' privacy interests and raise national security concerns given the U.S. government's efforts to ban the use of TikTok on official government devices and systems.

184. Defendant's services did not depend on Defendant deploying the tracking code from TikTok, Meta, Google, and LinkedIn on its Website or Portal. The magnitude of the burden on Defendant to prevent the disclosure of federal employees' IIHI to third-party technology companies is and was minimal, as reflected in federal guidance and HIPAA provisions prohibiting such disclosure.

185. The consequences of placing the burden on Defendant to prevent disclosure of federal employees' IIHI to third-party technology companies are and were likewise minimal. At all relevant times, Defendant had ultimate control over the source code it deployed on its Website and Portal, and Defendant was able to provide healthcare services to federal employees without the use of the tracking code from TikTok, Meta, Google, and LinkedIn.

186. Defendant breached its duty of care to Plaintiffs and the Class in the following ways, among others:

a. By failing to implement adequate data-security protocols to prevent the unauthorized disclosure of IIHI collected via the Website and Portal;

b. By failing to adhere to industry standards regarding the safeguarding of IIHI and the use of online tracking technologies;

c. By installing and deploying the tracking source code and failing to monitor and prevent the collection and dissemination of IIHI intercepted through the tracking source code;

d. By failing to adequately train IT staff, network security personnel, and/or marketing and advertising personnel to safeguard and protect from disclosure employees' IIHI; and

e. By failing to implement processes to detect and respond to unauthorized disclosures involving IIHI and promptly notify affected employees.

187. As a direct and proximate result of Defendant's breach and unauthorized disclosure of Plaintiffs' and the Class's IIHI, Plaintiffs and Class Members suffered and continue to suffer harm and injury, including loss of privacy associated with disclosure of their sensitive medical data.

188. Plaintiffs and the Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages in an amount to be proven at trial.

## COUNT IV
## INVASION OF PRIVACY – PUBLICATION OF PRIVATE FACTS
## (On Behalf of Plaintiffs and the Nationwide Class)

189. Plaintiffs re-allege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

190. A claim for invasion of privacy by publication of private facts requires that (1) publicity was given to the disclosure of private facts; (2) the facts were private and not public facts; and (3) the matter made public would be highly offensive to a reasonable person.

191. Defendant's conduct in deploying the tracking code from TikTok, Meta, Google, and LinkedIn on its Website and Portal resulted in the publication of private facts to the largest digital advertising companies in the world. On information and belief, TikTok, Meta, Google, and LinkedIn aggregated Plaintiffs' and the Class's personal and highly sensitive medical data for purposes of selling targeted advertising and/or otherwise monetizing the data in the broader data marketplace, consistent with their business models, resulting in the widespread publication of Plaintiffs' and the Class's data.

192. Plaintiffs' and the Class's communications of IIHI regarding symptoms, conditions, and treatments were private and intended only for Defendant.

193. Defendant's publication of Plaintiffs' and the Class's IIHI obtained via the Website and Portal is highly offensive to a reasonable person because the tracking was entirely surreptitious, and the disclosures relate to federal employees' most sensitive personal information, including information about specific symptoms, conditions, and treatments. The disclosure is also highly offensive because it violates HIPAA and related regulations. The publication to TikTok is particularly highly offensive given the U.S. Government's efforts to prevent disclosure of sensitive information to TikTok.

194. As a direct and proximate result of Defendant's unauthorized disclosure of Plaintiffs' and the Class's IIHI, Plaintiffs and Class Members suffered and continue to suffer harm and injury, including loss of privacy associated with disclosure of their sensitive medical data.

195. Plaintiffs and the Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment in their favor as follows:

a. Certification of the Classes pursuant to the provisions of Fed. R. Civ. P. 23 and an order that notice be provided to all Class Members;

b. Designation of Plaintiffs as representatives of the Classes and the undersigned counsel as Class Counsel;

c. An award of damages in an amount to be determined at trial or by this Court;

d. An order for injunctive relief, enjoining Defendant from engaging in the wrongful and unlawful acts described herein;

e. An order for declaratory relief as may be appropriate;

f. An award of statutory interest and penalties;

g. An award of costs and attorneys' fees; and

h. Such other relief the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury of all issues so triable.

Respectfully submitted,

Dated: September 4, 2026

*/s/ Ryan J. Ellersick*

Ryan J. Ellersick (Admitted *Pro Hac Vice*)
**ZIMMERMAN REED LLP**
14648 N. Scottsdale Road, Suite 130
Scottsdale, AZ 85254

Telephone: (480) 348-6400
Facsimile: (480) 348-6415
ryan.ellersick@zimmreed.com

David M. Cialkowski, IL Bar No. 6255747
Brian C. Gudmundson
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
david.cialkowski@zimmreed.com
brian.gudmundson@zimmreed.com

*Attorneys for Plaintiffs*